**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **KEYSPAN LNG, L.P.**<br><br>**v.**<br><br>**THE RHODE ISLAND COASTAL RESOURCES MANAGEMENT COUNCIL;[1] MICHAEL M. TIKOIAN, in his Capacity as Chairman of the Rhode Island Coastal Resources Management Council; JAN P. MALIK; PAUL E. LEMONT; LAURENCE W. EHRHARDT; THOMAS RICCI; DAVID ABEDON; JERRY SAHAGIAN; DANIEL DAPONTE; EILEEN S. NAUGHTON; V. SUSAN SOSNOWSKI; JOSEPH R. PAOLINO; K. JOSEPH SHEKARCHI; GERALD P. ZARRELLA; NEIL GRAY; RAYMOND C. COIA; and FREDERICK VINCENT in their Capacities as Members of the Rhode Island Coastal Resources Management Council** | ) | **C.A. NO. 05-091L** |

**STATE OF RHODE ISLAND'S MOTION FOR PRELIMINARY INJUNCTION (STAYING THE 6-MONTH REVIEW PERIOD UNDER THE COASTAL ZONE MANAGEMENT ACT)**

For the reasons stated in the accompanying Memorandum, as supported by the certified copies of official records and filings by KeySpan in the accompanying Appendix, the State respectfully moves this honorable Court for an order in the nature of a Preliminary Injunction, staying and tolling the running of any 6-month review period KeySpan may have invoked.

---

[1] The Rhode Island Coastal Resources Management Council has no legal existence separate and apart from the State of Rhode Island and has no capacity to sue or be sued. Rhode Island Coastal Resources Management Council ("CRMC") is a state agency created by an Act of the Rhode Island General Assembly whose powers and duties are set forth at R.I. Gen. Laws §§ 46-23-1 *et seq*. The naming of the Coastal Resources Management Council must be treated as the naming of the State.

9

Respectfully submitted,
THE STATE OF RHODE ISLAND
for Defendants,
by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (# 3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was mailed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Providence, RI 02903, on this 17th March, 2005.

\\Attg5\Civil\M. Rubin\CASES\Keyspan\Pleadings KeySpan v. CRMC\State of RI's Motion for Preliminary Injunction.doc

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **KEYSPAN LNG, L.P.** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO. 05-091L** |
| | ) | |
| **RHODE ISLAND COASTAL** | ) | |
| **RESOURCES MANAGEMENT COUNCIL;**[1] ***et al*** | ) | |

**MEMORANDUM IN SUPPORT OF STATE OF RHODE ISLAND'S MOTION FOR PRELIMINARY INJUNCTION (STAYING ASSERTED 6-MONTH REVIEW PERIOD)**

## INTRODUCTION

Although this case involves a complex welter of regulatory programs and agencies at both the State and Federal levels, at bottom the question is simple: **Under the Coeur d'Alene doctrine, may a private party force the State into a Federally-prescribed forum**[2] **in which the State is restrained from asserting its relevant ownership of sovereignty lands?**

An ancillary, but more urgent, question also arises: **Should such private party's prosecution of such proceeding be stayed while the Court is deliberating the matter?** The Court is requested to immediately answer this last question in the affirmative lest an arbitrary deadline looming as early as May of this year (and the preparations therefor) be allowed to disrupt the *status quo* and cause permanent detriment to the State.

To simplify, the State has two sets of substantive rights at stake: *First*, its original rights as sovereign to own submerged land, which rights are preserved by the implied and express terms of the United States Constitution; *second*, certain rights statutorily conferred on it by

---

[1] The naming of the Coastal Resources Management Council ("CRMC") must be treated as the naming of the State. *See also* fn. 10, *infra*.

[2] As discussed *infra*, the Federally-prescribed forum referred to is not this Court but, instead, an administrative tribunal established under a federal statute.

Congress under the Federal Coastal Zone Management Act ("CZMA").[3] Contrary to the rule of sovereign immunity, KeySpan LNG, L.P. ("KeySpan") is exclusively invoking a Federally-prescribed administrative process in a manner designed to force the State to choose between the two sets of rights. Under KeySpan's approach, the State is confronted with, at best, a Hobbesian choice between two dire alternatives: *Either* enter the Federally-supervised administrative tribunal at the expense of the Public Trust Doctrine; *or* attempt to preserve the Public Trust Doctrine and thereby suffer default on its CZMA rights.[4]

On the surface, this case is merely about two sets of *State* processes. But that appearance masks the underlying truth that one of those supposed *State* processes is really a *Federal* process which relegates the State to a non-plenary, non-sovereign, role and, more importantly, does not allow for State assertions of title to land. Since only one of the two procedures allows for the presentation of State sovereignty over public trust lands, any route which does not include that particular procedure is tantamount to both an indignity to the State and a substantive abrogation

---

[3] 16 U.S.C. § 1451 *et seq.*

[4] The State's CZMA rights, although dependent and incomplete, are substantial and are not to be sacrificed lightly.

The CZMA Federal Consistency requirement, which benefits coastal states, is located in section 307 of the Act, 16 U.S.C § 1456. The regulations thereunder are at 15 C.F.R. Part 930. These require that applicants for certain federal licenses or permits for activities in the coastal zones of coastal states undertake a Consistency Certification Review before the relevant state coastal resources management agency. This applies if the state agency is federally-designated and its program is federally-approved. The CRMC is so designated and the CRMC's statute and regulations, called the Coastal Resources Management Program ("CRMP"), is so approved. Indeed, KeySpan itself pleads such designation and approval in paragraph 12 of the Complaint.

Thus, the CRMC is entitled to evaluate the KeySpan project under the standards of the CRMP; the CZMA Consistency Certification Review is based upon consideration of the project's compliance with applicable provisions of the CRMP. Thus, state and local *regulatory* interests are to be protected. However, under a Consistency Certification Review, there is no provision for satisfying state *property*-law requirements to obtain a license to use submerged land.

of those rights. Only by invoking *both* processes, in tandem, can KeySpan avoid an Eleventh Amendment violation in the course of its attempt to build the project.

To elaborate, KeySpan's procedural maneuvering reflects an underlying position on the substance and content of pre-emption under the Natural Gas Act (NGA) *vis-à-vis* state sovereignty lands: KeySpan implicitly argues that the NGA supercedes State ownership of submerged lands under the Public Trust Doctrine. While KeySpan is free to make this argument (assuming in can be made in good faith[5]), KeySpan is not free to force the State to litigate this question in a forum other than one of the State's own choosing. This is the essence of the holding in Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997).

The State *does* have a process by which KeySpan can obtain a site-license or, alternatively, assert that it needs none.[6] In violation of sovereign immunity, however, KeySpan attempts to by-pass that process[7] and haul the State into a Federal tribunal upon pain of a default against the State with respect to other valuable State rights.

**FACTS AND PROCEEDINGS**

KeySpan has purportedly invoked a Federally-created six-month procedure to which the State is a party. That process is ultimately administered by the United States Secretary of

[5] Although not crucial for a determination of the threshold Eleventh Amendment issue, the Court should know that KeySpan is clearly wrong on the merits. This is discussed *infra*.

[6] This is a process under the State Coastal Resources Management Program, called the Category B Assent application. *See, generally,* the so-called Redbook containing the overall statute, regulations and handbook for applicants. This can be found at: http://www.crmc.state.ri.us/pubs/programs/redbook.pdf.

[7] The processes are supposed to be simultaneous. The CZMA Consistency Certification Review process is discussed at 15 C.F.R. Part 930. By its terms, that process is to conform to State procedures. Thus, the Federal Consistency Review is, according to CRMC practice, to be accomplished in conjunction with the applicant "obtaining the required [state-law] CRMC Assent." *See* CRMC Federal Consistency Manual at 11. The Manual can be found at www.crmc.state.ri.us/pubs/programs/fedconsist.pdf.

Commerce and is entitled "Federal Consistency Certification." If valid (and the State contends it is not), that procedure will bind the State.[8] The application concerns, *inter alia*, KeySpan's proposed marine construction off of Field's Point in Providence, Rhode Island.[9]

Thus, KeySpan has taken the position that the State is relegated solely to a role in a Federally-prescribed "Consistency Certification" review procedure. KeySpan eschews a proceeding before the Council[10] under the Council's normal State-prescribed procedures for yielding state-owned sovereignty lands (notwithstanding KeySpan's own earlier use of a "Category B" form, *i.e.*, a form invoking that State-prescribed procedure. *See* Exhibit 1,2 and 3 to State's Amended Pleading.)

A fuller history of the preliminary skirmishing between KeySpan and the State is set forth in the counter-claim. *See* ¶¶ 56 - 88 of the State's Amended Pleading.

KeySpan's plans explicitly call for certain structures, the base of which will be embedded in the land underlying an arm of Narragansett Bay.[11] This implicates questions of: (1)

---

[8] Although that application is presently submitted to a State agency, the Rhode Island Coastal Resources Management Council ("CRMC" or "Council"), the CRMC's role is not definitive and plenary under the procedure invoked. Instead, that role is preliminary and subordinate to Federal action — rendering the State ultimately dependent.

[9] KeySpan cannot seriously dispute that its project involves public trust lands. For instance, Complaint, ¶ 1, states that the proposal includes installing a new ship berth in the Providence River. *See also* fn. 11 *infra*.

[10] The Rhode Island Coastal Resources Management Council ("CRMC" or "Council") is a state agency created by an Act of the Rhode Island General Assembly whose powers and duties are set forth at R.I. Gen. Laws §§ 46-23-1 *et seq.*, and the regulations adopted thereunder.

[11] KeySpan states that it plans to construct:

> [A] new ship berth in the Providence River to the east of the existing facility . . ..

Application of KeySpan LNG, L.P. for Authorization of a Liquefied Natural Gas Import Terminal, April 2004, at Vol. I, p. 8, In the matter of KeySpan LNG, L.P., Federal Energy

ownership of the land in question, (2) whether the Federal government has purported to over-ride

---

Regulatory Commission, ("F.E.R.C."), Docket No. CP04-223. KeySpan goes on to describe its proposed "Marine Facilities:"

> The pier and berthing facilities for the proposed Project will consist of a single ship berth with mooring and breasting dolphins [a dolphin is "a group of piles . . .;" *see* http://dictionary.reference.com/search?q=dolphin] and a trestle. It is designed to accommodate LNG ships with cargo capabilities of 71,500 to 145,000 cubic meters. The berth will include four breasting dolphins and six mooring dolphins and will be equipped with fender systems, quick release hooks and capstans. The berth will include walkways between the dolphins and the land for personnel access and a gangway . . . for the transfer of crew.

*Id.* at 9. *See also id.* at Vol. II-A, Exhibit F, p. 1-9 (same text). A copy of excerpts from that document is attached as Exhibit 5 to the State's Amended Pleadings. KeySpan then provides further description:

> KLNG proposes to replace its existing LNG barge unloading facilities by installing a new LNG ship berth in the Providence River, . . ..

*Id.* at p. 1-3. For further example, KeySpan states:

> The modification work (Work) includes adding LNG ship unloading facilities, Marine Work consisting of ship mooring and a jetty, . . ..

*Id.* at Vol. II-C, Exhibit F, p. 3. Furthermore, KeySpan states:

> The sequence of the Marine Work begins with the installation of the piles to support the ship mooring, the jetty head and the jetty trestle. After the pile work is complete, the primary focus moves to structures between and above the piles.
>
> . . . [M]ost of the work is over water, executed from barges on the water.

*Id.* at p. 14. In addition, KeySpan says:

> Pile driving cranes and hammers are mobilized to the site on a work barge . . .. A four-point mooring system will stabilize the barge location while piles are driven to the design depth.

*Id.* at p. 15. KeySpan's F.E.R.C. filings are listed and, with the correct software, may be accessed at: http://elibrary.Ferc.gov/idmws/docket_search.asp. Further documentation of KeySpan's admissions can be found at fn. 9, *supra*.

existing ownership, (3) whether, in any event, the State should be forced (at the peril of that ownership) into a federally-sponsored administrative forum.

**ARGUMENT**

At the outset, a quick review of the state Public Trust Doctrine is in order. This will be followed by a discussion of whether federal law attempts to alter the State Public Trust Doctrine. (For this discussion, it is assumed that KeySpan has the advantages the law confers upon a riparian proprietor. If KeySpan does not, its attempt to resist state-law processes is on even weaker footing.) Next, this Memorandum turns to whether KeySpan's manner of invocation of a Federal "Consistency Certification" process violates the State's sovereign immunity. Finally, the acute need for a Preliminary Injunction at this stage will be shown.

## I. THE PUBLIC TRUST DOCTRINE SIGNIFIES STATE OWNERSHIP OF THE SITE

### A. Title To Land Below The Mean-High-Tide-Line Is In The State.

It is axiomatic that "in this state, at common law, fee of the soil in tide waters below high-water mark is in the state." Bailey v. Burges, 11 R.I. 330, 331 (1876).[12]

### B. Title To Land Below The Mean-High-Tide-Line Does Not Pass Until Actual Filling.

Thus, it is black-letter law that, prior to the time that a littoral (*i.e.*, riparian or shore-front) owner actually takes advantage of his physical adjacency to the water by filling or building, he has no title to the area to be filled or built upon.[13] As simply stated in J.S. Thorton

---

[12] *Accord, e.g.*, Warren v. Thornton-Whitehouse, 740 A.2d 1255, 1259 (R.I. 1999) ("the state holds title to all land below the high water mark in a proprietary capacity for the benefit of the public"); Narragansett Real Estate v. MacKenzie, 34 R.I. 103, 112, 82 A. 804, 806 (1912) ("fee of the land below ordinary high-water mark is in the State").

[13] An intertwined line of authority concerns the right of oystermen to enjoy the bed of Narragansett Bay. The same basic rule applies: public rights trump private rights in all tidelands. *See* Rocky Point Oyster Co. v. Standard Oil, 265 F. 379, 383 (D.R.I. 1920) (construing Rhode Island law) (oyster-bed lease revocable by State because "the tide-flowed lands are subject to a continuous public trust, to be administered by the Legislature"); Payne &

& Co. v. Smith Grant & Co., 10 R.I. 477, 484 (1873), "the public right is paramount." Thus, while riparian rights (with respect to yet-unfilled areas) are very strong as against other private parties, they have little force against the sovereign. *See id.* at 486 (Potter, J., dissenting on other grounds) ("**as against everybody *but* the state**"); Providence v. Comstock, 27 R.I. 537, 544, 65 A. 307, 309 (1906) ("**until forbidden by the State**"); Carr v. Carpenter, 22 R.I. 528, 530, 48 A. 805, 805 (1901) ("**as against all the world *but* [the State]**"); Murphy v. Bullock, 20 R.I. 35, 40, 37 A. 348, 350 (1897) ("**not** recognized **against the State**"); Allen v. Allen, 19 R.I. 114, 115, 32 A. 166 (1895) ("**as against anyone *but* the State**"); Folsom v. Freeborn, 13 R.I. 200, 205 (1881) ("**against everybody *but* the State**") (emphasis added to all above quotations).

### C. All Filling And Construction Below The Mean-High-Tide-Line Requires State Assent.

Not surprisingly, then, the precedents dealing with coastal filling and marine construction, while recognizing that early public policy in Rhode Island generally encouraged wharfing, also hold that such practice always required at least informal State agreement. "It is true the riparian proprietor may fill out in front of his land, but, if he does so, he **fills out by the permission or acquiescence** of the state." Bailey v. Burges, 11 R.I. 330, 331 (1876) (emphasis added). This is why language concerning some form of State license or permission is woven through the wharfing cases.[14]

---

Butler v. Providence Gas, 31 R.I. 295, 313, 77 A. 145, 152 (1910) ("the right thereby granted [by State leases of the bay to private parties] . . . is merely a license . . . subject to the public's right").

[14] Thompson v. Sullivan, 88 R.I. 305, 315, 148 A.2d 130, 136 (1959) ("contingent upon . . . **permission** from the state"); Dawson v. Broome, 24 R.I. 359, 372, 53 A. 151, 157 (R.I. 1902) ("**under leave of the state**"); New York, N.H. & H. R. R. v. Horgan, 25 R.I. 408, 412, 56 A. 179, 181 (R.I. 1903) ("under the **license** thus given"); Carr v. Carpenter, 22 R.I. 528, 530, 48 A. 805, 805 (1901) ("[the State] may **suffer** the littoral proprietor to acquire"); Walsh v. Hopkins, 22 R.I. 418, 420, 48 A. 390, 391 (1901) ("by **sufferance**, and not by right"); Prior v. Comstock, 17 R.I. 1, 2, 19 A. 1079, 1079 (1889) ("**if permitted** to do so by the State"); Gerhard v. Bridge

With this background in place, cases such as Gerhard v. Bridge Com'rs, 15 R.I. 334, 5 A. 199 (1886) (denying all private property rights in an offshore location where a structure was to be built) unfold like a syllogism.

The upshot is that KeySpan does not own the area it seeks to build upon and KeySpan gains nothing by resort to the theory of riparian rights. *Prima facie*, the State owns the land where KeySpan's proposed project will be located.

**D. The Coastal Council, In Addition To Regulating Public Trust Lands, Also Controls The Disposition Of Such Land As Real Estate.**

The agency responsible for implementing Rhode Island's Public Trust Doctrine, in the first instance, is the CRMC.[15] The CRMC adopted the Rhode Island Coastal Resources

---

Com'rs, 15 R.I. 334, 335, 5 A. 199, 200 (1886) ("a **license** to him to fill out and incorporate the flats with the upland"); Brown v. Goddard, 13 R.I. 76, 81 (1880) ("right to fill out **under leave of the State**"); Aborn v. Smith, 12 R.I. 370, 373 (1879) ("the State . . . **permits** the owner of the upland to take by filling"); Providence Steam-Engine Co. v. Providence & S. S.S., 12 R.I. 348, 355 (1879) ("a **license** to him to fill out"). (Emphasis added to all above quotations.)

[15] In year 2000, the General Assembly passed P.L. of R.I. 2000, c. 314, "An act Relating to Waters and Navigation – Coastal Resources Management Council," regarding public trust lands. This legislation reaffirmed or established certain positive public trust principles.

More specifically, the enactment clearly differentiates between required regulatory approval of filling activity under environmental statutes and the legal disposition of title. The Act is re-produced at: http://www.rilin.state.ri.us/PublicLaws/law00/law00314.htm. The Act states:

> With the exception of any and all projects to fill land of twenty-five (25) acres or more [which require deeding by means of a resolution of the General Assembly itself], the General Assembly hereby recognizes and declares that the CRMC is delegated the sole and exclusive authority for the leasing of submerged and filled lands and giving **licenses for the use** thereof. Accordingly, the CRMC will develop, coordinate and adopt a system for the leasing of submerged and filled lands, and **licenses for the use thereof**, and will ensure that all such leases and **licenses** are consistent with the public trust.

*Id.* at § 3 (emphasis added). After this discussion of the *ownership* interests at the disposal of the State, the statute separately discusses the State's *regulatory* authority:

Management Program ("RICRMP") in 1976. The Federal government, with recognition of the CRMC's public trust function, gave the CRMC its federal program approval pursuant to the CZMA in 1978. The RICRMP is structured as a strategic plan for the State's coastal areas, and is both regulatory *and proprietary* in nature (a distinction elaborated upon in the last footnote and in the next sub-section).

**E. There Is A Clear Distinction Between Governmental Regulation And Governmental Ownership.**

In considering the scope of the CRMC's power (and the affects of any Congressional action thereon), it is important *not* to conflate a government's authority to *regulate* a water-body and its authority to *own* a property interest in such water-body. The two possible perogatives were sharply distinguished in a particular Supreme Court case comparing Congress' general Commerce Clause authority to the powerful Federal Navigational Servitude. Kaiser Aetna v. U.S., 444 U.S. 164 (1979). "All this Court's cases dealing with the authority of Congress to regulate navigation and the so-called 'navigational servitude' can**not simply be lumped into one basket**," the Court stated in distinguishing between waters that were merely subject to regulation under the Commerce Clause and the smaller sub-set of waters "subject to a public right of access." *Id.* at 172 (emphasis added). In that particular case, the government lost to the particular private party because the government had mere regulatory authority but did not have a property interest to rely upon.

---

> [N]othing in this chapter shall be construed to limit or impair the authority of the state, or any duly established agency thereof, to regulate filling or dredging affecting tidal lands owned by the state or any other entity and nothing in this chapter shall be construed to limit or impair the obligation of the applicant to obtain all applicable regulatory approvals.

*Id.*

By comparison, as shown earlier, Rhode Island is in the relatively strong position of holding a *property*, rather than merely a *regulatory*, interest. With this background in mind, let us turn to the pre-emption arguments.

## II. THE FEDERAL GOVERNMENT HAS NOT EXPRESSED AN ATTEMPT TO PRE-EMPT OR ALTER THE PUBLIC TRUST DOCTRINE

### A. Regulatory Pre-Emption Cases Do Not Apply To State Real Estate Owners.

KeySpan vigorously cites (in various letters to the CRMC) to Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988); National Fuel Gas Supply Corp. v. Public Serv. Com'n, 894 F.2d 571, 578 (2nd Cir. 1990); ANR Pipeline Co. v. Iowa State Commerce Com'n, 828 F.2d 465, 470 (8th Cir. 1987); Algonquin LNG v. Loqa, 79 F.Supp. 2d 49, 52 (D.R.I. 2000); and Kern River Gas Transm'n v. Clark County, 757 F.Supp. 1110, 1114 (D. Nev. 1990).[16] But none of those opinions call for pre-emption of State land *ownership*. Rather, they deal with mere *regulation*.

Nor does the underlying statute, which those cases invoke, explicitly attempt to displace state *ownership*.[17]

Moreover, the so-called "clarification" tacked onto the Congressional appropriations bill that passed last fall did nothing to alter this analysis.[18] The language in that bill that "The

---

[16] *But see* Midwestern Gas Transm'n v. McCarty, 120 F.Supp.2d 1155 (S.D. Ind. 2000) (expressing doubt as to claims of pre-emption under NGA).

[17] Those cases apply the federal Natural Gas Act ('NGA'), 15 U.S.C. §§ 717 *et seq.*, the recodified federal Natural Gas Pipeline Safety Act (NGPSA), 49 U.S.C. §§ 60101 *et seq.* Most especially, they concern Section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a).

[18] On or about November 20, 2004, language concerning LNG siting authority was inserted into H.R. Report No. 108-792 accompanying (and incorporated into) H.R. 4818, the Consolidated Appropriations Act of 2005. This language was not germane to the funding of the Federal Government, which was the stated subject-matter of the Act it accompanied. Instead it purports to convey an interpretation of what a different Congress intended 66 years earlier when it enacted the Natural Gas Act.

Natural Gas Act clearly preempts states on matters of approving and siting natural gas infrastructure . . .," does not speak to state *ownership.*

If any question remains as to whether Congress intended to pre-empt the state Public Trust Doctrine, that question is resolved by reference to the Coeur d'Alene case.

**B. Coeur d'Alene Calls For Non-Preemption Of State Real Estate Ownership, At Least With Respect To Public Trust Lands.**

The fairly recent decision by the United States Supreme Court in the Coeur d'Alene case emphasized the connection between the Public Trust Doctrine and state sovereignty. More importantly, the Court emphasized that the United States government is unlikely to ever seek to impair such state sovereignty. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997), involving a dispute over a state's title to a lake bottom that was alleged to have been deeded-away by Federal authorities to an Indian tribe, deserves quotation at length:

> [T]he State . . . [has] sovereign control over submerged lands, lands with a unique status in the law and infused with a **public trust** . . .. As we stressed in Utah Div. of State Lands v. United States, lands underlying navigable waters have historically been considered "sovereign lands." State ownership of them has been "considered an essential attribute of sovereignty." The Court from an early date has acknowledged that the people of each of the Thirteen Colonies at the time of independence "became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." Martin v. Lessee of Waddell. . . . The importance of these lands to state sovereignty explains our longstanding commitment to the principle that the United States is presumed to have held navigable waters in acquired territory for the ultimate benefit of future States and **that disposals by the United States** during the territorial period **are not lightly to be inferred,** and should **not be regarded as intended unless the intention was definitely declared or otherwise made very plain.** . . .

> The principle which underlies . . . **the strong presumption of state ownership** is that navigable waters uniquely implicate sovereign interests.

Coeur d'Alene at 283-84 (emphasis added; some internal citations and quotation marks omitted). In short, the national government is deemed to be (and has proven to be) circumspect with respect to each state's ownership of its respective Public Trust Doctrine lands even during the territorial periods when it, as predecessor, held title. This is so even in circumstances where the national government had competing trusteeship obligations to others.

Given the fact that Rhode Island, unlike Idaho, was one of the original thirteen states, and given the fact that KeySpan has less of a moral claim to submerged lands than a governmental unit of local Native Americans, the underlying thrust of the Coeur d'Alene case is especially forceful here. *Per force*, the Federal government has had even less motive and even less opportunity to interfere with the sea-bed title in the instant situation: in Rhode Island's upper bay, aboriginal rights are not at stake and this state was not carved out of Federal lands. At the very least, an unmistakable, overt, specific expression of an intent to over-ride such proprietorship would have to be manifest in an Act of Congress. As further specified immediately below, none has been cited or found.

**C. There Are Two Means By Which Congress Hypothetically Could Override State Ownership But It Has Done Neither.**

Rhode Island cheerfully concedes that the Federal government, for the sake of the Nation, *could* supercede Rhode Island's property rights. There are two methods by which the national government *could* easily trump the State's title. Indeed, the curious absence of the employment of either of those two methods is extremely telling here. When one considers the powerful tools at the command of Congress and its delagees when Congress genuinely desires to push a state's

land-tenure aside, the novel method asserted by KeySpan (the supposed regulatory pre-emption of the State's real estate title) takes on an air of desperation.

*1. Congress has not delegated eminent domain power to FERC with respect to KeySpan's type of project.*

Of course, if FERC or KeySpan had been granted the power of eminent domain in this situation they could put it to good use: "Because . . . the United States' power of eminent domain is supreme to the power to maintain tidal lands for the public trust, . . . [c]ondemnation of these lands extinguishes the State's public trust . . .." U.S. v. 11.037 Acres of Land, 685 F.Supp. 214, 217 (N.D. Calif. 1988).

Alas, KeySpan does not have the backing of Congress with respect to that power and actually finds itself in a relatively *dis*favored status. By contrast, other classes of beneficiaries of the Natural Gas Act are in a much stronger position. For example, § 7(h) of the Act confers on FERC-certified pipe-line builders the power of eminent domain to acquire rights-of-way as well as "other stations or equipment necessary to the proper operation of such pipe line or pipe lines." 16 U.S.C. § 717(h). Significantly, this section is silent with respect to liquefied natural gas terminals and, thus, does not extend such eminent domain power to KeySpan.

The result is that KeySpan is bereft of the authority to compel the necessary land rights from the State of Rhode Island in order to construct berthing facilities on the submerged lands of the Providence River. Instead, KeySpan is left to look on in envy, to concoct unheralded theories of the regulatory pre-emption of land titles, and complicate the bureaucratic process with forum-shopping.

2. *Congress has not delegated the exercise of the Federal Navigational Servitude to FERC.*

Of course, a direct Federal governmental exercise of the Federal Navigational Servitude will trump states' rights deriving from ownership of tide-lands as has been held by numerous Supreme Court cases. *See* U.S. v. Cherokee Nation of Okla., 480 U.S. 700, 704 (1987) ("Whether the title to the bed of the stream is retained by the State or the title of the riparian owner extends to the . . . the stream, . . ., the rights of the title holder are subject to the dominant power of the federal Government") (internal quotation marks and citations omitted); Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82, 88 (1913) ("title to such submerged lands is acquired and held subject to the power of Congress to deepen the water over such lands, or to use them for any structure which the interest of navigation, in its judgment, may require"); Philadelphia Co. v. Stimson, 223 U.S. 605, 635 (1912) ("although the title to the . . . submerged soil is in the various states . . ., it is always subject to the servitude in respect of navigation . . . in favor of the Federal government"); Scranton v. Wheeler, 179 U.S. 141, 163 (1900) ("So that whether the title to the submerged lands of navigable waters is in the state or in the riparian owners, it was acquired subject" to the Federal Navigational Servitude). Again, however, the vacuum is telling: Congress has not delegated the exercise of the servitude to FERC or to its permitees but, instead, to the Army Corp of Engineers by the Rivers & Harbors Appropriation Act of 1899. *See, e.g.,* United States v. Republic Steel Corp., 362 U.S. 482 (1960). And, even when the Army Corp of Engineers permits a private project, it merely expresses toleration, not active delegation of its paramount power. *Id.*

* * *

In sum, the Federal Government has done nothing to alter the basic fact that Rhode Island owns the site and KeySpan does not. KeySpan must apply under purely State law, to the CRMC, for a license to use State land separate and apart from any Federal requirements. And, even if a contrary argument were, in good faith, available, that argument must be made in a state-accepted, rather than a federally-dictated, forum — a subject to which we now turn.

## III. SOVEREIGN IMMUNITY IS VIOLATED BY THE TERMS UNDER WHICH KEYSPAN HAS INVOKED A FEDERAL TRIBUNAL

### A. As Background, Constitutional Sovereign Immunity Is Broader Than The Eleventh Amendment.

The broad scope of sovereign immunity derives from the concept of federalism itself, not just from the Eleventh Amendment. In Alden v. Maine, 527 U.S. 706 (1999) (examining history of the Amendment), the Court states:

> The phrase ["Eleventh Amendment Immunity"] is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from nor is limited by the terms of the Eleventh Amendment. Rather, as the Constitution's structure, and its history, and the authoritative interpretations by the Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today . . ..

527 U.S. at 713. The result is that the sparse language of the Amendment does not limit a State's broad immunity to a private suit:

> Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms. That presupposition . . . has two parts: first, that each State is a sovereign entity in our federal system; and second, that **[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent.**

Alden, 527 U.S. at 729 (citations and internal quotation marks omitted; emphasis added). As detailed next, this expansiveness justifies application of the rule to forums other than Federal courts.

**B. The Eleventh Amendment And Related Immunity Applies To The Consistency Certification Forum.**

*1. Federal Courts are not the only forums affected by the immunity.*

Importantly, the Court in Alden v. Maine, 527 U.S. 706 (1999), explained that the logic of the Eleventh Amendment decisions "**does *not* turn on the forum in which the suits were prosecuted**." *Id.* at 733 (emphasis added). Instead, the Court held, Congress may *not* "subject nonconsenting states to private suits in **any** forum." *Id.* at 745 (emphasis added). "This separate and distinct structural principle is not directly related to the scope of the judicial power established by Article III, but inheres in the system of federalism established by the Constitution." *Id.* at 732.

In Alden, the Court rejected Congress' attempt to over-come a state's immunity to suit by purporting to invoke the jurisdiction of that state's own court system. The Court held that the attempt improperly violated the State of Maine's sovereign immunity: "Congress may subject the States to private suits in their own courts only if there is 'compelling evidence' that the States were required to surrender this power to Congress pursuant to the constitutional design." *Id.* at 730-31 (*quoting* Blatchford v. Native Village of Noatak, 501 U.S. 775, 781 (1991)).

*2. Administrative tribunals are affected by the immunity.*

Turning to the matter at bar, when acting in the capacity KeySpan wishes for (that is to say, when undertaking a Federal Consistency Certification review), the CRMC reports to the Secretary of Commerce. Since the Secretary of Commerce (acting through the CZMA) is serving as a "legislative court," Northern Pipeline Const. Co. v. Marathon Pipe Line Co., 458

U.S. 50, 73 (1982), and because the judiciary must review any determination by the Secretary, the terms of the Eleventh Amendment apply directly to this case. Even if the Court were to find that the Secretary of Commerce is not a "court" within the terms of the Eleventh Amendment, the Amendment still applies: Congress cannot subvert a State's sovereign immunity by creating an administrative tribunal; Congress may not achieve under its Article I powers that which is prohibited under Article III.

3. *In this case, the Consistency Certification review process falls within the bar of the Eleventh Amendment because it is being invoked in a manner inconsistent with the conditional consent given by the State.*

The State makes no bones about it: to a degree, State has readily, indeed, enthusiastically, consented to the Federal Consistency Certification review process. As the CRMC itself states in its official publication entitled Federal Consistency Manual (available at www.crmc.state.ri.us/pubs/programs/fedconsist.pdf):

> Through this process, the state has the opportunity to evaluate those federal activities which affect the state's coastal zone and ensure that the activities meet state coastal management policies. . . .
>
> [T]he consistency process has become an important step for ensuring federal activities respect Rhode Island's valuable coastal zone.

*Id.* at p. 1 of Manual.

However, this consent is *conditional.* In the case of private applicants for Federal approvals, the State has conscientiously insisted that those applicants file dual applications. The Manual could not be more explicit with respect to the fact that the process is specifically conditioned on the applicant also partaking in the State program:

> Generally, applicants proposing an activity within the first tier of Rhode Island's coastal zone [the portion of the coastal zone closest to the sea including the sea itself] must apply for a CRMC Assent

> (CRMC permits are referred to as Assents). When an Assent from the CRMC is required, and the proposed activity involves either a direct or indirect federal action, the issuance of an Assent constitutes CRMC concurrence with an applicant's certification that the project is consistent with the RICRMP. In all cases, however, the issuance of a CRMC Assent and the certification or determination of federal consistency remain distinct, even when the two processes overlap. Activities that require federal approval and are reasonably likely to affect any coastal use or resource, but which do not require a CRMC Assent, remain subject to the consistency requirement.
>
> There are several types of Assents issued by the Council. They include:
>
> . . .
>
> Category B Assents (RICRMP §110.2);
>
> . . . .

*Id.* at p. 11 of Manual.

The upshot is that Rhode Island's consent was based on the prospect of dual-tracking. The invocation of the Consistency Review process in excess of that consent is an aggressive act subjecting the State to the indignity of being dragged into a process that it resists and in which sovereign interests (ownership and control of lands beneath the water-ways) are jeopardized.

**C. The Eleventh Amendment Applies To KeySpan's Claim Even Though KeySpan Purportedly Relies On Federal Authority.**

This case does *not* present a situation where the United States government is seeking to enforce laws directly against a State. Rather, a private entity is asserting *its* supposed rights not those of the Federal government. This is precisely the situation that the Eleventh Amendment seeks to prevent. Alden v. Maine, 527 U.S. 706, 756 (1999) (a suit against a State by the federal government or another State "differs in kind from the suit of an individual . . . the fear of private suits against nonconsenting States was the central reason given by the founders who chose to

preserve the States' sovereign immunity"). Accordingly, barring an exception, the State's sovereign immunity and the Eleventh Amendment act to bar any resort to an unwelcome forum (or even to a welcome forum on unwelcome terms).

**D. The Eleventh Amendment And Related Immunity Applies Even Though KeySpan Seeks No Money Damages.**

Of course, KeySpan can be expected to refer to the *Ex Parte* Young exception while ignoring the incisive exception-to-the-exception carved out by Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997). The latter holding is that private legal action that could result in a diminution of state title to sovereign lands *is* covered by the Eleventh Amendment.

To elaborate, of course, a plaintiff may sometimes proceed against state officials in their official capacity under the doctrine of *Ex parte* Young, 209 U.S. 123 (1908). Typically, when a plaintiff seeks to prospectively enjoin a state official from committing an alleged violation of federal law, the Eleventh Amendment poses no bar. In determining whether the doctrine of *Ex parte* Young avoids an Eleventh Amendment bar to suit, theoretically a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment).

Superficially, here, KeySpan is seeking injunctive and declaratory relief, alleging that CRMC's requirement that KeySpan comply with CRMC's Category B Assent process is pre-empted by the NGA and FERC regulations. At first blush, this might ordinarily satisfy the "straightforward inquiry."

But, enter the Coeur d'Alene opinion. Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 271 (1997) (principal opinion of Kennedy, J., joined by Rehnquist, C. J.), recognized a

major exception to *Ex parte* Young. In Coeur d'Alene, an action was brought by a Federally-recognized Indian tribe against a state and its officials in which the tribe alleged an on-going violation of its property rights in contravention of Federal law and sought, essentially, prospective injunctive relief. The Court held that the claim was barred by the Eleventh Amendment because the action implicated special sovereignty interests and the relief sought would block State officials from exercising jurisdiction over a substantial portion of land that was arguably state-owned. The critical fact was that the particular outcome prayed-for would effectively divest the State of its sovereign proprietary dominion over submerged lands.

Thus, in Coeur d'Alene, the plaintiffs tried to use *Ex parte* Young to divest a State of sovereign ownership over territory within its boundaries. In that case, the "straightforward inquiry" proved complex: Coeur d'Alene recognized that *Ex parte* Young jurisprudence requires careful consideration of a suit's potential impacts on the sovereign interests of a State, especially such suit touches upon lands under-lying water-ways.

In the final analysis, KeySpan's attempted invocation of a pure Federal review comes within the protection afforded by Coeur d'Alene since the facts are legally identical.

## IV. THE STATE IS ENTITLED TO A PRELIMINARY INJUNCTION

In deciding whether to issue injunctive relief, this Court must consider:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issue; and (4) the effect (if any) of the court's ruling on the public interest.

Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). "The *sine qua non* of that formulation is whether the plaintiffs are likely to succeed on the merits." Weaver v.

irreparable harm by, *inter alia*, forcing Rhode Island to forego its public trust lands licensing mechanism. In other words, if the State were to comply with KeySpan's insistence that KeySpan has properly triggered the 6-month clock, then the State would find itself complicit in the voiding of its public trust rights. Alternatively, if Rhode Island insists on its public trust rights, it will find its CZMA rights forfeited (and, if KeySpan has its way, its Public Trust Doctrine rights too).

This is compounded by the practical difficulties of completing a difficult process in the time-frame that KeySpan precipitously asserts.

**B. The State Has A Substantial Likelihood Of Success On The Merits.**

This topic has, in effect, already been briefed in the bulk of this Memorandum.

**C. The Balance Of Hardships Favors The State.**

Since KeySpan itself would benefit from a procedure unclouded by jurisdictional infirmity, there is no countervailing equity.

**D. An Injunction Will Advance The Public Interest.**

The vindication of the public trust is, by definition, in the public interest.

## CONCLUSION

The motion should be granted.

---

"[i]f the State agency objects to the applicant's consistency certification within six months following commencement of review, it shall notify the applicant, Federal agency and Director of the objection." *Id.* at § 930.63. Additionally, "[c]oncurrence by the State agency shall be conclusively presumed if the State agency's response to the consistency certification is not received within six months following commencement of State agency review." *Id.* at § 930.78.

If the application in question is complete, this six-month period of "consistency certification begins at the time the State agency receives a copy of the consistency certification, and the [necessary] information and data . . .." *Id.* at § 930.60.

CZMA Federal Consistency Regulations may be accessed at: http://www.ocrm.nos.noaa.gov/pdf/15CFRPart930.pdf.

On February 16, KeySpan, for the first time, informed the State the KeySpan was relying on a start date of December 1, even though it earlier said December 31, 2004.

Respectfully submitted,
THE STATE OF RHODE ISLAND
for Defendants,
by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (# 3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

## CERTIFICATION

I, the undersigned, hereby certify that a copy of the foregoing was mailed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Providence, RI 02903, on this 17th March, 2005.

\\Attg5\Civil\M. Rubin\CASES\Keyspan\KeySpan v. CRMC\Pleadings KeySpan v. CRMC\Memorandum in Support of State of Rhode Island's Motion for Preliminary Injunction, Shortened version, revised by jim.doc