# AFFIDAVIT OF THE DIRECTOR OF CRMC

## General Background and Qualifications

1. My name is Grover Fugate; I am a coastal zone manager and a public servant. I serve (and have served for nearly twenty years) as the Executive Director of Rhode Island's coastal zone management agency, called the Coastal Resources Management Council ("CRMC").

2. From February 2, 1986 to the present, I have been Executive Director of the CRMC in which role I plan, organize, direct and coordinate the daily activities of the State coastal resources management agency. My role is to endeavor to do so consistent with the policies, regulations and statutory authorities of state and federal law. As Director, I am the senior staff person who oversees all the daily activities of the Council and its staff of roughly 27 persons and who issues administrative permits for the Council.

3. The program I administer as Executive Director of CRMC is called the Rhode Island Coastal Resources Management Program ("CRMP").

4. In addition to my duties as Director of the CRMC, I have also been involved with coastal zone management through the following activities during the last two decades: Guest lecturer at the University of Rhode Island; Trainer at the Integrated Coastal Management Training Institute, Coastal Resources Center, University of Rhode Island; Rhode Island delegate to the Coastal States' Organization.

5. Prior to taking on the directorship of CRMC, I was Director of Shore Zone Management for the Department of Development & Tourism of the Province of Newfoundland & Labrador from January, 1985, until January, 1986, and, prior to that, I held a post as a provincial Regional Resource Planner from 1981 to 1985.

17

6. During the time period of my directorship of provincial Shore Zone Management, and in addition to those duties, I was also a Lecturer at Memorial University, St. John's, Newfoundland.

7. My academic background follows: Master of Business Administration, Memorial University of Newfoundland, 1984, with an emphasis in Natural Resource Policy Analysis; Certificate in Public Administration, Memorial University of Newfoundland, 1980; B.S., Natural Resources Management, University of Connecticut, 1976.

**Qualifications and Familiarity with Respect to the CRMP**

8. During my tenure, the CRMC has processed roughly 1,200 to 1,600 permit applications in a typical year.

9. For instance, in year 2003, the CRMC processed 1,244 applications.

10. For further example, by comparison, in 1995, the CRMC processed roughly 1,600 applications.

11. I have, directly or indirectly, supervised the processing of all of these applications.

**Qualifications with Respect to Predecessor Programs**

12. The CRMC keeps certain archived records from before the CRMC's own existence.

13. In general terms, the purpose for which CRMC keeps and uses those records in the ordinary course of business, in both permit and enforcement actions, is to determine the extent there may have been either prior construction within tidal waters or prior fill within tidal waters. Essentially, CRMC uses them to check whether there has been a prior permit.

14. The records in our archives date back to the beginnings of administrative assents in Rhode Island. Prior to the CRMC, there was the Department of Natural Resources which included a Harbors & Rivers Division within that department. Prior to that, there was a Department of Public Works which also included a Harbors & Rivers Division. Before that, the function was

performed by the Harbor Commission and then, beforehand, by the Board of Harbor Commissioners and, originally, prior to the first creation of any of those bodies in the 1870s, by the General Assembly itself. In that early period, the primary source of permission was by means of legislative action.

15. Based on my familiarity with those archived records as well as with Harbor Commission reports and superceded legislation, I am familiar with those predecessor agencies, their lineage, those entities' jurisdiction, the format of the applications those entities accepted for review, and their practices with respect to fill or structures within the public tide-waters of the state.

**Qualifications with Respect to the CZMA**

16. As background, the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 *et seq.*, and 15 C.F.R. Part 930 — in addition to requiring direct Federal projects to undergo review by state coastal zone management agencies — requires that applicants for certain federal licenses or permits (*i.e.*, applicants for permission to conduct indirect Federal activities) provide to the federal licensing or permitting authority a "certification that the proposed activity complies with and will be conducted in a manner consistent with" any federally-approved state coastal resources management program and, at the same time, furnish to the state agency designated under the CZMA "a copy of the certification and necessary data and information." *See* 15 C.F.R. §930.57.

17. As further background, the process that ensues is held under a six-month deadline and is called a "Federal Consistency Determination Review" or a "Federal Consistency Certification Review" (depending on whether the project is a direct or indirect Federal activity).

18. As still further background, at the end of such six-month process, the designated state agency then shall notify the federal licensing or permitting authority and the applicant whether the

designated state agency concurs with or objects to the consistency certification. *See* 15 C.F.R. § 930.62.

19. The CRMC is the designated state coastal zone management agency under the CZMA with respect to direct and indirect Federal activities in Rhode Island.

20. The CRMC performs 50 to 60 Federal Consistency Determination reviews on direct Federal activities in a typical year.

21. I estimate that the CRMC does several hundred Federal Consistency Certification reviews on *in*direct Federal activities in a typical year.

22. The reason I cannot be more specific on the number of Federal Consistency Certification reviews on *in*direct Federal activity is that the CRMC keeps no separate data on such reviews.

23. The reason that the CRMC keeps no separate data on such reviews is that the CRMC processes Federal Consistency Certification reviews on *in*direct Federal activity as part-and-parcel of our state assent process through parallel processing.

**Qualifications as to Consistency Review Involving Projects Regulated Under the NGA**

24. I have conducted several parallel reviews of applications involving projects which implicated the Natural Gas Act.

**Qualifications and Familiarity with Respect to the Army Corps § 10 Permitting Program**

25. As background, when the Federal Harbors & Rivers Act of 1899 came into effect, its administration and enforcement were delegated to the Army Corps, a Federal agency. Thus, permits from the Army Corps under Section 10 of that Act have been required ever since the turn of the last century.

26. I am intimately familiar with the policies and practices of the Army Corps with respect to waterways during the entire time period of my directorship including the current time.

Throughout my tenure, I have had a great volume of observation of the Army Corps putting its policies into effect.

27. More specifically, I am familiar with the following documents expressing Army Corps General Regulatory Policies: 33 CFR Part 320; an internal office memorandum dated January 14, 1997, to CRMC Permitting, Enforcement, & Policy Staffs regarding ACOE Programmatic General Permit Program; a letter dated February 2, 2000, to Jeffrey M. Willis, Supervising Environmental Planner of the CRMC from the Department of the Army, New England District, Corps of Engineers; a letter dated January 21, 2000, to Robert DeSista, Army Corps of Engineers/NED from the Coastal Resources Management Council; the Department of the Army Programmatic General Permit for the State of Rhode Island.

28. Over the course of holding my position, I have considered, reviewed, or been involved with literally thousands of applications which also invoked Army Corps' jurisdiction.

29. In each of those many applications, both the Coastal Council and the Army Corps have taken action because, as I understand it, there is dual jurisdiction.

30. When the Army Corps takes an action in a dual jurisdiction situation, I am aware of their actions. I receive formal notice of such action even though the Amy Corps acts subsequent to the CRMC.

31. Because the programs essentially mirror each other, the Army Corp and the CRMC address, and have each addressed, the same concerns.

32. Throughout my tenure, I and my staff have met regularly with the Army Corps on applications where there is dual jurisdiction to discuss concerns that we jointly hold.

33. The Army Corps and the CRMC's respective permitting staffs routinely meet with respect to common concerns, and the staffs routinely cross-check their respective regulations so that they

are dove-tailing with one other. In fact, many of the CRMC's regulatory changes over the years have been done to bring the CRMC into harmony with parallel Army Corps' policies and standards.

34. In sum, I am familiar with the requirements of the § 10 of the Federal Rivers & Harbors Act of 1899 as it relates to the CRMP and the Army Corps programs. I know the Army Corps' stated and effective regulatory policies with respect to the permitting of structures in the navigable waters.

**Familiarity with Historic Army Corp Practices**

35. In the course of CRMC's archival searches in its own archives of the records of its predecessors (described above), the CRMC finds references to the Army Corps because there was concurrent authority with the Army Corps, at those earlier times as today, under Section 10 of the Federal Harbors & Rivers Act. So, there are sometimes notes in the CRMC's archives of records of predecessor agencies to the effect that the applicants would also have to apply to the Army Corps for their activities.

36. Moreover, the CRMC, acting through the Army Corps' staff, does archival work in Army Corps' archives for the same purposes the CRMC searches its own archives.

37. Based on the above, and related activities and readings, I am aware of Army Corps' practices throughout the history of the § 10 program.

**Familiarity with KeySpan's Application**

38. I have read and understand paragraphs 45 through 90 of the STATE OF RHODE ISLAND'S AMENDED ANSWER ON BEHALF OF DEFENDANTS AND COUNTER-CLAIM TO PRESERVE ELEVENTH AMENDMENT RIGHTS in the court case of KeySpan v. CRMC, U.S.D.C. D.R.I., Docket # 95-091L.

39. I am familiar with all of the matters related therein.

40. I am familiar with all of the underlying documents referred to therein.

41. I am familiar with all of the applications and purported applications referred to therein. This is so, because those materials were submitted to the CRMC. Even the FERC-filed materials were cross-filed with the CRMC.

42. I hereby verify, affirm, adopt, and incorporate, by this reference, paragraphs 45 through 90 of the STATE OF RHODE ISLAND'S AMENDED ANSWER ON BEHALF OF DEFENDANTS AND COUNTER-CLAIM TO PRESERVE ELEVENTH AMENDMENT RIGHTS.

**Familiarity with Rhode Island Waterways**

43. Based on my directorship, I am intimately familiar with Rhode Island's marine geography, including the nature and extent of the various waterways.

**Nature of the Waterway Where KeySpan Proposes to Build**

44. The Providence River, at the point where KeySpan would build, is an arm of the sea, a navigable water-way, a salt-water body of water, and is subject to the ebb-and-flow of the tide. It is navigable in its natural state as well as in its current state. Although bearing the proper name "Providence River," in fact, it is not, technically, a river at all, at that point, but rather a tidal estuarine embayment.

**KeySpan's Proposal Involves Marine Construction**

45. KeySpan proposes marine construction as more fully set forth in the portions of the pleading referred to above. I refer specifically to paragraphs 45 through 55 of that pleading.

**Unconventional Nature of KeySpan's Approach**

46. KeySpan's attempt to avoid coordinated simultaneous parallel review under both CZMA and the CRMP (*i.e.* KeySpan's attempt to avoid filing for a State Assent) is the first attempt ever by any applicant to do so, including applicants regulated under the Natural Gas Act.

**Imminence of Harm**

47. KeySpan asserts a review completion deadline of May 31, 2005.

48. The harms discussed in the next three sections will take effect within a few days due to the deadline KeySpan is insisting upon. Mobilization of resources and notice to the public is almost underway due to the necessary lead-time involved.

49. The harms discussed in the remaining sections will take hold in a matter of weeks.

**Suddenness and Unexpectedness of Imminence of Harm**

50. It was not until the 16th of February, 2005, that KeySpan notified CRMC that it was insisting upon a May 31 deadline date.

51. Prior to that time, KeySpan had taken a different position as I understood it.

52. The pleading referred to above details the basis for my understanding, which, I believe, was reasonable.

53. It was not until approximately a month later, in early to mid-March, that an *impasse* was reached in discussions to postpone that deadline.

**Irreparable Harm — Resources — 1,100 hours of Staff and Council-Member Time**

54. The CRMC is a small agency with a tremendous work-load, much of which has statutory and budgetary deadlines. It is a monumental task to review, and hold mandatory hearings upon, a project of KeySpan's magnitude, and a significant portion of the agency will have to put aside current reviews to address this project.

55. With respect to hearing resources, our current budget is not capable of hearing the number of contested cases we are hearing. This year, we have already exceeded our budget for hearing costs. We are awaiting legislative approval to see if we will be allowed to continue. The review of this proposal project will cause us to well exceed our appropriation. To do it (undertake a set of hearings) twice (in order to, in a separate, later round of hearings, consider whether to license use of public trust lands) will cause a significant budget shortfall for which we do not have authority. The General Assembly is the only body with the authority to approve budget over-runs.

56. I estimate the following time expenditure for a four-hour hearing, and I expect the KeySpan hearings to consume almost a dozen times that amount of time (I estimate 45 hours):

*Contested Case Public Hearing Effort*
*One (four-hour) Hearing*

| | **Hours** |
|---|---|
| **Stenographic** | **4** |
| **Clerical** | |
| Hearing Notice Preparation/Typing/ Initial Compiling of Addresses | 2 |
| Maintenance of Mailing Addresses database | 2 |
| Locate/Reserve Hearing Room | 3 |
| Multiple phone calls to various facilities | |
| Coordination between town/city facilities and Subcommittee's schedule | |
| Coordination with legal counsels (CRMC, applicant, AG, etc.) | |
| Written/Telephone Notice to Council members | 1 |
| Coordination of Hearing schedule with stenographer | 0.5 |
| Telephone/mailings | |
| Public Hearing Review Package | 5 |
| Comb through file for pertinent documentation; compile information | |
| Copy information into package | |
| Delivery of Public Hearing Review Package | 5 |
| Status requests (via telephone) | |
| Telephone inquiries | 2 |
| Setup appointments to view file | 1 |
| Press/media inquiries | 1 |

| | |
|---|---|
| File Review | |
| Copies | 3 |
| Research of similar files/assents issued to that property | 2 |
| Post-review, orderly re-arrangement of file | 0.5 |
| Monthly calendar preparation | |
| Subcommittee schedule often requires that calendar be revised as necessary | 0.5 |
| Mailing/notification of changes to schedule | 1 |
| Attend Hearing (4 hrs x 1 staff) | 4 |
| **Total Clerical** | **33.5** |
| **Professional** | |
| Staff Review of Application and supporting documents | |
| Supervising Civil Engineer | 35 |
| Supervising Environmental Scientist | 35 |
| Dredging Coordinator | 35 |
| Staff Preparation of Reports/Recommendations to the Council | |
| Supervising Civil Engineer | 35 |
| Supervising Environmental Scientist | 35 |
| Dredging Coordinator | 35 |
| Staff Attendance at subcommittee Hearing (4 hrs x 3 staff) | 12 |
| **Total Professional** | **222** |
| **Executive** | |
| Review of Application and supporting documents | |
| Executive Director | 35 |
| Review of Staff Reports/Recommendations (3 reports x 2 hrs) | |
| Executive Director | 6 |
| Preparation of Policy Reports, if necessary | |
| Executive Director | 28 |
| Deputy Director (or Policy staff as appropriate) | 28 |
| Attendance at subcommittee Hearing (4 hrs x EXDIR) | 4 |
| **Total Executive** | **101** |
| **Council Members** | |
| | **20** |

**TOTAL** **380.5 Hours**

57. Thus, the first four hours of hearing alone will consume roughly 380.5 person-hours of CRMC time.

58. Each subsequent four-hour increment of hearing will consume roughly 71.5 person-hours of CRMC time.

59. The estimated 40 hours of hearings after the first four hours will consume 715 person-hours of CRMC time.

60. The KeySpan hearings, estimated at 45 hours, will consume nearly **1,100 hours** of CRMC staff time.

**Irreparable Harm — Diversion of Resources**

61. The above commitment of resources will have obvious repercussions for other proposed projects under review. We have, in various phases of review, several billion dollars' worth (based on capital value) of proposed projects in process. These, in many cases, will have to be put on hold. To do this once will be a significant impact to the CRMC and the Rhode Island economy. To do this twice would have severe repercussions to the CRMC and, moreover, would have severe repercussions to proposed projects; these would be pushed aside because of timing considerations, meaning the loss of millions of dollars to the economy.

**Irreparable Harm — Imposition on the Interested Public**

62. There will be significant attendance and comment from the public — all for naught, if the de-coupled would-be CZMA set of hearings prove invalid.

**Irreparable Harm — De-Coupling of Parallel Programs**

63. Bifurcated review will de-couple overlapping and intertwined issues in express violation of settled CRMC policy. Said policy has been approved by NOAA.

**Irreparable Harm — Lack of Federal Input**

64. The following are particular problems with bifurcated review:

a. The proposed project, and information regarding it, is changing in response to review by other agencies. Thus, the project proposal CRMC will now review under Federal Consistency Review may not be the project proposal the CRMC would review later under a State Assent application; as a result, there will be inconsistencies and inefficiencies in CRMC's own review. One possible scenario is that the CRMC would have to deny the current project proposal based on current information under Federal Consistency Review. But, nonetheless, due to changes made in the Environmental Impact Statement process, and in response to other permitting agencies, a permittable project could later emerge. But, the CRMC's Federal Consistency Review would have been made and would already be under appeal. Both the State Assent review and Consistency Review of the modification would be complicated by the "on appeal" status of the Federal Consistency Review.

b. The normal course for federal approvals and licenses is through what is known as the Programmatic General Permit Process. This is a joint federal-state permit process, which relies on day-to-day coordination of a project under review. This process was specifically set up to avoid the situation now created by KeySpan. That situation is one where the proposal for a project the Army Corps is reviewing has already changed and is not the same proposal for a project we at the CRMC are reviewing. The Army Corps has additional information requests that KeySpan will have to respond to. Those are responses that we do not have, nor will we have, because our review has, under KeySpan's approach, already started. Thus, the project proposal which the Army Corps will subject to its final review may be totally different from what the project proposal that the CRMC reviews, necessitating a whole new review by this

agency. The Army Corps is, by federal law, prohibited from issuing an Army Corps permit until CRMC's Consistency Certification has been issued or denied. If the CRMC were to deny Consistency (reject the proposal under the CZMA), then the Army Corps would not be able to issue the Army Corps' permit. This further illustrates the need for close coordination that cannot occur under KeySpan's approach. Such coordination will not take place because of the truncated review now scheduled at the insistence of KeySpan.

65. The CRMC is being asked (forced) to render a Federal consistency decision on a proposed project that is also before (being considered by) federal agencies that are trying to complete a draft Environmental Impact Statement with respect to the proposal. The review of the proposed project is still within the draft stage of the Environmental Impact Statement process; the Federal government hasn't issued the final Environmental Impact Statement yet. CRMC is now being asked (indeed, forced) to review a project proposal for federal consistency prior to the time that such Environmental Impact Statement will be completed.

**Lack of Pre-Emption — Limited Effect of KeySpan's Anticipated Federal Permit.**

66. The Regulatory Division of the Department of the Army is currently reviewing the proposed project with respect to KeySpan's application for a Department of the Army permit for the proposed dolphin structures pursuant to § 10 of the Rivers & Harbors.

67. The Army Corps' regulatory authority is independent of FERC's.

68. § 10 of the Rivers & Harbors Act (under which the Army Corps operates) prohibits the "creation of any obstruction not affirmatively authorized by Congress to the navigable capacity of any of the waters of the United States," 33 U.S.C. § 403.

69. For a structure of this type, the Army Corps' regulations, *see,* 33 C.F.R. 320.4(g), state: "Authorization of work or structures by [the Department of the Army] does not convey a

property right, nor authorize any injury to property or invasion of other rights." *See also* 33 C.F.R. 320.4(g)(6):

> A [Department of the Army] permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a [Department of the Army] permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application.

70. The standard form federal permit that KeySpan is seeking would, itself, provide, under its terms, that:

> You are authorized to perform work in accordance with the terms and conditions specified below.
>
> . . .
>
> **2. Limits of this authorization.**
>
> a. This permit does not obviate the need to obtain other Federal, state, or local authorizations required by law.
> b. This permit does not grant any property rights or exclusive privileges.
> c. This permit does not authorize any injury to the property or rights of others.

*See* Appendix A to Part 325 — Permit Form and Special Conditions.

71. Every Army Corps permit of the type KeySpan seeks states:

> The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

72. The practices related herein are essentially unchanged throughout the history of the § 10 program.

73. Never in the entire history of Rhode Island's and the Army Corps' regulation of coastal construction and filling has a § 10 permit from the Army Corps acted to displace, limit, or over-ride state authority.

Director of CRMC

Subscribed and sworn to before me on this 25th day of March, 2005.

Notary Public
Print Name: Joanne M. Storm
My Commission Exp. 7/31/05

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was ~~mailed~~ handed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Providence, RI 02903, on this 25 day of March, 2005.

\\Attg5\Civil\M. Rubin\CASES\Keyspan\KeySpan v. CRMC\Pleadings KeySpan v. CRMC\Affidavit of Director of CRMC for ks case.doc