UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KEYSPAN LNG, L.P. | ) | |
| | ) | |
| v. | ) | C.A. NO. 05-091S |
| | ) | |
| RHODE ISLAND COASTAL | ) | |
| RESOURCES MANAGEMENT COUNCIL;[1] *et al* | ) | |

**STATE OF RHODE ISLAND'S MOTION FOR SUMMARY JUDGMENT**

The State of Rhode Island hereby moves for Summary Judgment on KeySpan's claim and includes herein arguments for grant of dismissal for failure-to-state-a-claim with respect to defendant CRMC. A Memorandum, an Appendix (to be filed separately), and a Statement of Undisputed Facts is included.

Respectfully submitted,
THE STATE OF RHODE ISLAND
for Defendants,
by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 S. Main St., Prov., RI 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 S. Main St., Prov., RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (#3940)
Counsel for CRMC
681 Smith St., Prov., RI 02908
Tel: (401) 521-4100

[1] The Rhode Island Coastal Resources Management Council has no legal existence separate and apart from the State of Rhode Island and has no capacity to sue or be sued.

36

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was mailed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Prov., RI 02903; Peter D. Ruggiero, Ruggiero, Orton, & Brochu, 20 Centerville Road, Warwick, RI 02886; Christopher M. Mulhearn, Ferrucci Russo, P.C., 55 Pine Street, Suite 4, Prov., RI, 02903; Adrienne G. Southgate, Prov. City Solicitor's Office, 275 Westminster Street, Prov. RI, 02903; and Frederick M. Lowther, Esq., Dickstein, Shapiro, Morin & Oshinsky, 2101 L. Street NW, Washington, DC 20037 on this 18th day of April, 2005.

\\Attg5\Civil\M. Rubin\CASES\Keyspan\KeySpan v. CRMC\Pleadings KeySpan v CRMC-- Plenary Motion & Memo\Alternative Motion for SJ.doc

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **KEYSPAN LNG, L.P.** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO. 05-091S** |
| | ) | |
| **RHODE ISLAND COASTAL** | ) | |
| **RESOURCES MANAGEMENT COUNCIL;**[1] ***et al*** | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT:**

**NO FEDERAL ENACTMENT CHANGES THE RULES THAT A PRIVATE DEVELOPER SEEKING TO INSTALL NEW STRUCTURES ON A STATE'S SUBMERGED LAND MUST OBTAIN A STATE LICENSE; MOREOVER, A SUIT CLAIMING THE CONTRARY SHOULD *NOT* BE BROUGHT IN FEDERAL COURT**

Respectfully submitted,
THE STATE OF RHODE ISLAND
for Defendants,
by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (# 3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

---

[1] The Rhode Island Coastal Resources Management Council has no legal existence separate and apart from the State of Rhode Island and has no capacity to sue or be sued.

## TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

INTRODUCTION .......... 1

FACTS AND PROCEEDINGS .......... 2

* * *

ARGUMENT

PART ONE — THE PUBLIC TRUST DOCTRINE BARS THIS CLAIM .......... 5

I. THE PUBLIC TRUST DOCTRINE ESTABLISHES STATE OWNERSHIP OF THE SITE .......... 5

A. Title To Land Below The Mean-High-Tide-Line Is In The State .......... 5

B. Title To Land Below The Mean-High-Tide-Line Does Not Pass Until Actual Filling .......... 5

C. All Filling And Construction Below The Mean-High-Tide-Line Requires State Assent .......... 6

D. The Coastal Council, In Addition To Regulating Public Trust Lands, Also Controls The Disposition Of Such Land As Real Estate .......... 7

E. There Is A Clear Distinction Between Governmental *Regulation* And Governmental *Ownership*. .......... 8

II. THE FEDERAL GOVERNMENT HAS NOT EXPRESSED AN ATTEMPT TO PRE-EMPT OR ALTER THE PUBLIC TRUST DOCTRINE .......... 9

A. *Regulatory* Pre-Emption Cases Do Not Apply To State Real Estate *Ownership* ... 9

B. Even With Respect To Hydro Power, FERC's In-Roads Into State Water Law Are Limited. .......... 10

C. Coeur d'Alene Calls For Non-Preemption Of State Real Estate Ownership, At Least With Respect To Public Trust Lands .......... 13

D. There Are Two Means By Which Congress Hypothetically Could Override State Ownership, But It Has Done Neither .......... 15

1. *Congress has not delegated eminent domain power to FERC with respect to KeySpan's type of project* ....... 15

2. *Congress has not delegated the exercise of the Federal Navigational Servitude to FERC or to KeySpan* ....... 16

i. Army Corps permits do not displace states' public trust rights ....... 17

ii. Congress does not delegate the Federal Navigational Servitude to entities other than Federal agencies ....... 22

* * *

PART TWO — SOVEREIGN IMMUNITY BARS THIS CLAIM ....... 24

I. SOVEREIGN IMMUNITY IS VIOLATED BY KEYSPAN'S NAMING OF THE CRMC ....... 24

II. THE SUIT IS BARRED WITH RESPECT TO THE OFFICIALS AS WELL ....... 25

CONCLUSION ....... 29

\\Attg5\Civil\M. Rubin\CASES\Keyspan\KeySpan v. CRMC\Pleadings KeySpan v CRMC-- Plenary Motion & Memo\Table of Contents.doc

## INTRODUCTION

Although this case involves a complex welter of regulatory programs and agencies at both the State and Federal levels, at bottom, the resolution hinges upon the twin holdings of Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997): *First,* Congress is deemed *not* to intrude on state ownership of sea-beds; and, *second,* in any event, under the Eleventh Amendment, Federal tribunals will not adjudicate private claims to the contrary.

As background, KeySpan is seeking to construct a marine terminal that would rest on the State-owned bed of Narragansett Bay. But KeySpan has not applied for a State deed, lease, or license; nor, alternatively, has KeySpan petitioned the State courts for a declaration that it needs none. Instead, KeySpan has come before this Court, purportedly resorting to *Ex Parte* Young and a particular Federal regulatory scheme, seeking to partially overthrow State property law. To elaborate, KeySpan's position is that the Commerce Power regulations supercede State ownership — under the Public Trust Doctrine — of submerged lands. This is contrary to the correct frame-work which is shown here:



Indeed, KeySpan's entire claim is an exercise in confusion. Most profoundly, it seeks to confuse the National control of waterways by *regulation* of private activities with National *possession* of such waterways. In other words, KeySpan seeks to confuse *in*direct control with *direct* control. In this manner, KeySpan benightedly seeks to bolster its claim of pre-emption, which is based on the Government's ordinary regulation of private activity (as represented by the column on the left, *supra*), by incorrectly attempting to latch onto legal precepts concerning the Government's direct ownership (as represented by the right-hand column, *supra*).

## FACTS AND PROCEEDINGS

KeySpan purports to be able to go forward with its proposed marine construction[2] off Field's Point in Providence, Rhode Island, without invoking (or only tentatively invoking[3]) the State process for obtaining a site license with respect to submerged lands. Thus, KeySpan takes the position that the State coastal zone program is relegated *solely* to a role in a Federally-prescribed "Consistency Certification" review procedure.[4] KeySpan eschews a proceeding

---

[2] KeySpan is not expected to dispute that its project involves public trust lands. This is essentially admitted by KeySpan and these admissions are documented in the Defendant's Statement of Undisputed Facts ¶¶ 2-5, 8, 10.

[3] *See* Stipulation in this matter dated on or about April 13, ¶ 6 (essentially encouraging KeySpan to invoke the state law process under protest).

[4] Federal Consistency Certification Review under the Coastal Zone Management Act (CZMA), 16 U.S.C. §§ 1451-1465, deals with some concerns for protecting and managing the coastline that Congress has declared to be limitations on FERC's (and other federal licensing agencies') power.

Distilled to its essence, the CZMA provides that, if a project is located in a state's coastal zone, then a Federal licensing agency (for example, FERC) cannot issue a final approval unless one of six contingencies transpires: (1) the state's applicable agency concurs that the proposed project is consistent with the state's coastal zone management program; (2) the state's concurrence is conclusively presumed by virtue of the state's failure to act by timely objection (as described in the next paragraph); (3) the Secretary of Commerce, on appeal by the applicant, overrides a state objection by reversing the agency and finding a planned activity consistent with objectives of the CZMA; (4) the Secretary so acts on his own initiative; (5) the Secretary of

Commerce, on appeal by the applicant, overrides a state objection by finding that, notwithstanding the correctness of the objection, a planned activity is otherwise necessary for national security; *or* (6) the Secretary so acts on his own initiative. 16 U.S.C. § 1456(c)(3)(A).

As alluded to above, once a FERC applicant applies to a state for a consistency certification, the state has six months to review this application, if it contains all necessary data and information. 16 U.S.C. § 1456(c)(3)(A). If six months pass without any objection from the state, then the state, by operation of the federal statute, forfeits its right to object to the project under the CZMA, and the project's consistency with the state's coastal program "shall be conclusively presumed" by FERC. *Id.*

By federal regulation, this six-month period for objection does not commence, however, until the state has received all necessary data and information required by the state's Coastal Zone Management Program to begin review. 15 C.F.R. § 930.60. The phrase "necessary data and information" is expressly defined by regulation to include everything identified in the state's Coastal Zone Management Program as necessary for review of a certification. 15 C.F.R. § 930.58(a)(2). A request by the state for *additional*, as opposed to *required*, information does not stop the six-month clock. Moreover, there is merely a thirty-day period provided for in 15 C.F.R. § 930.60(a)(1) for the state agency to notify an applicant of such deficiencies and thereby toll the clock.

In any event, pursuant to 15 C.F.R. §930.60(a)(3), state agencies and applicants may mutually agree to stay or extend the six month time-period for review of a certification of Federal consistency if that agreement is in writing and is provided to the pertinent Federal permitting agency.

As noted above, even if the state timely objects to the applicant's certification, that state decision is not necessarily fatal to the FERC license (or other Federal license) application. The FERC license (or other Federal license) applicant may appeal to the Secretary of Commerce for an override of the state's objection on the grounds that the applicant's proposed project is "consistent with the objectives of [the CZMA] or is otherwise necessary in the interest of national security." 16 U.S.C. § 1456(c)(3)(A).

Coastal zone boundaries, drawn by each state, show the areas subject to a state-devised coastal zone management program protecting coastal zones. 16 U.S.C. § 1455. The states' coastal zone maps and management plans must be approved by the National Oceanic and Atmospheric Administration (NOAA). This authority is granted by statute to the Secretary of Commerce, who delegated the authority to NOAA, who in turn delegated parts of this authority to the Office of Coastal Zone Management (OCZM). 16 U.S.C. § 1454.

The CZMA defines the coastal zone as:

> the coastal waters . . . and the adjacent shorelands . . ., and includes islands, transitional and intertidal areas, salt marshes, wetlands, and beaches.. . . The zone extends inland from the shorelines only to the extent necessary to control shorelands, the uses of

before the Council[5] under the Council's normal State-prescribed procedures for yielding state-owned sovereignty lands, notwithstanding KeySpan's own earlier use of a "Category B" form, *i.e.*, a form invoking that State-prescribed procedure.[6] *See* J.App. tabs 3, 5-8; Statement of Undisputed Facts ¶ 11. A fuller history of the preliminary skirmishing between KeySpan and the State can be gleaned from the parties' appendix. *See* J.App. tabs 3, 5-10, 13-21. *See also* Defendants' Amended Counter-claim ¶¶ 56 - 88; Statement of Undisputed Facts ¶¶ 11-14.

KeySpan's plans explicitly call for certain structures, the base of which will be embedded in the land underlying an arm of Narragansett Bay.[7] This implicates questions of: (1) ownership of the land in question; (2) whether the Federal government has purported to override existing ownership; (3) whether, in any event, the State should be forced (at the peril of any such ownership) into this federal judicial forum.

---

> which have a direct and significant impact on the coastal waters.. . .

16 U.S.C. § 1453(1).

The Federal government gave the CRMC its federal program approval pursuant to the CZMA in 1978.

[5] The Rhode Island Coastal Resources Management Council ("CRMC" or "Council") is a state agency created by an Act of the Rhode Island General Assembly whose powers and duties are set forth at R.I. Gen. Laws §§ 46-23-1 *et seq.*, and the regulations adopted thereunder.

[6] Thus, even KeySpan LNG, L.P. ("KeySpan LNG") acknowledged, at least temporarily, that, pursuant to The Rhode Island Coastal Resources Management Act, R.I. Gen. Laws 46-23-1 *et. seq.*, KeySpan was required to submit to the CRMC an Application for Category B Assent to build its project.

[7] As noted, *supra*, KeySpan's statements to this effect are recounted in the Statement of Undisputed Facts at ¶¶ 2-5, 8, 10.

## ARGUMENT

## PART ONE — THE PUBLIC TRUST DOCTRINE BARS THIS CLAIM

At the outset, a quick review of the state Public Trust Doctrine is in order. This will be followed by a discussion of whether federal law attempts to alter that Doctrine. (For this discussion, it is assumed that KeySpan has the advantages the law confers upon a riparian proprietor. If KeySpan does not, its attempt to resist state-law processes is on even weaker footing.) Next, this Memorandum turns to whether KeySpan's invocation of this Court's jurisdiction violates the State's sovereign immunity.

### I. THE PUBLIC TRUST DOCTRINE ESTABLISHES STATE OWNERSHIP OF THE SITE.

#### A. Title To Land Below The Mean-High-Tide-Line Is In The State.

It is axiomatic that "in this state, at common law, the fee of the soil in tide waters below high-water mark is in the state." Bailey v. Burges, 11 R.I. 330, 331 (1876).[8]

#### B. Title To Land Below The Mean-High-Tide-Line Does Not Pass Until Actual Filling.

Thus, it is black-letter law that, prior to the time that a littoral (*i.e.*, riparian or shore-front) owner actually takes advantage of his physical adjacency to the water by filling or building, he has no title to the area to be filled or built upon.[9] As simply stated in J.S. Thorton &

---

[8] *Accord, e.g.*, Warren v. Thornton-Whitehouse, 740 A.2d 1255, 1259 (R.I. 1999) ("the state holds title to all land below the high water mark in a proprietary capacity for the benefit of the public"); Narragansett Real Estate v. MacKenzie, 34 R.I. 103, 112, 82 A. 804, 806 (1912) ("fee of the land below ordinary high-water mark is in the State").

[9] An intertwined line of authority concerns the right of oystermen to enjoy the bed of Narragansett Bay. The same basic rule applies: public rights trump private rights in all tidelands. *See* Rocky Point Oyster Co. v. Standard Oil, 265 F. 379, 383 (D.R.I. 1920) (construing Rhode Island law) (oyster-bed lease revocable by State because "the tide-flowed lands are subject to a continuous public trust, to be administered by the Legislature"); Payne & Butler v. Providence Gas, 31 R.I. 295, 313, 77 A. 145, 152 (1910) ("the right thereby granted [by State leases of the bay to private parties] . . . is merely a license . . . subject to the public's right").

Co. v. Smith Grant & Co., 10 R.I. 477, 484 (1873), "the public right is paramount." Thus, while riparian rights (with respect to yet unfilled areas) are very strong as against other private parties, they have little force against the sovereign. *See id.* at 486 (Potter, J., dissenting on other grounds) ("**as against everybody *but* the state**"); Providence v. Comstock, 27 R.I. 537, 544, 65 A. 307, 309 (1906) ("**until forbidden by the State**"); Carr v. Carpenter, 22 R.I. 528, 530, 48 A. 805, 805 (1901) ("**as against all the world *but* [the State]**"); Murphy v. Bullock, 20 R.I. 35, 40, 37 A. 348, 350 (1897) ("**not** recognized **against the State**"); Allen v. Allen, 19 R.I. 114, 115, 32 A. 166 (1895) ("**as against anyone *but* the State**"); Folsom v. Freeborn, 13 R.I. 200, 205 (1881) ("**against everybody *but* the State**") (emphasis added to all above quotations).

### C. All Filling And Construction Below The Mean-High-Tide-Line Requires State Assent.

Not surprisingly, then, the precedents dealing with coastal filling and marine construction, while recognizing that early public policy in Rhode Island generally encouraged wharfing, also hold that such practice always required at least informal State agreement. "It is true the riparian proprietor may fill out in front of his land, but, if he does so, he **fills out by the permission or acquiescence** of the state." Bailey v. Burges, 11 R.I. 330, 331 (1876) (emphasis added). This is why language concerning some form of State license or permission is woven through the wharfing cases.[10]

[10] Thompson v. Sullivan, 88 R.I. 305, 315, 148 A.2d 130, 136 (1959) ("contingent upon . . . **permission** from the state"); Dawson v. Broome, 24 R.I. 359, 372, 53 A. 151, 157 (R.I. 1902) ("**under leave of the state**"); New York, N.H. & H. R. R. v. Horgan, 25 R.I. 408, 412, 56 A. 179, 181 (R.I. 1903) ("under the **license** thus given"); Carr v. Carpenter, 22 R.I. 528, 530, 48 A. 805, 805 (1901) ("[the State] may **suffer** the littoral proprietor to acquire"); Walsh v. Hopkins, 22 R.I. 418, 420, 48 A. 390, 391 (1901) ("by **sufferance**, and not by right"); Prior v. Comstock, 17 R.I. 1, 2, 19 A. 1079, 1079 (1889) ("**if permitted** to do so by the State"); Gerhard v. Bridge Com'rs, 15 R.I. 334, 335, 5 A. 199, 200 (1886) ("a **license** to him to fill out and incorporate the flats with the upland"); Brown v. Goddard, 13 R.I. 76, 81 (1880) ("right to fill out **under leave of the State**"); Aborn v. Smith, 12 R.I. 370, 373 (1879) ("the State . . . **permits** the owner of the

With this background in place, cases such as Gerhard v. Bridge Com'rs, 15 R.I. 334, 5 A. 199 (1886) (denying all private property rights in an offshore location where a structure was to be built), unfold like a syllogism.

The upshot is that KeySpan does not own the area it seeks to build upon and KeySpan would gain nothing by resorting to the theory of riparian rights. *Prima facie*, the State owns the land where KeySpan's proposed project will be located.

**D. The Coastal Council, In Addition To Regulating Public Trust Lands, Also Controls The Disposition Of Such Land As Real Estate.**

The agency responsible for implementing Rhode Island's Public Trust Doctrine, in the first instance, is the CRMC.[11] The CRMC adopted the Rhode Island Coastal Resources

---

upland to take by filling"); Providence Steam-Engine Co. v. Providence & S. S.S., 12 R.I. 348, 355 (1879) ("a **license** to him to fill out"); Engs v. Peckham, 11 R.I. 210, 224 (1875) ("a **license** or invitation to the riparian proprietor to fill or wharf out"). (Emphasis added to all above quotations.)

[11] In year 2000, the General Assembly passed P.L. of R.I. 2000, c. 314, "An act Relating to Waters and Navigation – Coastal Resources Management Council," regarding public trust lands. This legislation reaffirmed or established certain positive public trust principles.

More specifically, the enactment clearly differentiates between required regulatory approval of filling activity under environmental statutes and the legal disposition of title. The Act is re-produced at: http://www.rilin.state.ri.us/PublicLaws/law00/law00314.htm. The Act states:

> With the exception of any and all projects to fill land of twenty-five (25) acres or more [which require deeding by means of a resolution of the General Assembly itself], the General Assembly hereby recognizes and declares that the CRMC is delegated the sole and exclusive authority for the leasing of submerged and filled lands and giving **licenses for the use** thereof. Accordingly, the CRMC will develop, coordinate and adopt a system for the leasing of submerged and filled lands, and **licenses for the use thereof**, and will ensure that all such leases and **licenses** are consistent with the public trust.

*Id.* at § 3 (emphasis added). After this discussion of the *ownership* interests at the disposal of the State, the statute separately discusses the State's *regulatory* authority:

Management Program ("RICRMP") in 1976. The RICRMP is structured as a strategic plan for the State's coastal areas, and is both *regulatory* and *proprietary* in nature (a distinction elaborated upon in the previous footnote and in the next sub-section).

### E. There Is A Clear Distinction Between Governmental *Regulation* And Governmental *Ownership*.

In considering the scope of the CRMC's power (and the effects of any Congressional action thereon), it is important *not* to conflate a government's authority to *regulate* a water body with its authority to *own* a property interest in such water body. The two possible perogatives were sharply distinguished in a particular Supreme Court case comparing Congress' general Commerce Clause authority to the powerful Federal Navigational Servitude. Kaiser Aetna v. U.S., 444 U.S. 164 (1979). "All of this Court's cases dealing with the authority of Congress to regulate navigation and the so-called 'navigational servitude' **cannot simply be lumped into one basket**," the Court stated in distinguishing between waters that were merely subject to regulation under the Commerce Clause and the smaller sub-set of waters "subject to a public right of access." *Id.* at 172 (emphasis added). In that particular case, the government lost to the particular private party because the government had mere regulatory authority but did not have a property interest to rely upon.

By comparison, as shown earlier, Rhode Island is in the relatively strong position of holding a *property*, rather than merely a *regulatory*, interest. With this background in mind, let us turn to the pre-emption arguments.

---

> [N]othing in this chapter shall be construed to limit or impair the authority of the state, or any duly established agency thereof, to regulate filling or dredging affecting tidal lands owned by the state or any other entity and nothing in this chapter shall be construed to limit or impair the obligation of the applicant to obtain all applicable regulatory approvals.

*Id.*

## II. THE FEDERAL GOVERNMENT HAS NOT EXPRESSED AN ATTEMPT TO PRE-EMPT OR ALTER THE PUBLIC TRUST DOCTRINE

### A. *Regulatory* Pre-Emption Cases Do Not Apply To State Real Estate *Ownership*.

KeySpan vigorously cites (in various letters to the CRMC; *see* J.App. tabs 9, 11) Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988); National Fuel Gas Supply Corp. v. Public Serv. Com'n, 894 F.2d 571, 578 (2nd Cir. 1990); ANR Pipeline Co. v. Iowa State Commerce Com'n, 828 F.2d 465, 470 (8th Cir. 1987); Algonquin LNG v. Loqa, 79 F.Supp. 2d 49, 52 (D.R.I. 2000); and Kern River Gas Transm'n v. Clark County, 757 F.Supp. 1110, 1114 (D. Nev. 1990).[12] But none of those opinions call for pre-emption of State land *ownership*. Rather, they deal with mere *regulation*.

Nor does the underlying statute, which those cases invoke, explicitly attempt to displace state *ownership*.[13] In other words, nothing in the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq*., operates against the strong tradition of state seisin-in-fee, discussed above.

Moreover, the so-called "clarification" tacked onto the Congressional appropriations bill that passed last fall did nothing to alter this analysis.[14] The language in that bill that "The Natural Gas Act clearly preempts states on matters of approving and siting natural gas infrastructure . . .," does not speak to state *ownership*.

---

[12] *But see* Midwestern Gas Transm'n v. McCarty, 120 F.Supp.2d 1155 (S.D. Ind. 2000) (expressing doubt as to claims of pre-emption under the NGA).

[13] Those cases apply the federal Natural Gas Act ('NGA'), 15 U.S.C. §§ 717 *et seq*., the recodified federal Natural Gas Pipeline Safety Act (NGPSA), 49 U.S.C. §§ 60101 *et seq*. Most especially, they concern Section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a).

[14] On or about November 20, 2004, language concerning LNG siting authority was inserted into H.R. Report No. 108-792 accompanying (and incorporated into) H.R. 4818, the Consolidated Appropriations Act of 2005. This language was not germane to the funding of the Federal Government, which was the stated subject matter of the Act it accompanied. Instead, it purports to convey an interpretation of what a different Congress intended 66 years earlier when it enacted the Natural Gas Act.

**B. Even With Respect To Hydro Power, FERC's In-Roads Into State Water Law Are Limited.**

Imagine, for the sake of argument, that Congress wished to subordinate state water law. It would be odd, indeed, if Congress chose to locate such subordination in the Natural Gas Act, a statute which implicates water-ways only tangentially and incidentally (other than setting rates, the Natural Gas Act of 1938 regulates the construction of new natural gas pipelines and related facilities). The statute makes no express reference to water-ways; nor would one expect it to do so, the legislation having been first enacted in an era when the maritime shipment of natural gas was unforeseen. Cryogenics was an unknown technology in the 1930s.

The NGA's silence with respect to water rights does, however, give rise to one conclusion that the parties emphatically agree upon: As stated by KeySpan, "The U.S. Army Corps of Engineers . . . has authority over the project under . . . Section 10 of the Rivers and Harbors Act [of 1899]. . .." *See* KeySpan's August 20, 2004, Category B Assent Application, p. 1-4, J.App. p. 97. In other words, when Congress wrote the NGA, it was aware of the routine exercise of Federal physical jurisdiction over water-ways which had been manifested in Victorian-era statutes with, arguably, Federal common-law antecedents dating back to the birth of the Republic. It chose not to displace that regime, a regime which, as will be highlighted *infra*, has historically worked in tandem with state public trust law.

Otherwise, the silence of the NGA with respect to water rights prompts a contrast with the Federal Power Act of 1920, the cornerstone of the edifice that is now FERC. In contrast with the NGA, that legislation concerns facilities that not only *touch upon* water resources but are literally *in* those resources: that act governs hydro-electric dams. An amalgam of Wilsonian idealism, Rooseveltian conservationism (Square Deal hold-overs were instrumental in its drafting), and western-state agrarian populism, the Federal Power Act is the comprehensive

national charter for hydro power and the prototype for the later New Deal era of Federal activism. Thus, if one were to look for an aggressive posture by Congress with respect to state water law, one would look to that legislation.

So mindful were the law-makers of the intersection between their creation and the topic of water law that, in a rare move, Congress displaced its earlier authorization of Army Corps regulation of waterways under § 10 of the 1899 Rivers & Harbors statute, and, as an alternative, gave the Army Corps, using the exact same standards, a veto-role within the framework of the Federal Power Act licensing process itself. *See* § 4(d) of the Act. Obviously, this revision to Corps jurisdiction only applied to hydro projects; otherwise § 10 authority was unaffected.

Yet, curiously, under that landmark legislation, all three branches of the Federal government have approached state water law with trepidation. The legislative branch, explicitly recognizing that state-law property rights in the "beds and banks" of navigable streams were to be honored (*see* section 9(b)), resorted to eminent domain (*see* section 21 of the Act) to secure the sites for many projects. The legislators implicitly left it to a spirit of cooperative federalism to secure the remainder. *See* Federal Power Act of 1920, *passim*.

For several decades, the executive, in turn, supported plenary deference to all state law concerning waterways: FERC's predecessor, the Federal Power Commission, sided with the State of Iowa when the issue of pre-emption first came before the High Court in the First Iowa case in the mid-40s. *See* First Iowa Hydro-Electric Coop. v. FPC, 328 U.S. 152 (1946). It was only because a private licensee claimed pre-emption that the issue ever came before the Court.

Finally, while the judiciary did find *some* pre-emption in First Iowa (and, then, only over a vigorous dissent by Justice Frankfurter), it did so on the narrowest of grounds: *non*-proprietary state police power regulations (in that case regulations of the flowing water itself) must yield, but

state (and state-created) "**proprietary rights**" were exempt from preemption. California v. F.E.R.C., 495 U.S. 490, 498 (1990) (quoting First Iowa, 328 U.S. at 175-76) (emphasis added by the California v. F.E.R.C. Court). One must consider that state water law subsumes: (1) state ownership of the beds and banks (under the public trust doctrine); (2) state-created private ownership of the same; (3) state ownership of the flowing water itself, at least in some states; (4) state-created vested rights to the same under the appropriation legal systems of arid western states; (5) state-created reasonable-use rights to the same in the riparian legal systems of the relatively high-rainfall eastern states; and (6) police power regulation of the waters. Only this last portion of state dominion was hindered by the FPA and First Iowa. Thus, only a fraction of the states' domain was invaded by Congress, and that fraction is the portion that is the most remote from the Public Trust Doctrine.

The narrowness of First Iowa (and of the pre-emptive effect it found in the FPA) was brought home by Federal Power Comm'n v. Niagara Mohawk Power Corp., 347 U.S. 239 (1954), authored by none other than Justice Burton who had led the First Iowa majority some eight years beforehand:

> [R]eal property rights, are determined by state law. Title to them is acquired in conformity with that law. The Federal Water Power Act merely imposes upon their owners the additional obligation of using them in compliance with that Act.
>
> The legislative history of the Act discloses no substantial support for the drastic policy which the Commission seeks to read into it. To convert this Act from a regulatory Act to one automatically abolishing preexisting water rights on a nationwide scale calls for a convincing explanation of that purpose. We find none.

*Id.* at 252-53, (1954) (footnotes omitted).

Making the very distinction advocated in this Memorandum, Justice Burton, writing for the Court, made the following comparison. The opinion compared the "dominant [Federal Navigational] [S]ervitude," the "exercise [of which] requires clear authorization . . . in explicit terms" if it is to operate as against state-created or state-held rights, on one hand, with "the much more general and regulatory language of the Federal Water Power Act" on the other hand. Speaking of the latter, the Justices continued,

> Neither it, nor the license issued under it, expressly abolishes any existing proprietary rights to use the waters of the Niagara River. Unlike [a] statute [exercising the Servitude], the Federal Water Power Act mentions no specific properties. It makes no express assertion of the paramount right of the Government to use the flow of the . . . navigable stream to the exclusion of existing users. On the contrary, the plan of the Act is one of reasonable regulation of the use of navigable waters, coupled with encouragement of their development as power projects by private parties.

*Id.* at 249-51 (1954) (footnotes omitted; emphasis added).

KeySpan seeks to succeed where the Niagara-Mohawk Power Corp. failed. But, in doing so, it relies on a weaker Act against a stronger state right. Its cause is hopeless. And if any question remains as to whether Congress intended to pre-empt the state Public Trust Doctrine by the NGA, that question is resolved by reference to the Coeur d'Alene case.

### C. Coeur d'Alene Calls For Non-Preemption Of State Real Estate Ownership, At Least With Respect To Public Trust Lands.

The fairly recent decision by the United States Supreme Court in the Coeur d'Alene case emphasized the connection between the Public Trust Doctrine and state sovereignty. More importantly, the Court emphasized that the United States government is unlikely to ever seek to impair such state sovereignty. Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997), involving a dispute over a state's title to a lake bottom that was alleged to have been deeded away by Federal authorities to an Indian tribe, deserves quotation at length:

> [T]he State . . . [has] sovereign control over submerged lands, lands with a unique status in the law and infused with a **public trust** . . .. As we stressed in Utah Div. of State Lands v. United States, lands underlying navigable waters have historically been considered "sovereign lands." State ownership of them has been "considered an essential attribute of sovereignty." The Court from an early date has acknowledged that the people of each of the Thirteen Colonies at the time of independence "became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." Martin v. Lessee of Waddell. . . . The importance of these lands to state sovereignty explains our longstanding commitment to the principle that the United States is presumed to have held navigable waters in acquired territory for the ultimate benefit of future States and **that disposals by the United States** during the territorial period **are not lightly to be inferred,** and should **not be regarded as intended unless the intention was definitely declared or otherwise made very plain.** . . .
>
> The principle which underlies . . . **the strong presumption of state ownership** is that navigable waters uniquely implicate sovereign interests.

Coeur d'Alene at 283-84 (emphasis added; some internal citations and quotation marks omitted). In short, the national government is deemed to be (and has proven to be) circumspect with respect to each state's ownership of its respective Public Trust Doctrine lands.

Given the fact that Rhode Island, unlike Idaho, was one of the original thirteen states, and given the fact that KeySpan has less of a moral claim to submerged lands than a governmental unit of local Native Americans, the underlying thrust of the Coeur d'Alene case is especially forceful here. *Per force*, the Federal government has had even less motive and even less opportunity to interfere with the sea-bed title in the instant situation: in Rhode Island's upper bay, aboriginal rights are not at stake, and this state was not carved out of Federal lands. At the very least, an unmistakable, overt, specific expression of an intent to override such proprietorship

would have to be manifest in an Act of Congress. As further specified immediately below, none has been cited or found.

**D. There Are Two Means By Which Congress Hypothetically Could Override State Ownership, But It Has Done Neither.**

Rhode Island cheerfully concedes that the Federal government, for the sake of the Nation, *could* supercede Rhode Island's property rights. There are two methods by which the national government *could* easily trump the State's title. Indeed, the curious absence of the employment of either of those two methods is extremely telling here. When one considers the powerful tools at the command of Congress (and its delagees) when Congress genuinely desires to push a state's land-tenure aside, the novel method asserted by KeySpan (the supposed regulatory pre-emption of the State's real estate title) takes on an air of desperation.

*1. Congress has not delegated eminent domain power to FERC with respect to KeySpan's type of project.*

Of course, if FERC or KeySpan had been granted the power of eminent domain in this situation they could put it to good use: "Because . . . the United States' power of eminent domain is supreme to the State's power to maintain tidal lands for the public trust, . . . condemnation of these lands extinguishes the State's public trust . . .." U.S. v. 11.037 Acres of Land, 685 F.Supp. 214, 217 (N.D. Calif. 1988).

Alas, KeySpan does not have the backing of Congress with respect to that power and actually finds itself in a relatively *dis*favored status. By contrast, other classes of beneficiaries of the Natural Gas Act are in a much stronger position. For example, § 7(h) of the Act confers on FERC-certified pipe-line builders the power of eminent domain to acquire rights-of-way as well as "other stations or equipment necessary to the proper operation of such pipe line or pipe lines."

15 U.S.C. § 717(h). Significantly, this section is silent with respect to liquefied natural gas terminals and, thus, does not extend such eminent domain power to KeySpan.

The result is that KeySpan is bereft of the authority to compel the necessary land rights from the State of Rhode Island in order to construct berthing facilities on the submerged lands of the Providence River. Instead, KeySpan is left to look on in envy and concoct unheralded theories of the regulatory pre-emption of land titles.

2. *Congress has not delegated the exercise of the Federal Navigational Servitude to FERC or to KeySpan.*

Of course, a direct governmental exercise of the Federal Navigational Servitude will trump states' rights deriving from ownership of tide-lands, as has been held by numerous Supreme Court cases.[15]

Again, however, the vacuum is telling: As will be explained immediately, Congress has not delegated the exercise of the Servitude to FERC or to FERC's permitees but, instead, to the Army Corps of Engineers; and, even when the Army Corp permits a private project, it merely expresses toleration, not an active delegation.

---

[15] *See* U.S. v. Cherokee Nation of Okla., 480 U.S. 700, 704 (1987) ("[w]hether . . . the title to the bed of the stream is retained by the State or . . . the riparian owner . . . the rights of the title holder are subject to the dominant power of the federal Government") (internal quotation marks and citations omitted); Montana v. U.S., 450 U.S. 544, 551 (1981) ("[t]he State's power over the beds of navigable waters remains subject to only one limitation: the paramount power of the United States to ensure that such waters remain free to interstate and foreign commerce"); Lewis Blue Point Oyster Cultivation Co. v. Briggs, 229 U.S. 82, 88 (1913) ("title to such submerged lands is acquired and held subject to the power of Congress to deepen the water over such lands, or to use them for any structure which the interest of navigation, in its judgment, may require"); Philadelphia Co. v. Stimson, 223 U.S. 605, 635 (1912) ("although the title to the . . . submerged soil is in the various states . . ., it is always subject to the servitude in respect of navigation . . . in favor of the Federal government"); Scranton v. Wheeler, 179 U.S. 141, 163 (1900) ("whether the title to the submerged lands of navigable waters is in the state or in the riparian owners, it was acquired subject" to the Federal Navigational Servitude).

**i. Army Corps permits do not displace states' public trust rights.**

In its role as guardian of the navigability of the waters of this country, the Army Corps is to regulate myriads of activities, including obstructions to, structures in, and alterations or modifications of navigable waters,[16] and the deposit of refuse in such waters.[17] The Corps also plans and constructs projects to improve rivers and harbors and to control floods.[18] As the footnoting indicates, central to these roles is the venerable and powerful § 10 of the River & Harbor Act of 1899 (the section under which KeySpan would be permitted). *See, e.g.*, United States v. Republic Steel Corp., 362 U.S. 482, 488-92 (1960) (using the adjective "broad" four times, as well the terms "not narrow[]," "[not] cramped," "great design," and "[to be] read . . . charitably," in describing the Corps' powers); United States v. Alaska, 503 U.S. 569, 578 (1992) (unanimously adopting the language of the Republic Steel opinion).

Soon after its adoption in 1899, the courts made short work of the notion that § 10, which provides for federal permits for building in navigable waters, can supercede the public trust property rights vested in states:

> Whether Congress may, against or without the expressed will of a state, give affirmative authority to private parties to erect structures in such waters, it is not necessary in this case to decide. It is only necessary to say that the act of 1899 does **not** manifest the purpose of Congress to go to that extent under the power to regulate foreign and interstate commerce and thereby to supersede the original authority of the states. The effect of that act, reasonably interpreted, is to make the erection of a structure in a navigable river, within the limits of a state, **depend upon the concurrent or joint assent of *both* the national government and the state government**. The Secretary of War, acting under the authority conferred by Congress, may assent to the erection by private parties of such a structure. Without such assent the structure cannot

[16] Section 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 403.

[17] Section 13 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 407.

[18] 33 U.S.C. §§ 540 to 633.

> be erected by them. But under existing legislation they must, before proceeding under such an authority, **obtain *also* the assent of the state** acting by its constituted agencies.

Cummings v. City of Chicago, 188 U.S. 410, 431 (1903) (emphasis added). The Cummings opinion distinguished between the Corps' possessory powers over waterways and its mere toleration of private works:

> In a sense, but only in a limited sense, the United States has taken **possession** of Calumet river, by improving it, by causing it to be surveyed, and by establishing lines beyond which no dock or other structure shall be erected in the river without the approval or consent of the Secretary of War, to whom has been committed the determination of such questions. **But Congress has not passed any act under which parties, having simply the consent of the Secretary, may erect structures** in Calumet river **without reference to the wishes of the state** of Illinois on the subject.

*Id.* at 426-27 (1903) (emphasis added).

Cummings' specific holding with respect to § 10 is now well-entrenched in Supreme Court jurisprudence[19] and, of course, that of the lower courts.[20] Suffice it to quote at length just one particularly thoughtful lower-court synthesis:

---

[19] Organized Village of Kake v. Egan, 369 U.S. 60, 63-64 (1962) ("permit[ ] granted by the Army Corps of Engineers . . . is simply acknowledgment that the activity does not violate federal law, and **not an exemption from state licensing**"); Wisconsin v. Illinois, 278 U.S. 367, 412 (1929) ("[§ 10] was **not intended to override the authority of the state to put its veto** upon the placing of obstructing structures in navigable waters within a state, and both state and federal approval were made necessary in such case"); Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, 262 (1915) ("exercise of power by [one sovereign] does **not preclude** another exercise" by the other sovereign); North Shore Boom & Driving Co. v. Nicomen Boom Co., 212 U.S. 406, 412 (1909) ("there is a **concurrent** or joint **jurisdiction** of the state and national governments over the erection of a structure which obstructs navigation"). (Emphasis added on all quotations.).

[20] Norfolk Dredging Co. v. Radcliff Materials, Inc., 264 F. Supp 399, 402 (E.D. Va. 1967) ("the federal government had no property interest in the harbor bottom which it could convey, since title to **the bottom is clearly vested in** the Commonwealth of **Virginia**"); Eagle Intern., Inc. v. Crossett Port Authority, 766 S.W.2d 28, 31 (Ark.App. 1989) ("the permit herein is only a finding that appellant's proposed mooring dolphins and floating dock **will not interfere** with or be detrimental to navigation, and it is **not equivalent to a declaration that the appellant may**

> [The Submerged Lands Act of 1953, 43 U.S.C., section 1314] specifically confirms the state's title to submerged tidelands. The state holds this title not by virtue of a federal grant, but as an incident of the transfer to the state of local sovereignty at the time of admission to the Union. The state's title is subject only to the paramount power of the United States to control such waters for the purpose of navigation in interstate and foreign commerce.
>
> [Defendant] argues that the term 'paramount' indicates that the United States retained title to the lands as well as the navigable waters. In view of the express language of the statute indicating that the **paramount right applies only to** the **regulation** and control of the lands and waters for constitutional purposes of commerce and navigation but **does not include proprietary rights** of ownership or the use and development of the lands, this contention is entirely without merit.

County of Marin v. Roberts, 84 Cal. Rptr. 425, 429 (1970) (emphasis added).

Indeed, one must look no further than the language of the Army Corps' own regulations for the current language embodying the rule of Cummings: "Authorization of work or structures by the [Army Corps] does not convey a property right, nor authorize any injury to property or

---

**proceed** . . . without first obtaining the consent of the Port Authority"); County of Marin v. Roberts, 84 Cal. Rptr. 425, 429 (1970) ("paramount right applies only to the regulation . . . of the . . . waters . . . but does **not** include **proprietary rights** of ownership"); Cobb v. Lincoln Park Com'rs, 202 Ill. 427, 439-40 (1903) ("the permission of the general government to build a wharf in navigable waters is necessary[;] [b]ut such permission is **not** given to **override** the rights of **the owners** of the submerged lands"); Pierson v Coffey, 706 S.W.2d 409, 413 (Ky. App. 1985) ("[t]he requirement that a person must obtain a permit before he or she may place obstructions in the river **does not** confer any interest in riparian **property** upon the recipient of the permit"); Kliebert Educational Trust v. Watson Marines Services, Inc., 454 So.2d 855, 859 (La.App. 5 Cir. 1984) ("a permit issued by the Federal Government merely expresses the assent of the Federal Government so far as concerns the public rights of navigation but **in no way obviates** the necessity of obtaining **state assent** to the work authorized"); Wilson v. Hudson County Water Co., 76 A. 560, 567 (N.J. Eq. 1910) ("section [10] as worded clearly contemplates that the consent of the Secretary [of the Army] shall **merely be permissive** of the doing of work for which authority already exists"); Carrithers v. Terramar Beach Community Improvement Assoc., 630 S.W.2d 648, 650 (Tex. App. 1981) ("[t]he grant of a permit by the U. S. Army Corps of Engineers to the defendants did **not** bestow upon them any **property rights** with respect to the submerged lands") *rvs'd on other grounds* 645 S.W.2d 772 (Tex. 1983). (Emphasis added on all quotations.)

invasion of other rights." 33 C.F.R, § 320.4(g) (1980). This is elaborated in 33 C.F.R. 320.4(g)(6):

> A [Army Corps] permit does not convey any property rights, either in real estate or material, or any exclusive privileges. Furthermore, a [Department of the Army] permit does not authorize any injury to property or invasion of rights or any infringement of Federal, state or local laws or regulations. The applicant's signature on an application is an affirmation that the applicant possesses or will possess the requisite property interest to undertake the activity proposed in the application.

In fact, the Corps goes so far as to explicitly deny the conveyance of property rights in the language of the permit itself:

> a. This permit does not obviate the need to obtain other Federal, state, or local authorizations required by law.
>
> b. This permit does not grant any property rights or exclusive privileges.
>
> c. This permit does not authorize any injury to the property or rights of others.

Permit Form & Special Conditions, 33 CFR 325, App. A. Another endorsement states:

> The permittee understands and agrees that, if future operations by the United States require the removal, relocation, or other alteration, of the structure or work herein authorized, or if, in the opinion of the Secretary of the Army or his authorized representative, said structure or work shall cause unreasonable obstruction to the free navigation of the navigable waters, the permittee will be required, upon due notice from the Corps of Engineers, to remove, relocate, or alter the structural work or obstructions caused thereby, without expense to the United States. No claim shall be made against the United States on account of any such removal or alteration.

*Id.*

Moreover, Cummings stands at the center of a trilogy of cases construing the various powers of the Army Corps with respect to waterways, which, taken together, have a more general implication: Congress is traditionally reluctant to trammel the Public Trust Doctrine.

Cummings was first echoed in Montgomery v. City of Portland, 190 U.S. 89 (1903), which was virtually a companion case. The Army Corps gave approval to a riparian owner to construct wharves, but the local authorities then ordered the owner to cease. The Court stated that, although the case involved § 12 of the River & Harbor Act of 1888, rather than § 10 of the 1899 Act, the case was the same, in principle, as Cummings, and reiterated that "the right of private persons to erect structures in a navigable water . . . cannot be said to be complete and absolute without the concurrent or joint assent of **both** the general and state governments." *Id. at* 106.

More importantly, the Montgomery Court was careful to note the distinction (repeated throughout the instant Memorandum) between a private action tolerated by the United States government and a direct action by the government itself. By contrast with the right of the United States to engage in mere regulation of private activity, "the right of the [United States] government to erect public structures in a navigable water of the United States rests upon **different** grounds" and would not be subject to state or local approval. *Id.* at 106.

Cummings also inspired International Bridge Co. v. New York, 254 U.S. 126 (1920), which involved a dispute over a bridge constructed from New York State to Canada over the Niagara River; some of the support columns for the bridge sat on state-granted bottom lands. Like Montgomery, this case involved a different Federal statute than in Cummings. But the Court, explicitly following the spirit of Cummings, held that the requirement of "concurrent or

joint assent" of both state and federal governments applied. The Court expanded upon the logic of Cummings by making reference to the foundational nature of state ownership of bottom lands:

> The Act does not make Congress the **source** of the right to build but assumes that the right comes from another **source**, that is, the State. It merely subjects the right supposed to have been obtained from there to the further condition of getting from Congress consent to action upon the grant.

*Id* at 133.

Read narrowly, these three holdings can be seen as isolated technical constructions of particular obscure statutes, some of them obsolete. Taken together, a larger proposition emerges: Dual proprietary control of the Nation's waters has been the affirmative policy of successive Congresses.

**ii Congress does not delegate the Federal Navigational Servitude to entities other than Federal agencies.**

KeySpan will search in vain for any provision of the United States Code which might convey the Servitude to KeySpan. Congress virtually *never* yields the Servitude to another entity. In United States v. Cherokee Nation of Okla., 480 U.S. 700 (1987), a treaty had deeded the riverbed of a particular waterway (in that case, the Arkansas River) to an Indian tribe. The tribe, armed with the deed, sued, claiming that the tribe, and not the Government, now had exclusive rights to undertake navigational improvements to the river bottom. The claim pre-supposed that the Government had conveyed to the tribe its easement to control navigation (*i.e.*, the Federal Navigational Servitude elaborated, *supra*); absent that conveyance, it was universally understood that the tribe's property title would include no right to exclude the Government's riverbed activities. *Id.* at 704.

The Court — speaking through the Chief Justice Rehnquist and unanimously reversing two lower courts — noted that the treaty (couched in general terms) said nothing specifically

about conveying the Government's navigational easement, *see id.* at 706, which the Court deemed to be an aspect of sovereignty. This, the Justices said, could be "surrendered [only] in unmistakable terms," *id.* at 707 (internal question marks omitted), if, indeed, it could be transferred at all.

The Cherokee case is a piece of the decisional road-map for the matter at hand. In many respects, the facts are equivalent. The treaty there, like the expected permit at hand, mentioned the water-body by name and referred to the land underlying that water body. The grantor there, like the Army Corps here, was an arm of the Federal sovereign. The governmental authority at issue there, as here, was the Federal Navigational Servitude. In each case, there is a claim by the recipient that a governmental power of the grantor was surrendered. Indeed, some of the facts there were even stronger in favor of the tribe than they are for KeySpan here. The treaty at issue there contained the language of fee simple conveyance language that is lacking, indeed, contradicted by, the Army Corps permit KeySpan hopes for in the matter *sub judice*. The recipient, unlike KeySpan in the case at hand, was a governmental entity. Yet, the Supreme Court in Cherokee, recognizing that the particular power at issue was an incident of sovereignty, rejected the grantee's claim. KeySpan is on even weaker footing.

In the instant case, KeySpan misses these implications by glossing over the sovereign prerogatives involved.

* * *

To recapitulate, KeySpan's claim of "pre-emption" rests on locating a paramount power. But, although the Natural Gas Act Certificate might pre-empt State regulation, it has no bearing on State ownership. Turning to the only other relevant power possibly paramount to a State's ownership of public trust lands is the Federal Navigational Servitude. But as demonstrated

above, that servitude will not be exercised by, or on behalf of, KeySpan. At most, KeySpan hopes to obtain a § 10 Army Corps permit that will *not* delegate the servitude and that will merely express toleration: such permit merely tolerates an intrusion on one sovereign's property rights; it does not authorize an intrusion onto those of the other sovereign.

To conclude this part, the Federal Government has done nothing to alter the basic fact that Rhode Island owns the site and KeySpan does not. KeySpan must apply under purely State law to the CRMC for a license to use State land separate and apart from any Federal requirements. And, even if a contrary argument were, in good faith, available, that argument must be made in a state-accepted, rather than a federally-dictated, forum — a subject to which we now turn.

## PART TWO — SOVEREIGN IMMUNITY BARS THIS CLAIM

### I. SOVEREIGN IMMUNITY IS VIOLATED BY KEYSPAN'S NAMING OF THE CRMC.[21]

One particular fairly recent landmark Supreme Court case on the scope of a state's sovereign immunity under the Eleventh Amendment ultimately controls the outcome of this case. *See* Idaho v. Coeur d'Alene Tribe, 521 U.S. 261 (1997). However, one portion of KeySpan's claims against the State defendants may be disposed of by relying on the Eleventh Amendment case law pre-dating Coeur d'Alene Tribe and, consequently, this Memorandum turns to that matter first.

As the Court has noted, the Eleventh Amendment stands "not so much for what it says, but for the presupposition . . . which it confirms." Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991). That "presupposition" is the doctrine of sovereign immunity, *i.e.*, that "'it

[21] The ensuing discussion is partially paraphrased from ANR Pipeline Co. v. Lafaver, 150 F.3d 1178, 1186-90 (10th Circ. 1998).

is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.*'" Hans v. Louisiana, 134 U.S. 1 at 13 (emphasis in original) (quoting *The Federalist,* No. 81 (A. Hamilton)).

Furthermore, it does not matter what form of relief a citizen might request in a suit against a state agency; all suits against state agencies themselves are to be dismissed. *See* Cory v. White, 457 U.S. 85, 90 (1982). It is on the basis of this holding in Cory that this Court, at the outset, should grant the defendants' motion with respect to the claims against the state agency, the CRMC. The entity cannot be sued. *Accord* ANR Pipeline Co. v. Iowa State Commerce Com'n, 828 F.2d 465, 470 (8th Cir. 1987) ("even a suit solely for prospective injunctive relief when it is brought against a state agency *qua* state agency is barred by the amendment."); Midwestern Gas Transm'n v. McCarty, 120 F.Supp.2d 1155 (S.D. Ind. 2000) ("[n]o exception applies to Midwestern's suit directly against the Indiana Utility Regulatory Commission itself").

## II. THE SUIT IS BARRED WITH RESPECT TO THE OFFICIALS AS WELL.

There are two narrow exceptions and one major qualification (often referred to as a third "exception") to the doctrine of sovereign immunity as it is enshrined in the Eleventh Amendment. The two exceptions are: 1) a state may waive its Eleventh Amendment immunity by consenting to be sued, but only in the clearest and most unmistakable terms; and 2) Congress may abrogate the states' Eleventh Amendment immunity, but again, only by using the clearest and most unmistakable terms, and, furthermore, only when Congress is exercising a power granted to it by a constitutional amendment post-dating the Eleventh Amendment, principally section 5 of the Fourteenth Amendment.

A third route for a party to obtain relief against a state agency in federal court (the qualification referred to above) is the so-called *Ex Parte* Young "exception" to the Eleventh

Amendment; in nominal form, the rule is not actually an "exception" because the citizen's suit is not against the state, but, rather, it is a suit against a state official. In such a suit, when a party seeks only prospective equitable relief — as opposed to any form of money damages or other relief at law — then the Eleventh Amendment generally does not stand as a bar to the exercise of the judicial power of the United States. *See* *Ex Parte* Young, 209 U.S. 123, 158-59 (1908); *see also* Coeur d'Alene, 521 U.S. 261, 288 (O'Connor, J., concurring) ("[t]he *Young* doctrine recognizes that if a state official violates federal law, he is stripped of his official or representative character and may be personally liable for his conduct; the State cannot cloak the officer in its sovereign immunity").

Under the *Ex Parte* Young legal fiction, when an official of a state agency is sued in his official capacity for prospective equitable relief, he is generally not regarded as "the state" for purposes of the Eleventh Amendment, and the case may proceed in federal court. *See* Green v. Mansour, 474 U.S. 64, 68 (1985) (reading *Ex Parte* Young to hold "that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law"). In determining whether the doctrine of *Ex Parte* Young avoids an Eleventh Amendment bar to suit, theoretically a court need only conduct a "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment).

Superficially, here, KeySpan is seeking injunctive and declaratory relief, alleging that CRMC's requirement that KeySpan comply with CRMC's Category B Assent process is pre-

empted by the NGA and FERC regulations. At first blush, this might ordinarily satisfy the "straightforward inquiry."

But, enter the Coeur d'Alene opinion. The decision in Idaho v. Coeur d'Alene Tribe, 521 U.S. 261, 271 (1997), recognized that, because of the important interests of federalism and state sovereignty implicated by the *Ex Parte* Young doctrine, the rule needed limits. The upshot is the major exception-to-the-"exception" carved out by Coeur d'Alene.

The narrowing of the *Ex Parte* Young doctrine in Coeur d'Alene arose in a case involving a federal suit by an Indian tribe seeking a declaratory judgment establishing its right to quiet enjoyment over the submerged lands of Lake Coeur d'Alene, in addition to seeking prospective injunctive relief against numerous Idaho state officials to prevent them from exercising the state's asserted jurisdiction over those submerged lands. Coeur d'Alene, 521 U.S. 261, 265. In sum, in Coeur d'Alene, an action was brought by a Federally-recognized Indian tribe against a state and its officials in which the tribe alleged an on-going violation of its property rights in contravention of Federal law and sought, essentially, prospective injunctive relief. The Court was badly fractured by the case,[22] but a majority of justices agreed that the *Ex Parte* Young doctrine could not save the tribe's federal suit even though the tribe sought only prospective equitable relief and its suit did not run afoul of any of the other long-recognized limitations to the doctrine. *See* Coeur d'Alene 521 U.S. 261, 292 (Kennedy, J., majority

[22] Justice Kennedy wrote the principal opinion for the Court, but key provisions of his opinion garnered only one other vote. *See* Coeur d'Alene, 521 U.S. 261, 262-263 (Kennedy, J., minority opinion, with Rehnquist, C.J., as to Parts II-B, II-C, and II-D). The controlling concurrence by Justice O'Connor rejected Justice Kennedy's view that the *Ex Parte* Young doctrine should be applied on a case-by-case approach. *See id.* at 288 (O'Connor, J., concurring in judgment, with Scalia, J., and Thomas, J.) The dissent by Justice Souter, *see id.* at 297 (Souter, J., dissenting, with Stevens, J., Ginsburg, J., and Breyer, J.), rejected both Justice Kennedy's minority view and the position of common ground for the Court's majority, *i.e.*, that the *Ex Parte* Young doctrine may not be used to obtain prospective injunctive relief that is the functional equivalent of a quiet title action against a state when that relief implicates special sovereignty interests.)

opinion). A majority of justices agreed that, instead, the tribe's requested injunctive relief would be the "functional equivalent" of a quiet title action against the state. *See id.* at 281 (Kennedy, J., majority opinion); *id.* at 289 (O'Connor, J., concurring). That kind of relief "implicates special sovereignty interests" that the federal courts must carefully evaluate, bearing in mind the fundamental place of state sovereignty in our federal system. *See id.* at 2040 (Kennedy, J., majority opinion). After cataloguing the deep historical roots, and the legal importance, of state control over water-beds, the Court ruled that the claim was barred by the Eleventh Amendment because the action implicated special sovereignty interests and the relief sought would block State officials from exercising jurisdiction over a substantial portion of land that was arguably state-owned. The critical fact was that the particular outcome prayed-for would effectively divest the State of its sovereign proprietary dominion over submerged lands. *See also* MacDonald v. Village of Northport, 164 F.3d 964, 972 (6th Cir. 1999) (in a case over an upland right-of-way to the water, a state's "great interest in maintaining access to the Great Lakes" was a "special sovereignty interest" that precluded an *Ex Parte* Young suit).

Coeur d'Alene imposes an important new requirement on federal courts as part of the *Ex Parte* Young analysis. In light of Coeur d'Alene, federal courts must examine whether the relief being sought against a state official "implicates special sovereignty interests." If so, a court must then determine whether that requested relief is the "functional equivalent" to a form of legal relief against the state that would otherwise be barred by the Eleventh Amendment. In the end, a court should not extend the *Ex Parte* Young doctrine to allow a suit for prospective equitable relief when that relief would be just as intrusive, if not more so, into core aspects of a state's sovereignty.

Here, KeySpan's attempted evasion of State licensing clashes with the protection afforded by Coeur d'Alene since the facts are legally indistinguishable.

## CONCLUSION

In the final analysis, the State has two sets of substantive rights at stake: *First*, its original rights as sovereign to own submerged land, which rights are preserved by the implied and express terms of the United States Constitution; *second*, its power to regulate for the general welfare under the police power. Even assuming, *arguendo*, that the latter is displaced, the former, nonetheless, remains unaffected. Add to this, the State's procedural right to be immune from suit in this Court, and dismissal results on multiple grounds.

The Defendants' motion should be granted.

Respectfully submitted,
THE STATE OF RHODE ISLAND
for Defendants,
by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (# 3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was mailed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Prov., RI 02903; Peter D. Ruggiero, Ruggiero, Orton, & Brochu, 20 Centerville Road, Warwick, RI 02886; Christopher M. Mulhearn, Ferrucci Russo, P.C., 55 Pine Street, Suite 4, Prov., RI, 02903; Adrienne G. Southgate, Prov. City Solicitor's Office, 275 Westminster Street, Prov. RI, 02903; and Frederick M. Lowther, Esq., Dickstein, Shapiro, Morin & Oshinsky, 2101 L. Street NW, Washington, DC 20037 on this 18th day of April, 2005.

\\Attg5\Civil\M. Rubin\CASES\Keyspan\KeySpan v. CRMC\KS v CRMC-Plenary Motion & Memo\Plenary Memo.doc