UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KEYSPAN LNG, L.P. | ) | |
| | ) | |
| v. | ) | C.A. No. 05-091S |
| | ) | |
| RHODE ISLAND COASTAL RESOURCES | ) | |
| MANAGEMENT COUNCIL, *et al.* | ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR AND MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

Plaintiff, Keyspan LNG, L.P. (hereinafter "KLNG") opposes the Defendants' Motion for Summary Judgment and relies upon the Memorandum of Law submitted herewith.

(43)

KeySpan LNG, L.P.
By its Attorneys,

Gregory L. Benik, Esq. (R.I. Bar No. 1515)
Holland & Knight LLP
One Financial Plaza
Suite 1800
Providence, RI 02903
(401) 751-8500
(401) 553-6850 fax

# CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a copy of the foregoing was mailed to following on this 2nd day of May, 2005.

**COUNSEL FOR**
**THE STATE OF RHODE ISLAND**
**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

Michael Rubin, Esq. (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x2116

Paul J. Roberti, Esq. (#4447)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x2231

Terrence J. Tierney, Esq. (2583)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903

**COUNSEL FOR**
**CITY OF WARWICK**
**(Courtesy Copy)**

Peter Ruggiero, Esq. (#5733)
Assistant City Solicitor
Ruggiero, Orton & Brochu
20 Centerville Road
Warwick, RI 02886

**COUNSEL FOR CRMC**

Brian A. Goldman, Esq. (#3940)
681 Smith Street
Providence, RI 02908
(401) 521-4100

**COUNSEL FOR**
**CITY OF EAST PROVIDENCE**
**(Courtesy Copy)**

W. Mark Russo, Esq. (#3937)
Christopher M. Mulhearn
Ferrucci Russo, P.C.
55 Pine Street, 4th Floor
Providence, RI 02903

William J. Conley, Jr., Esq. (#2149)
City Solicitor – City of East Providence
East Providence City Hall
145 Taunton Avenue
East Providence, RI 02914

**COUNSEL FOR CITY OF**
**PROVIDENCE**
**(Courtesy Copy)**

Adrienne G. Southgate, Esq. (#3363)
Deputy City Solicitor
City of Providence
Department of Law
275 Westminster Street, Suite 200
Providence, RI 02903

Kaurentond
_________________________

# 2815753_v1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KEYSPAN LNG, L.P. | ) | |
| | ) | |
| v. | ) | C.A. No. 05-091S |
| | ) | |
| RHODE ISLAND COASTAL RESOURCES | ) | |
| MANAGEMENT COUNCIL, *et al.* | ) | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS OPPOSITION TO DEFENDANT'S MOTION FOR AND MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT[1]

### I. Introduction

The parties' pleadings demonstrate that only two unresolved issues remain: First, does the purported need for KLNG to obtain title to or an easement on submerged lands owned by the State entitle the CRMC to require KLNG to submit to the State Category B Assent process, which: (a) involves review of issues that are examined thoroughly by the FERC under the NGA, the NGPSA, and their implementing regulations, and by the State under the CZMA, and (b) can result in a denial or conditional approval that can, according to the State, only be reviewed by a state court? KLNG submits that it does not, because: (1) the Category B Assent process is preempted by federal law; (2) the CZMA does not authorize the CRMC to require a Category B Assent as part of the CZMA Consistency Certification process; (3) the State's ownership of submerged lands is subject to a paramount federal right to regulate such lands for the constitutional purpose of commerce; and (4) if FERC authorizes KLNG to construct and operate its proposed Project, it will be exercising that paramount right to

---

1 This Memorandum uses the same short forms for the names of agencies, acts, etc. that were used in KLNG's memorandum in support of its motion for summary judgment.

authorize KLNG's use of the submerged land for the constitutional purposes of interstate and foreign commerce.

Second, is this action against the CRMC and its members in their official capacity properly before this Court, as KLNG submits, or is it instead barred by the Eleventh Amendment?[2]

## II. Many Issues Previously in this Case Have Been Conceded by The CRMC or Rendered Moot by Stipulation of the Parties.

A number of issues raised by the parties appear to have been conceded by the CRMC or rendered moot by the stipulation filed April 13, 2005 ("Stipulation"). The Stipulation required the parties to file cross motions for summary judgment with respect to all issues raised in KLNG's verified complaint ("Complaint"), the CRMC's counterclaim ("Counterclaim") and the parties' outstanding motions. KLNG's Complaint explained that the NGA and NGPSA "form a comprehensive and exclusive national regulatory scheme for natural gas transported and/or sold for resale in interstate and foreign commerce and the facilities associated with such transactions,"[3] and asserted that the State's Category B Assent process is preempted by the NGA, NGPSA and the regulations promulgated thereunder.[4] In its Memorandum in Support of Summary Judgment ("CRMC Memorandum"), the CRMC disputes KLNG's argument regarding the preemptive effect of the NGA and NGPSA in only one respect:

---

2 On April 22, 2005, KLNG submitted a Notice of Removal requesting that the action captioned *State of Rhode Island v. KeySpan LNG, L.P.*, CA No. 05-1896, be removed from the Providence Superior Court of the State of Rhode Island to this Court and, will also move that the removed State case be consolidated with this proceeding. The removed State case involves the same facts and issues raised in this proceeding, and KLNG's defenses to the removed State court action include the same federal preemption arguments that it has raised to this Court. Accordingly, KLNG's removal of the State action raises no new substantive issue.

3 Complaint ¶ 7.

4 *Id.* at 2.

their effect on State ownership of submerged land. Thus, it appears that the CRMC has conceded that the NGA and NGPSA preempt State regulation of KLNG's Project, other than State regulation derived from its ownership of submerged lands, and KLNG is entitled to judgment on that point.[5]

Likewise, the question whether the CRMC was obligated to act on KLNG's CZMA application within a specified or agreed time is mooted by Paragraph 3 of the Stipulation in which the CRMC agreed to issue its federal consistency determination by October 1, 2005, or within 30 days of this Court's decision, whichever is later.

Similarly, the question whether a Category B Assent application is a predicate for CRMC action on KLNG's CZMA Consistency Certification[6] is mooted by Paragraph 6 of the Stipulation, and by KLNG's re-filing and reinstatement of its Category B Assent application on April 18, 2005. If it is finally determined that an NGA project sponsor is required to obtain a Category B Assent to obtain the right to use state-owned submerged lands, then KLNG will concede that the State's federally approved CRMP requires the filing of a Category B Assent application to trigger the CZMA certification process and is thus an integral part of the State's CRMP. As such, the CRMC's denial or conditional approval of KLNG's Category B Assent Application would be subject to review by the Secretary of Commerce in accordance with the CZMA, and would not be

---

5 CRMC states, *e.g.*, that "although the Natural Gas Act Certificate might pre-empt State regulation, it has no bearing on State ownership." CRMC Memorandum at 23; *see also id.* at 9 (None of the opinions KLNG cites "call for pre-emption of State land *ownership*. Rather, they deal with mere *regulation*.") (emphasis in original). Otherwise, the CRMC's only attempt to dispute the well-established line of cases dealing with the preemptive effect of the NGA and NGPSA is a footnote, pointing to one case, *Midwestern Gas Transmission v. McCarty*, 120 F.Supp.2d 1155 (S.D. Ind. 2000), which, the CRMC states, indicates doubts as to claims of NGA preemption. That case was, however, reversed on appeal by *Midwestern Gas Transmission v. McCarty*, 270 F.3d 536 ( 7th Cir.), *cert. denied* 535 U.S. 1053 (2002), which expressly reaffirmed the preemptive effect of the NGA.

6 Counterclaim at 22.

subject to separate review in state court.[7] On the other hand, if this Court determines that the State's ownership of submerged lands does not trigger the Category B Assent process, then the CRMC must effectively concede that no state law requirement is a predicate to the CZMA process.

Finally, it appears that the CRMC is no longer pursuing a challenge to the constitutionality of the CZMA *per se* or claiming that its consent to a federally-approved CRMP was conditioned on an applicant's compliance with the Category B Assent process, issues that were raised in pre-Stipulation pleadings.

## III. The CRMC's Position on Ownership of Submerged Land Undermines a Comprehensive Scheme of Federal Regulation.

The CRMC's argument, in a nutshell, is that, because it owns 450 square feet of land in the Providence River on which KLNG seeks to place a pier, the CRMC is entitled to: (i) engage in a review process that is duplicative of the federal review process under the NGA, NGPA and CZMA; and (ii) issue a denial or conditional approval that may only be reviewed in state court. Under this theory, the CRMC would have the power to block a facility found by FERC to be consistent with the public interest and to be used in foreign and interstate commerce to provide much needed supplies of natural gas to consumers and businesses in several states. The CRMC's argument runs counter to the well-established case law that the NGA and NGPSA form a comprehensive and exclusive national regulatory scheme for natural gas transported and/or sold for resale in interstate and foreign commerce and for the facilities associated with such transactions, and that state laws which interfere or conflict with this comprehensive scheme are preempted. Moreover, because all land-based LNG import terminals require the use of marine-based structures on submerged lands in coastal

---

7 *See Mountain Rhythm Resources v. FERC*, 302 F.3d 958, 965-67 (9th Cir. 2002).

waters that are generally owned by states, the CRMC is asking this Court to declare that the legion of decisions confirming that the NGA and NGPSA preempt state and local laws are essentially irrelevant.

As explained in KLNG's Memorandum in Support of Summary Judgment, the State's ownership of submerged lands gives it no such power, because its ownership is subject to paramount federal rights and the FERC authorization, when issued pursuant to the NGA, will be an exercise of such paramount federal power. KLNG will thus not require title to or an easement on the 450 square foot parcel of submerged land at issue here to implement its federal authorization to construct its Project.

## IV. The State's Reliance on the Federal Power Act and the Rivers and Harbors Act Cases is Completely Unfounded.

Rather than deal with the impact of NGA preemption on the Category B Assent process, the CRMC attempts to obscure the issue by diverting this Court's attention to other federal statutes, like the Federal Power Act of 1935 ("FPA")[8] and the Rivers and Harbors Act, of 1899 ("RHA"),[9] statutes that lack the broad preemptive effect of the NGA and have no bearing on this case.

The FPA cases cited by the CRMC are inapposite for two reasons. First, they rely on specific provisions in the FPA designed to protect state rights that are not included in the NGA.[10] Second, KLNG is not seeking to displace the State's ownership

---

8 16 U.S.C.S. § 791a *et seq.* The CRMC cites no support for its claim that, unlike the FPA, the NGA was never intended to affect waterways. CRMC Memorandum at 10. In fact, interstate pipelines certificated under the NGA often extend hundreds of miles and must necessarily cross streams, rivers, and other waterways. *See, e.g., Iroquois Gas Transmission System, L.P.*, 53 FERC ¶ 61,194 (1990).

9 30 Stat. 1151, 33 U.S.C. § 403.

10 *See* FPA §§ 9, 27, 16 U.S.C. §§ 802, 821. Section 9 of the FPA requires an applicant to produce evidence that it has complied with the requirements of state laws "with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes." While this language appears to suggest that, in FPA cases, applicants must demonstrate compliance with such state laws, the Supreme Court has interpreted this language narrowly, holding that it applies only to those state laws that have

of land, but simply to prevent the State from using its ownership to block a federally authorized project. Furthermore, the FPA cases cited by the CRMC actually support KLNG's position. In *First Iowa Hydro-Electric Coop v. FPC*, 328 U.S. 152, 167 (1946), the Supreme Court noted that, while the FPA authorized some duality of control between the federal and state government, that duality did not require state and federal agencies to "share in final decision of the same issue." *See California v. FERC*, 495 U.S. 490, 502 (1990). Similarly, in *FPC v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 252 (1954), the Court observed that the Federal Water Power Act ("FWPA"), which is incorporated in the FPA, implies that certain riparian water rights determined by state law survive under the FWPA, which nonetheless "imposes upon their owners the additional obligation of using [those rights] in compliance with that Act." The Court also made it clear that a state may not exercise its rights in a way that "would 'constitute a veto of the project that was approved and licensed by FERC.'" *California v. FERC*, 495 U.S. at 506, citing *California ex rel. State Water Resources Board v. FERC*, 887 F.2d 743, 749 (9th Cir. 1989).

The CRMC also claims that federal preemption under the NGA extends only to state regulation, not state ownership,[11] but fails to cite a single case that supports this

---

not been superseded by the FPA. *First Iowa Hydro-Electric Coop v. FPC*, 328 U.S. 152, 178 (1946). In addition, the Court has determined that a "savings clause" in § 27 of the FPA, which states: "nothing herein [16 USCS §§ 791a *et seq.*] shall be construed as affecting or intending to affect or in any way interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein," 16 U.S.C. § 821, allows the states to retain some jurisdiction under the FPA. Nonetheless, it has interpreted that provision very narrowly to protect only state laws involving "rights of the same nature as those relating to the use of water in irrigation or for municipal purposes." *First Iowa*, 328 U.S. at 175-76; *California v. FERC*, 495 U.S. 490, 498 (1990). Under this interpretation, even § 27 of the FPA would not "save" from preemption a state's rights in submerged lands, but only its right to use water in irrigation or for municipal purposes.

11 CRMC Memorandum at 9.

broad theory.[12] It relies instead on isolated instances where state ownership was not preempted by the federal government's issuance of a permit under the RHA.[13] While the CRMC's cases explain that Congress has not preempted state ownership or regulation under the RHA, the RHA does not have the broad preemptive effect of the NGA, which reflects Congress' intent to occupy the field of regulation of natural gas transported in interstate and foreign commerce and the facilities associated therewith. *See, e.g., Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300-01 (1988); *National Fuel Gas Supply Corp. v. Pub. Serv. Comm'n of NY*, 894 F.2d 571, 576-77 (2d Cir.), *cert. denied*, 497 U.S. 1004 (1990); *Algonquin LNG v. Loqa*, 79 F. Supp.2d 49, 51 (D.R.I. 2000).

Unlike the NGA, the RHA has only recently been interpreted broadly[14] and has never been interpreted to have broad preemptive effect. The cases cited by the CRMC considered whether Congress, in the RHA, intended to preempt state control over land. They uniformly found that Congress did not so intend, but rather found its language to be "prohibitory, preventative, and defensive," which is "not apt language to affirmatively give authority." *See Cummings v. Chicago*, 188 U.S. 410, 425 (1903). Courts have also noted that § 10 permits are not necessary in all circumstances, for example, in cases where a riparian land owner wharfs out within a harbor line previously set by the COE. *Cobb v. Lincoln Park Comm'rs*, 202 Ill. 427, 439-40 (1903).

---

12 In fact, there is no basis for the CRMC's broad contention that preemption principles are inapplicable where the state's real property is at issue. To the contrary, the Supreme Court has held in other contexts that preemption principles "are not inapplicable ... simply because real property law is a matter of special concern to the States: 'The relative importance to the State of its own law is not material when there is a conflict with a valid federal law, for the Framers of our Constitution provided that the federal law must prevail.'" *See Fidelity Federal Savings & Loan Ass'n v. De La Cuesta*, 458 U.S. 141, 153(1982) (quoting *Free v. Bland*, 369 U.S. 663, 666 (1962)).

13 CRMC Memorandum at 17-19.

14 See *United States v. Alaska*, 503 U.S. 569, 580-81 (1992) (for many decades, the Secretary's authority under RHA § 10 was interpreted very narrowly; not until 1968, were regulations amended to allow the Corp of Engineers ("COE") to consider the effects of permitted activities on the public interest).

Many courts have also pointed out that COE permits themselves specifically disclaim that they are a transfer of any property rights and instead require permit holders to obtain the owner's assent to perform the work authorized. *See, e.g., Eagle International, Inc. v. City of Crosset Port Authority*, 27 Ark. App. 36, 38, 40 (1989). All of these cases are, however, irrelevant, because KLNG is not claiming that the RHA or its RHA § 10 permit do or will give KLNG any preemptive right to utilize lands in the Providence River.

In sharp contrast, the NGA -- the statute on which KLNG relies here -- has been interpreted as a "broad" statute that preempts the subject matter of the entire field it regulates. Unlike the RHA, a certificate of public convenience and necessity under § 7 or an authorization under § 3 of the NGA *must* be obtained from FERC in *all* instances where a person seeks to construct or modify a natural gas facility under the NGA.[15] Cases applying the RHA may support the conclusion that federal statutes that do not have broad preemptive effect, like the RHA, allow states to retain concurrent jurisdiction over navigable waters. Where, however, Congress has intended to occupy the field of regulation, as in the NGA, states may not exercise their ownership interest in navigable waters in a manner that conflicts with the federal government's authority.[16]

The CRMC has also failed to provide any support for its claim that there are only two means -- eminent domain and the federal navigational servitude -- by which

---

15 *See* 15 U.S.C. § 717b ("no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to so.").

16 *See United States v. 1.58 Acre of Land*, 523 F. Supp. 120, 123 (D. Mass. 1981)("those aspects of the public interest in the tidelands and the lands below the low water mark that relate to the commerce and other powers delegated to the federal government are administered by Congress in its capacity as trustee of the jus publicum, while those aspects of the public interest in this property that relate to nonpreempted subjects reserved to local regulation by the states are administered by state legislatures in their capacity as co-trustee . . .").

Congress can override state ownership.[17] This position is not even supported by the CRMC's cases, one of which suggests an additional means, *i.e.*, enactment of preemptive federal legislation under the Commerce Cause. *See Wilson v. Hudson County Water Company*, 76 A. 560, 566, 567 (N.J. Eq. 1910) ("Congress may some day be induced to enact a law under the commerce clause of the federal constitution, which will make a grant of power such as is contended for by the Water Company . . ." to lay pipe through submerged lands). This third mechanism is exactly the one at issue in this case. The CRMC's contention is also directly contradicted by § 1314 of the SLA, which provides that the states' ownership interests in submerged land are subject, not only to the federal government's paramount power to exercise "all its navigational servitude and rights in" submerged lands and navigable waters, but also to its paramount "powers of regulation and control of said land and navigable waters for the constitutional purpose of commerce, navigation, national defense, and international affairs." Thus, contrary to the CRMC's claim, the State's ownership is subject to both the federal government's navigational servitude and its paramount power to regulate and control submerged lands and navigable waters for the constitutional purpose of commerce.

## V. FERC's Authorization Will Permit KLNG to Use the Submerged Land at Issue Without Exercising the Power of Eminent Domain

The CRMC raises the issue of eminent domain in two contexts. First, it concedes that, if KLNG were to have eminent domain authority under § 7(h) of the NGA, its case would be moot. Second, it suggests that the absence of eminent domain powers in § 3 of the NGA implies a Congressional intent to make state ownership of property a basis for state review and regulation of FERC-regulated interstate natural gas projects that affect those property interests.

---

17 CRMC Memorandum at 15-16, 23.

On the first point, KLNG agrees that eminent domain could be used to acquire title to state lands. It is KLNG's position, however, that it does not need eminent domain to use the 450 feet of submerged land that the State owns subject to the federal government's "paramount rights in and powers and regulation of said lands . . . for the constitutional purposes of commerce." This is true because, if FERC authorizes KLNG to construct and operate its Project on submerged lands in the Providence River, it will be doing so as an exercise of the federal government's paramount right to regulate and control that land in conjunction with the transmission and sale of natural gas in interstate and foreign commerce. The federal government, through FERC, will have exercised the rights reserved to it by the Constitution and confirmed by the SLA. Thus, KLNG will not need permission from the state to use those lands. Nor will it need eminent domain authority.[18]

The federal navigational servitude cases cited by the CRMC support rather than undermine this view. The federal navigational servitude refers to the dominant authority of the federal government under the Commerce Clause to regulate and control matters relating to navigable waters.[19] It is a recognition that the federal government has an easement to use such lands. When properly exercised it is not deemed a taking but a lawful exercise of a power to which the property owner has always been subject. It is often raised in cases considering whether the federal

---

18 The CRMC also states, without support, that eminent domain authority under § 7(h) applies only to "pipe-line builders," not to LNG terminals. CRMC Memorandum at 15-16. There is no basis to this claim. Eminent domain authority under § 7(h) applies to any holder of a certificate of public convenience and necessity issued pursuant to § 7(c) of the NGA, whether a pipeline or an LNG facility. KLNG, in fact, currently operates its existing LNG facility under a § 7 certificate (pursuant to which it constructed new facilities in 1999). Moreover, FERC has the authority to issue certificates to LNG Terminals under both §§ 3 and 7 but, as discussed in the text, has chosen in recent years to regulate them under its more flexible § 3 authority.

19 *See United State v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 704 (1987).

government is required to compensate owners affected by exercise of the servitude. Compensation must be paid for lands taken above the ordinary high-water mark, but not for those under navigable waters subject to the servitude because of the special public nature of such waters.[20] When the federal government exercises its navigational servitude, it is not required to use the power of eminent domain. Thus if, as the CRMC appears to concede, the land under the Providence River to be used for the Project is navigable water subject to the federal navigational servitude, which the federal government would not need to condemn, it follows that a federally regulated entity authorized by FERC to act in the public interest to construct a facility on such land would not be required to use eminent domain authority to simply use, not acquire, that property.[21]

Second, while § 7(h) explicitly provides natural gas companies with eminent domain and § 3 does not, there is nothing in the legislative history of the NGA to suggest that this distinction would permit a state to use its ownership of submerged land to block a project authorized under § 3. In fact, there was no reason for Congress

---

20 *See id.*; *Lewis Blue Point Oyster Cultivation Co. v. Briggs*, 229 U.S. 82, 89 (1913); *Philadelphia Co. v. Stimson*, 223 U.S. 605, 634-36 (1912); *Scranton v. Wheeler*, 179 U.S. 141, 163 (1900). Contrary to CRMC's argument, the cases it cites do not make a distinction between federal government preemption of regulations as opposed to ownership, but rather draw a distinction between property for which compensation must be paid in a taking under the Fifth Amendment and property under navigable waters subject to the federal navigational servitude for which no compensation need be made. In *Kaiser Aetna v. United States*,444 U.S. 164, 179 (1979), for example, the federal government was required to compensate the private owner of submerged land for making it available to the public because, under the unique circumstances of that case, the land was analogous to lands above the ordinary high water mark. *Id.*

21 Piers like KLNG's serve a navigational purpose because they are erected for the purpose of aiding commerce by improving navigation. *See Scranton*, 179 U.S. at 160-161. *See also Stockton v. Baltimore & N.Y.R. Co.*, 32 F. 9, 14-15, 18-21 (1887) (railway corporation, as agent for Congress, is not required to condemn, pay compensation for or obtain state consent to use of a few square feet of river bottom for the foundation of a bridge to be used for the purpose of aiding commerce; commerce power extends to control of navigable waters and lands under them for purposes of erecting piers, bridges and all other instrumentalities of commerce).

to address eminent domain in § 3 because that provision does not mention facilities, but simply provides FERC with authority to approve imports and exports. FERC's predecessor, the Federal Power Commission, was originally uncertain of the extent of its power under § 3. It was only in *Distrigas Corporation v. FPC*, 495 F.2d 1057 (D.C. Cir. 1974), that the Court of Appeals for the District of Columbia Circuit confirmed that the Commission has broad and flexible power under § 3. The court found:

> it fully within the Commission's power, so long as that power is responsibly exercised, to impose on imports of natural gas the equivalent of Section 7 certification requirements both as to facilities and . . . sales . . . Indeed, we think that Section 3 supplies the Commission not only with the power necessary to prevent gaps in regulation, but also with flexibility in exercising that power – flexibility far greater than would be the case were we to hold that imports are interstate commerce, automatically and compulsorily subject to the entire panoply of Section 7's requirements.

*Id.* at 1064. While for many years FERC authorized LNG facilities under both §§ 3 and 7, in recent years, FERC has "relied exclusively on section 3 for LNG terminal facilities and operations" because it "better distinguishes foreign from interstate commerce and enables the Commission to employ the greater regulatory flexibility available . . . to respond and adapt to changes in the nature of the LNG industry."[22] Thus, the absence of explicit eminent domain in § 3 cannot be interpreted to suggest that Congress intended to make state ownership of property a basis for state review and regulation of an LNG terminal regulated by FERC under the NGA.

---

22 *See Sound Energy Solutions*, 107 F.E.R.C. ¶ 61,263 at P 25 (2004). As FERC recently explained, the fact "that section 3 does not contain the word "facilities" has been no barrier to including facilities as part of import/export authorizations. The intent to import or export gas and the physical capability to convey the gas are two halves of a whole transaction. Siting, construction, and operation are means to the import end. Hence, section 3 has traditionally required authorization of both a plan on paper to move gas and a proposal to put facilities in place to make that happen." *Id.* at P 35 (footnote omitted).

## VI. Eleventh Amendment Issue

The CRMC's argument that the Eleventh Amendment bars KLNG's lawsuit against the CRMC and its members is based on misplaced reliance on reversed and irrelevant case law and in complete disregard for well-established case law under the *Ex parte Young* doctrine.

As fully demonstrated in KLNG's March 18, 2005 Memorandum, (i) KLNG's lawsuit against CRMC and its members satisfies the jurisdictional requirements under the *Ex parte Young* doctrine because it seeks prospective relief against individual state officials for ongoing violations of federal law and (ii) the CRMC's reliance on *Idaho v. Coeur d'Alene*, 521 U.S. 261 (1997) is misplaced. Quite simply, *Coeur d'Alene* has been relegated to a footnote in *Ex parte Young* jurisprudence. Indeed, if any vitality is left in *Coeur d'Alene*, it is limited to that case's facts, which involve alleged ownership in the submerged lands and bed of the 24 miles long and 1 to 3 miles wide Lake Coeur d'Alene and of the various navigable rivers and streams that form part of its water system. Contrary to the CRMC's distortions of the KLNG lawsuit, the instant case does not involve in any way quieting title to state land. KLNG does not dispute the fact that the State holds title to the submerged lands and does not seek title or ownership to such land, but rather the use of approximately 450 square feet of land for the piles of its shipping berth – a significant distinction the CRMC refuses to recognize.

Moreover, the CRMC is an entity that exists to sue and be sued. The cases that the CRMC cites for the proposition that the claims against the CRMC are barred by the Eleventh Amendment are flawed. *Midwestern Gas Transm'n v. McCarty*, 120 F. Supp.2d 1155 (S.D. Ind. 2000), has been reversed and remanded, and *ANR Pipeline Co. v. Iowa State Commerce Com'n*, 828 F.2d 465,470 (8th Cir. 1987), does not stand for the

proposition for which it is cited and does not contain the quote attributed to it.[23] *Corey v. White*, 457 U.S. 85 (1982) also does not clearly support the argument for which it is cited. Quite simply, KLNG's claims against the CRMC are not barred by the Eleventh Amendment because it exists to be sued and KLNG's claims do not threaten the State's fiscal integrity or seek retrospective relief.

## VII. Conclusion

For all the reasons stated in this Memorandum and KLNG's previous Memorandum in support of summary judgment, KLNG's motion for summary judgment should be granted.

KeySpan LNG, L.P.
By its Attorneys,

Gregory L. Benik, Esq. (R.I. Bar No. 1515)
Holland & Knight LLP
One Financial Plaza
Suite 1800
Providence, RI 02903
(401) 751-8500
(401) 553-6850 fax

[23] It is interesting to note that the court in *ANR Pipeline* held that the NGPSA preempted safety regulation provisions of an Iowa statute. The Attorney General may have meant to cite to *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178 (10th Cir. 1998). This ANR case involves a property tax dispute in which the claims were barred by the Eleventh Amendment because, among other things, they sought retrospective relief, which falls outside of the *Ex parte Young* doctrine. KLNG does not seek retrospective relief.

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that a copy of the foregoing was mailed to following on this 2nd day of May, 2005.

**COUNSEL FOR**
**THE STATE OF RHODE ISLAND**
**PATRICK C. LYNCH**
**ATTORNEY GENERAL**

Michael Rubin, Esq. (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x2116

Paul J. Roberti, Esq. (#4447)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 x2231

Terrence J. Tierney, Esq. (2583)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903

**COUNSEL FOR**
**CITY OF WARWICK**
**(Courtesy Copy)**

Peter Ruggiero, Esq. (#5733)
Assistant City Solicitor
Ruggiero, Orton & Brochu
20 Centerville Road
Warwick, RI 02886

**COUNSEL FOR CRMC**

Brian A. Goldman, Esq. (#3940)
681 Smith Street
Providence, RI 02908
(401) 521-4100

**COUNSEL FOR**
**CITY OF EAST PROVIDENCE**
**(Courtesy Copy)**

W. Mark Russo, Esq. (#3937)
Christopher M. Mulhearn
Ferrucci Russo, P.C.
55 Pine Street, 4th Floor
Providence, RI 02903

William J. Conley, Jr., Esq. (#2149)
City Solicitor – City of East Providence
East Providence City Hall
145 Taunton Avenue
East Providence, RI 02914

**COUNSEL FOR CITY OF**
**PROVIDENCE**
**(Courtesy Copy)**

Adrienne G. Southgate, Esq. (#3363)
Deputy City Solicitor
City of Providence
Department of Law
275 Westminster Street, Suite 200
Providence, RI 02903

[signature]

# 2814357_v1