UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **KEYSPAN LNG, L.P.** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO. 05-091S** |
| | ) | |
| **RHODE ISLAND COASTAL** | ) | |
| **RESOURCES MANAGEMENT COUNCIL; *et al*** | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF SUMMARY JUDGMENT**

## I. KEYSPAN'S SELECTIVE QUOTATION OF A STATUTE UNDERSCORES THE WEAKNESS OF KEYSPAN'S POSITION — KEYSPAN LACKS THE POWER EMBODIED IN THE NAVIGATIONAL SERVITUDE.

### A. KeySpan Omits Crucial Wording From The Submerged Lands Act.

KeySpan's truncated rendition of the Submerged Lands Act ("SLA") is contained within the following portion of their brief: "the states hold title subject to the federal government's paramount 'rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce.'" SLA § 6, 43 U.S.C. § 1314(a) *as quoted in* KeySpan Memo. at p. 14. A juxtaposition of KeySpan's quotation with the complete text of the clause is instructive:

| SLA § 1314(a) as <u>Quoted by KeySpan</u> | SLA § 1314(a) <u>in full</u> |
|---|---|
| "Rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce." | (a) The United States retains all its **navigational servitude *and*** rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce, navigation, national defense, and international affairs, all of which shall be paramount to, **but** shall **not** be deemed to include, **proprietary rights of ownership,** or the rights of management, administration, leasing, use, and development of the lands and natural resources which are specifically recognized, confirmed, established, and **vested in** assigned to **the respective States** and others by section 1311 of this title. |

Submerged Lands Act § 6, 67 Stat. 32, 43 U.S.C. § 1314(a) (emphasis added).

44

KeySpan's failure to quote the passage towards the end of the full sub-section, where Congress manifested in elaborate terms its deference to the states' fee ownership,[1] might be excusable. After all, KeySpan does make the minimal acknowledgement that "the State holds title." KeySpan Memo. at p. 14.

Much more importantly, however, KeySpan neglects the language at the beginning of the text that separately refers to the dominant navigational servitude of the United States, on one hand, and the general Congressional power to regulate commerce, on the other hand. Congress was careful to distinctly list a corollary of the federal power to regulate commerce and, then, to list that power itself. This portion, avoided by KeySpan, is precisely in accordance with the arguments made by the Defendant State Officials here.

**B. The Navigational Servitude is the only aspect of the Commerce Power that is in the nature of a property right.**

The distinction is simple. The Constitution confers a unique power upon the Federal Government that is in the nature of *an interest in land* in connection with navigable waters and from which KeySpan derives *no* authority. This is apart from the typical power to regulate

---

[1] Historically, the judiciary has been likewise solicitous of the states' tenure of under-water lands:

> For when the Revolution took place the people of each State became themselves sovereign; and in that character **hold** the absolute right to all their navigable waters and **the soils** under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government.

Martin v. Waddell's Lessee, 41 U.S. [16 Pet.] 367, 410 (1842) (emphasis added).

> **The character of the state's ownership** in the land and in the waters **is the full proprietary right**.

Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 63 (1921) (emphasis added). *See also* Shively v. Bowlby, 152 U.S. 1 (1893); Pollard's Lessee v. Hagan, 44 U.S. [3 How.] 212 (1845).

commerce (the Commerce Clause's allowance of ordinary regulation) from which KeySpan does derive whatever authority it might have.

The Supreme Court, early on, recognized the *property-like* nature of that unique power (that KeySpan lacks) — the Navigational Servitude: "[C]ommerce comprehends . . . all the navigable waters of the United States . . .. For this purpose they are the public **property** of the nation . . .." Gilman v. City of Philadelphia, 70 U.S. [3 Wall.] 713, 724-25 (1866) (emphasis added). In United States v. Virginia Electric Co., 365 U.S. 624 (1961), the Court, quoting older authorities, re-enforced this point with real estate analogies:

> This navigational **servitude** — sometimes referred to as a "**dominant servitude**," Federal Power Com. v. Niagara Mohawk Power Corp., 347 U.S. 239, 249, or a "superior navigation **easement**," United States v. Grand River Dam Authority, 363 U.S. 229, 231 — is the privilege to **appropriate** . . .. A classic description of the scope of the power and of the privilege attending its exercise is to be found in the Court's opinion in United States v. Chicago, M., St. P. & P.R. Co., 312 U.S. 592:
>
>> The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high-water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. [Citing cases.] The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from lawful exercise of **a power to which** that **property has always been subject**.

*Id.* at 627-28 (emphasis added).

### C. The navigational servitude is powerful but narrow.

For all its power, the Servitude is applicable in only the narrowest class of cases. As Justice Brandeis stated for a unanimous Court in a quiet-title action concerning a harbor bottom:

> **The right of the United States** in the navigable waters within the several states **is limited to the control thereof for purposes of navigation.**

Port of Seattle v. Oregon & W. R. Co., 255 U.S. 56, 63 (1921) (emphasis added). Obviously, in context, Justice Brandeis meant to refer only to the Government's *proprietary* interest. That particular interest was held to be narrow in extent.

Thus, the Supreme Court has insisted that a project should aid general navigation in order to qualify as an exercise of the Servitude, warning, in *dicta*, that the Federal Government's uncompensated interference with state-recognized water rights for the benefit of private individuals would probably run afoul of these limits:

> [W]e need not ponder whether, by virtue of a highly fictional navigation purpose, the Government could destroy the flow of a navigable stream and carry away its waters for sale to private interests without compensation to those deprived of them. We have never held that or anything like it, and we need not here pass on any question of constitutional power; for we do not find that Congress has attempted to take or authorized the taking, without compensation, of any rights valid under State law.

United States v. Gerlach Live Stock Co., 339 U.S. 725, 737 (1950).

These principles are well illustrated by United States v. 50 Foot Right of Way, 337 F.2d 956 (3d Cir. 1964) (Government's running of a wartime gas pipeline across the bed of a navigable estuary was not a qualifying navigational activity):

> If the right of way across . . . [the owner's] submerged land was taken in aid of navigation, . . . the United States would not be required to pay for such taking. . . . Within the realm of reason the mere running of a pipeline over the bed of a navigable body of water **cannot** be considered as an aid to navigation or as bearing some positive relation to the control of navigation. . . . Hence, the United States . . . should, therefore, be required to pay . . . [the owner] just compensation for the use of the submerged land.

*Id.* at 960 (emphasis added). Notably, the state there, the State of New Jersey, had conveyed the bottom-lands site to a private party. The private party prevailed in its claim for Just

Compensation. Obviously, the protections of the Constitution would apply with even greater force if a state still owned the land.

**D. Other than the Servitude, the Federal Government cannot impose structures on state bottom-lands without compensation.**

Of course, bottom-lands located within Government enclaves such as national parks or military bases belong to the United States. Other than those situations (which are, obviously, not applicable here), and other than eminent domain, only the Servitude will avail. In other words, outside of reserved Federal territory, the state ownership right to exclude structures prevails (unless just compensation is paid). As the Supreme Court (speaking through then-Associate Justice Rehnquist) has observed:

> [T]here are **two limitations** to the States' exclusive control of its streams — reserved rights so far at least as may be necessary for the beneficial uses of the **government property and the navigation servitude**. . . . [E]xcept where the reserved rights or navigation servitude of the United States are invoked, the State has total authority over internal waters.

California v. United States, 438 U.S. 645, 662 (1977) (internal citations and quotation marks omitted) (emphasis added). Similarly, in Kansas v. Colorado, 206 U.S. 46 (1907), the United States claimed that it had a right in the Arkansas River superior to that of Kansas and Colorado stemming from its power "to control the whole system of the reclamation of arid lands." *Id.* at 87. The Court disagreed and held that state irrigation law must prevail. The United States, of course, could appropriate water and build projects to reclaim *its own* public lands. *Id.* at 92. But federal legislation could not "override state laws in respect to the general subject of reclamation." *Id.*

By comparison, Federal control *was* allowed to override the state's police power interest in California v. F.E.R.C., 495 U.S. 490, 498 (1990), but *only* after it was specifically found that

the regulations at issue (ecological regulations aimed at maintaining sufficient in-stream flow to support fish) "neither reflect nor establish '**proprietary rights**.'" (Emphasis in original.)

Interestingly, all of the above cases in this sub-section, plus the Niagara Mohawk case cited beforehand (on page 13-14 of the Memorandum in chief), involved mere rights to use only the flowing water itself. The real estate beneath the water was not directly implicated. *Per force*, greater respect for state and state-created ownership is called for in the type of case *sub judice* involving subaqueous lands. The present situation more closely parallels the facts of the 50 Foot Right of Way case, *supra*, where the Government was forced to pay for bottom-lands; but the facts are even stronger for non-preemption here than in 50 Foot Right of Way. That case involved the Federal Government versus a private grantee. Here, we have a mere private developer versus the State itself.

**E. The navigational servitude is not at KeySpan's disposal.**

The Court can take judicial notice of many Federal projects freely built in tidelands (lighthouses, for instance) under Federal authority. KeySpan, evidently hoping to play on this familiarity, loosely generalizes in regard to the "paramount power." Only by a resort to vague and indiscriminate notions can KeySpan latch onto non-analogous situations so as to position itself to build on another's land.

Greater specificity would be fatal to KeySpan's claim. If KeySpan were to acknowledge that there are, in fact, a variety of powers within the Federal arsenal (as is acknowledged by the Submerged Lands Act that KeySpan only partially quotes from), the acknowledgement would allow for the subtlety of real reasoned analysis and intelligent distinctions. That would reveal KeySpan not as paramount, but as a mere pretender. Even KeySpan makes no claim to have the power to exercise the Federal Navigational Servitude.

## II. KEYSPAN'S REFERENCE TO FEDERAL "PARAMOUNT RIGHTS" IS BESIDES THE POINT; THE QUESTION IS WHETHER, IN THIS PARTICULAR CASE, CONGRESS HAS DELEGATED TO KEYSPAN THE PARTICULAR FEDERAL RIGHT TO PHYSICALLY OCCUPY SUBMERGED LAND.

As essentially stated already, Rhode Island concedes — indeed, Rhode Island advances — one of the central points of KeySpan's Memorandum. KeySpan states: "The State's Rights In And Control Over Lands Under The Providence River Are Subject To The Federal Government's Paramount Rights Therein." KeySpan Memo. at p. 14, heading A. But, obviously, such paramount rights, insofar as they would be effective to force the State to accept structures on underwater soil, are *not* self-executing. Rather, as even KeySpan seems to acknowledge, an affirmative act of Congress would be required. KeySpan omits that such an enactment would accomplish that result only if: (1) it were in the most express and unmistakable terms, and (2) the structures were directly commissioned by the United States government itself for a navigational installation or if compensation were paid. This second arises by virtue of the distinction found in the Submerged Lands Act, in Niagara Mohawk, and elsewhere.

## III. KEYSPAN RELIES ON PRECEDENTS THAT ARE INAPPLICABLE TO PROPRIETORSHIP.

KeySpan vigorously cites (in its Memorandum at 4-5) cases where federal law preempts state and local laws founded in the police powers and aimed at protecting the public health, safety, and welfare. These cases found preemption of that type of local laws: Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 310 (1988) (statute requiring a public utility exercising or claiming a right to transport natural gas in Michigan to obtain state approval; "[state act] seeks to **regulate** a field that the NGA has occupied" (emphasis added)); National Fuel Gas Supply Corp. v. Public Serv. Comm'n, 894 F.2d 571, 576 (2nd Cir. 1990) (state statute requiring certificate environmental compatibility and public need; "[r]egulations promulgated by an agency . . . may preempt similar state **regulations**"); ANR Pipeline Co. v. Iowa State Commerce Comm'n, 828

F.2d 465, 470 (8th Cir. 1987) (state statute imposing safety conditions and subsequent fines for violation of safety conditions); Algonquin LNG v. Loqa, 79 F.Supp.2d 49, 52 (D.R.I. 2000) (municipal zoning ordinance; "federal regulatory scheme comprehensively **regulates** . . . location"); Northern Natural Gas Co. v. Iowa Utilities Board, 377 F.3d 817, 821 (Iowa 2004) (state environmental provisions; "Iowa provisions **regulate** in an occupied field"); No Tanks, Inc. v. Public Utilities Comm'n, 697 A.2d 1313, 1316 (Me. 1997) (state safety and environmental regulation related to tank facilities; "state attempt to **regulate** preempted"); Northern Border Pipeline Co. v. Jackson County, 512 F.Supp. 1261, 1265 (D. Minn. 1981) (local zoning provision that would have required pipeline to be buried deeper; "no room for any state **regulation**"); and Kern River Gas Transm'n v. Clark County, 757 F.Supp. 1110, 1114 (D. Nev. 1990) (local permits targeting safety-specific construction requirements). But none of those opinions call for pre-emption of State land *ownership*. Rather, they deal with mere *regulation*.

## IV. KEYSPAN ITSELF CONTRADICTS ITS CONTENTION THAT FERC JURISDICTION IS EXCLUSIVE.

The statement on page 4 (heading "a") of KeySpan's Memorandum that "FERC Has Exclusive Jurisdiction Over . . . The Facilities Associated [with natural gas]" is belied by papers submitted by KeySpan itself. At Tab 4 of the Joint Appendix, the Court will find KeySpan's application to the Army Corps submitting to that agencies' jurisdiction over the facility. On page 97 of the Joint Appendix, and again on page 209, KeySpan recites: "The U.S. Army Corps of Engineers (USACE) has authority over the Project under . . . Section 10 of the Rivers and Harbors Act . . .." These statements constitute an acknowledgement that obstructions to navigation are outside of FERC's purview. The Corps, not FERC, will exercise jurisdiction to the extent the project might encroach on the Federal Navigational Servitude. Implicitly, the State will do likewise with respect to the Public Trust Doctrine.

Indeed, at one point, KeySpan even hints that FERC regulation is so limited that KeySpan would have to rely on other schemes to preempt CRMC licensing. KeySpan stated in November that local laws were "preempted to the extent that they purport to regulate matters addressed by federal law, in this case, those issues under the authority of FERC, the USACE and the USCG." It seems that, at that time, KeySpan was not relying on FERC, so much as ACOE jurisdiction, to try to limit the CRMC's role (an argument since shown to be untenable, *see* Memorandum in chief at 17-21).

## V. KEYSPAN MISSTATES THE ISSUE BY REFERRING TO THE CZMA.

CRMC's public trust jurisdiction does not derive from the CZMA. So, if Defendant State officials are correct, and the Public Trust Doctrine applies, then the CZMA is irrelevant to the State official's defense.

But KeySpan characterizes the issue as follows: "does the Rhode Island Coastal Resources Management Council ('CRMC') have the power to require KeySpan LNG, L.P. ('KLNG') to submit to the State's Category B Assent process to obtain CRMC review of its Coastal Zone Management Act ('CZMA') consistency certification ('CZMA Consistency Certification')?"

KeySpan's characterization of the issue is a pure distraction.[2]

---

[2] As reflected in the attached letter from KeySpan's counsel to the CRMC, on April 18, KeySpan reinstated and re-filed its application to the CRMC under R.I. Gen. Laws §§ 46-23-1 et seq., and under the Coastal Resources Management Program, for a Category B Assent for the project which is the subject of the instant court action. (Such reinstated and re-filed application is without prejudice to the KeySpan's position in the instant court action and shall not constitute a waiver of any benefits to the KeySpan under such court decision.) KeySpan having done so, the CZMA filing no longer stands alone apart from a CRMC application. The CZMA becomes irrelevant.

**CONCLUSION**

In addition to the Navigational Servitude implicit in the Commerce Clause (which KeySpan grasps at, but cannot obtain), Congress, of course, has the familiar power to regulate through an exercise of the commerce power (from which KeySpan might derive some benefit). The reach of the former power is relatively narrow, but forceful. The reach of the latter is broad, but less powerful. While the Federal Government can subject almost any natural resource to preemptive Federal *regulation* in the name of interstate commerce, it cannot trump property rights in doing so (except, of course, by paying just compensation).

Respectfully submitted,
THE STATE OF RHODE ISLAND

for Defendants, by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (# 3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was handed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Prov., RI 02903; and mailed to: Peter D. Ruggiero, Ruggiero, Orton, & Brochu, 20 Centerville Road, Warwick, RI 02886; Christopher M. Mulhearn, Ferrucci Russo, P.C., 55 Pine Street, Suite 4, Prov., RI, 02903; Adrienne G. Southgate, Prov. City Solicitor's Office, 275 Westminster Street, Prov. RI, 02903; and Frederick M. Lowther, Esq., Dickstein, Shapiro, Morin & Oshinsky, 2101 L. Street NW, Washington, DC 20037 on this 2nd day of May, 2005.

\\Attg5\Civil\M. Rubin\CASES\Keyspan\KeySpan v. CRMC\Pleadings KeySpan v CRMC-- Plenary Motion & Memo\Reply-Plenary 2nd version.doc