**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **KEYSPAN LNG, L.P.** | ) | |
| | ) | |
| **v.** | ) | **C.A. NO. 05-091S** |
| | ) | |
| **RHODE ISLAND COASTAL** | ) | |
| **RESOURCES MANAGEMENT COUNCIL; *et al*** | ) | |

# DEFENDANT STATE OFFICIALS' RESPONSE TO *AMICUS* CITY OF WARWICK — WARWICK CORRECTLY ARGUES THAT SECTION 3 HAS NO PRE-EMPTIVE EFFECT ON THIS CASE WHATSOEVER

## SUMMARY

The City of Warwick has indeed been a friend-of-the-Court by highlighting, in its *amicus* brief, that, "Unlike the certificate of convenience and necessity regulatory authority contained in Section 7 of the NGA, section 3 is nothing more than a paper tiger with regard to site or facility evaluation concerns." Warwick Memo at p. 5. Warwick has struck upon the reality that, unlike the comprehensive and highly-developed section 7 of the Act, section 3 does *not* mention *facilities*. Nor does it even mention the transportation, storage, or regasification of LNG.

The contrast between the two sections is acute. Under Section 7 of the NGA, an entity already meeting the rigorous standards for qualifying as a "natural gas company" can obtain a "Certificate of Public Convenience & Necessity" ("CPCN") to site and build "facilities" and exercise the power of eminent domain for that purpose. By contrast, under Section 3, which KeySpan invokes, none of the above apply. Section 3 pertains to any "person," and not to a qualified "natural gas company" as such;[1] section 3 calls for mere "authorization" rather than a CPCN; and section 3 concerns the activity of "*importation*" rather than the siting of *facilities*.

Most importantly, section 3 is a unique stand-alone section that operates outside of the

[1] Obviously, a "natural gas company" is in a subset of the universe comprised of any "person." *See* section 2(6) of the Act. Therefore, a "person" applying under section 3 might happen to be a "natural gas company." But that would be incidental. Such an applicant would not be applying as such. Moreover, such an applicant would not be regulated as such under that section.

integrated comprehensive scheme of the NGA. The touchstone of the NGA's comprehensiveness, according to the courts, is its regulation of entities defined by the term "natural gas company," a term lacking in section 3.

Earlier, the undersigned state officials argued: "But, although the Natural Gas Act Certificate might pre-empt State regulation, it has no bearing on State ownership." Memo at p. 23. That statement remains accurate and is reaffirmed. In keeping with that statement, the state officials herein explain that, while a section 7 *Certificate* might pre-empt State siting or environmental regulation, a section 3 *authorization* does no such thing. Likewise, these state officials earlier argued that "none of those opinions [cited by KeySpan] call for pre-emption of State land *ownership*. Rather, they deal with mere *regulation*." Memo at p. 9. In keeping with that statement, we now reaffirm that, while those opinions (cited by KeySpan) do, indeed, deal with *regulation*, they do so purely under section 7.

Thus, the ultimate position of the state officials is that any relevant pre-emptive effect working in KeySpan's favor is not germane to ownership and, moreover, in any event, there is no such preemptive effect whatsoever to begin with. Stated differently, there is no preemptive effect with respect to the KeySpan's project at all and, alternatively, even assuming *arguendo* that there were such an effect, it would be irrelevant to land ownership. In either event, the CRMC should be allowed to go forward under state law.

## ARGUMENT

### I. § 3 (AS OPPOSED TO § 7) OF THE NGA, IS WHOLLY NON-PRE-EMPTIVE WITH RESPECT TO KEYSPAN'S FACILITY.

#### A. All of the NGA cases cited by KeySpan are § 7 cases, not § 3 cases.

The cases prominently cited by KeySpan that have found exclusive federal jurisdiction under the NGA are easily distinguished as involving only FERC's authority to regulate *facilities* under *Section 7*, not the activity of *importation* under *Section 3*. For instance, National Fuel Gas

Supply Co. v. Public Serv. Comm'n, 894 F.2d 571 (2d. Cir. 1990), decided "the interrelationship between state and federal regulatory authorities governing . . . the interstate transportation of natural gas under **§ 7**". *Id.* (emphasis added). *See also* Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 301 (1988) ("**Sections** 4, 5, and **7** of the NGA, as amended, . . . give FERC a number of tools . . . in the exercise of its comprehensive authority"); Northern Natural Gas Co. v. Iowa Utilities Board, 377 F.3d 817, 819 (Iowa 2004) ("When natural gas companies seek to construct, extend, acquire, or operate facilities for . . . natural gas in interstate commerce, the NGA requires . . . a "certificate of public convenience and necessity" by the FERC. 15 U.S.C. § 717f[**§ 7** of the Act](c)(1)(A)"); Algonquin LNG v. Loqa, 79 F.Supp.2d 49, 50 (D.R.I. 2000) ("[a]s required by the NGA, *see* 15 U.S.C. § 717f[**§ 7** of the Act](c)(1)(A), Algonquin applied to the Federal Energy Regulatory Commission . . . for a Certificate of Public Convenience and Necessity"); Kern River Gas Transm'n v. Clark County, 757 F.Supp. 1110, 1112-13 (D. Nev. 1990) (noting that "Kern River Gas Transmission Company . . . holds a Certificate of Public Convenience and Necessity . . . issued by the Federal Energy Regulatory Commission . . .," and citing to "15 U.S.C. § 717f[**§ 7** of the Act](h)"); No Tanks, Inc. v. Public Utilities Comm'n, 697 A.2d 1313, 1315 (Me. 1997) (developer "must obtain a certificate of public convenience and necessity from FERC authorizing the construction and operation . . .. 15 U.S.C. § 717f[**§ 7** of the Act](c)"). (Emphasis added to all citations).

The other cases cited by KeySpan were decided under the Pipeline Safety Act, not the NGA, and are even more remote from the subject matter of section 3 than KeySpan's cited section 7 cases. *See* ANR Pipeline Co. v. Iowa State Commerce Comm'n, 828 F.2d 465, 470 (8th Cir. 1987); Northern Border Pipeline Co. v. Jackson County, 512 F.Supp. 1261 (D. Minn. 1981).

Thus, the narrow grounds of the cited cases prompt one to compare § 3 (15 U.S.C. § 717b) with § 7 (15 U.S.C. § 717f).

**B. A "natural gas company" is comprehensively regulated by the NGA; a "person" is not. Pre-emption concerns any "natural gas company" under § 7, not any "person" under § 3.**

The touchstone of the pre-emption decisions is the comprehensiveness of the regulatory scheme. The touchstone of this comprehensiveness is, in turn, the phrase "natural gas company."[2]

Take the example of Schneidewind v. ANR Pipeline Co., 485 U.S. 293 (1988). In Schneidewind, the Court held that, due to federal preemption, Michigan could not impose regulations on the issuance of securities by a *natural gas company* regulated by FERC. *Id.* The issue in that case was whether the state law impermissibly regulated the "rates and facilities of **natural gas companies** used in transportation and sale for resale of natural gas in interstate commerce," since that was in the exclusive province of FERC. *Id.* Indeed, the Justices began their analysis by noting:

> Both [of the two prevailing parties] are **natural gas companies**, within the meaning of the Natural Gas Act of 1938 (NGA or Act), ch. 556, 52 Stat. 821, as amended, 15 U.S.C. § 717 *et seq.* Thus, both are subject to the jurisdiction of the Federal Energy Regulatory Commission (FERC), the regulatory body charged with implementation of the NGA. *See* § 1(b) of the Act, 15 U.S.C. § 717(b).

Schneidewind, 485 U.S. at 295 (emphasis added). The Schneidewind Court then explained:

> FERC exercises authority over the rates and facilities of **natural gas companies** used in this transportation and sale through a variety of powers. Sections 4, 5, and 7 of the NGA, as amended, 15 U.S.C. §§ 717c, 717d, and 717f, give FERC a number of tools for examining and controlling the issuance of securities of **natural gas companies** in the exercise of its comprehensive authority.

[2] " 'Natural-gas company' means [an individual or a corporation] engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale." §§ 2(1) and 2(6) of the NGA, 15 U.S.C. §§ 717a(1) and (6).

Schneidewind, 485 U.S. at 301 (emphasis added). To quote just one exemplary passage, the opinion continues:

> Thus, a natural gas company's capital structure is related directly to the rates FERC allows it to charge. When a **company's** "equity ratio moves beyond generally accepted limits," however, FERC may calculate a company's rates on an imputed "reasonable capital structure" rather than on the actual structure. Thus, FERC exercises its ratemaking authority to limit the burden on ratepayers of abnormally high equity ratios. In addition, this power effectively permits FERC to control, albeit indirectly, a **natural gas company**'s capital structure. FERC's power to prevent an overcapitalized company from financing its equity through inflated rates presumably acts as a strong deterrent to the development of such a capital structure. Second, a **natural gas company** must obtain from FERC a **"certificate of public convenience and necessity"** before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce. § 7(c)(1)(A) of the NGA, as amended, 15 U.S.C. § 717f(c)(1)(A). FERC will grant the certificate only if it finds the **company** able and willing to undertake the project in compliance with the rules and regulations of the federal regulatory scheme. § 7(e), as amended, 15 U.S.C. § 717f(e). . . .
>
> . . . FERC has various powers and obligations that both allow and require it to protect against the deleterious effects of ill-considered or improper securities issuances in this area. For example, officers and directors of **natural gas companies** are prohibited from profiting from the company's securities issues. *See* § 12, 15 U.S.C. § 717k. No **company** may abandon any service or facility without FERC approval, including a finding by FERC that either the available gas supply is depleted, or "the present or future public convenience or necessity permit such abandonment." § 7(b), 15 U.S.C. § 717f(b). A **company** must keep its accounts in accordance with FERC's Uniform System of Accounts and must submit those accounts for review as FERC deems necessary. §§ 8 and 10, 15 U.S.C. §§ 717g and 717i; 18 CFR pt. 201 (1987). Finally, FERC has the authority to examine [a **natural gas company**] and to change "any rule, regulation, practice, or contract affecting [rates that] is unjust, unreasonable, unduly discriminatory, or preferential." § 5(a), 15 U.S.C. § 717d(a).

Schneidewind, 485 U.S. at 302-04. With these (and other) stringent requirements for a "natural gas company" in mind, the Justices stated and resolved the issue:

> We turn then, to the crux of the issue: whether [the state statute] is a regulation of the rates and **facilities** of **natural gas companies** used in transportation and sale for resale of natural gas in interstate commerce. Since we find that it is, we conclude that it is pre-empted.

Schneidewind, 485 U.S. at 306. Thus, the unanimous Court found that the comprehensive provisions of the Act with respect to those designated as a "natural gas company" protected against abuses that might be perpetrated by such entities. Therefore, a "natural gas company" is insulated from direct state regulation with respect to activities and facilities reserved for such an entity.

Alas for KeySpan, section 3 lacks any reference to "natural gas company." The comprehensive protections of the act (which are the basis of any pre-emption) are not at work in that section.

**C. There are no § 3 cases upholding pre-emption.**

Never has a Court of law given pre-emptive effect to section 3 when dealing with a facility of KeySpan's proposed type.

**D. § 3 does not involve CPCNs.**

The obvious point that section 3 does not confer a CPCN, and that, therefore, KeySpan will not have a CPCN, bears repetition since all judicial findings of NGA pre-emption have been tied to such a grant. As the name CPCN implies, that certification signifies that the recipient has been commissioned to further the public interest. No such honor will be bestowed upon KeySpan.

To elaborate, one must note the difference in the reference to the public interest that appears in Section 3 and that which appears in Section 7(c) which relates to certificates of public convenience and necessity (CPCNs). In the former instance, the permit must issue unless the proposed exportation "will not be consistent with the public interest," whereas, in the latter

instance, a stricter burden applies: a certificate can issue only if the proposed sale, etc., "is or will be required" by the public interest.

**§ 3 does not have pre-emptive effect with respect to *facilities*.**

*1. § 3 does not directly relate to* ***facilities****.*

Nothing in section 3 of the natural Gas Act, 15 U.S.C. § 717b, expressly confers on the FERC authority over LNG *facilities*. There are no references to the "facilities" used by entities receiving imported natural gas or LNG, and section 3 does not even use the word "facilities." Instead, on its terms, section 3 only governs federal regulatory authority over the activities of "importation" or "exportation." Because the FERC does not have such delegated pre-emptive authority under the section invoked, the FERC may not preempt Rhode Island law pertaining to such *facilities*, including Rhode Island law governing siting and environmental issues.

Congress' failure to refer to "facilities" in section 3 takes on added significance in light of Congress' inclusion of the term elsewhere. In sharp contrast to section 3 of the Natural Gas Act, section 7 of the Natural Gas Act, 15 U.S.C. § 717f, entitled "Construction, extension or abandonment of facilities," uses the word "*facilities*" fourteen times with regard to the FERC's regulatory authority. Indeed, section 7 of the Natural Gas Act, 15 U.S.C. § 717f, explicitly addresses FERC authority over construction of facilities, the extension of facilities, or abandonment of facilities in the heading to the section and throughout all of the subparts. For instance, Congress expressly gave FERC jurisdiction over *facilities* involved in the interstate sale and transportation of gas in NGA section 7(c)(1)(a), 15 U.S.C. § 717f(c)(1)(a). This distinction between section 3 and section 7 undermines the notion of FERC having pre-emptive authority over the KeySpan's proposed LNG facility based upon section 3.

The 1992 amendments reinforce this point. In 1992, the Energy Policy Act ("EPAct") amended section 3 of the Natural Gas Act, 15 U.S.C. § 717b.[3] Again, the word "*facilities*" was not included in the EPAct's amendments to section 3, in contrast to the original inclusion in and continued retention of numerous references to "facilities" in section 7, which remained unchanged. *Compare* 15 U.S.C. § 717b(a)-(c), *with* 15 U.S.C. § 717b(a)-(h). Because Congress has twice enacted legislation involving section 3, but omitted the term "*facilities*" both times, it is clear that Congress did not intend *this* section to provide the FERC with pre-emptive regulatory authority over facilities. *See* Cramer, 64 F.3d at 1412-13.

A cannon of statutory construction comes to mind:

> It is a fundamental rule of statutory construction that "when Congress includes a specific term in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded." Arizona Elec. Power Co-op. v. United States, 816 F.2d 1366, 1375 (9th Cir. 1987) (citing Russello v. United States, 464 U.S. 16, 23 (1983).

Cramer v. Commissioner, 64 F.3d 1406, 1412 (9th Cir. 1995). *See also* Perdomo-Padilla v. Ashcroft, 333 F.3d 964, 970 (9th Cir. 1003) ("the canon of *expressio unius est exclusio alterius* . . . as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions" (citations and quotations omitted)). Such is the case here: pre-emptive authority is precluded.

Even if this logic alone were not sufficient, KeySpan's anticipated theory of pre-emption is foreclosed by the D.C. Circuit's decision in Border Pipe Line Co. v. FPC, 171 F.2d 149, 151 (D.C. Cir. 1948). Although not a pre-emption decision, the court sharply distinguished between

---

[3] *See* Energy Policy Act of 1992, Pub.L. 102-486, tit. II, § 201, 106 Stat. 2866 (codified as amended 15 U.S.C. § 717b(a)-(c) by designating existing provisions as subsec. (a) and added subsecs. (b) and (c)).

FERC's jurisdiction (technically, its predecessor-agency's jurisdiction) under section 3 over the activity of exportation or importation, *see id.* at 150-51 and "regulatory measures," which the court identified as "rates, practices, accounting, facilities and financing," *id.*, covered in the other sections of the Act. Those other sections were applicable only to a "natural-gas company." Under this logic, whatever section 3 jurisdiction FERC has over KeySpan's plans is non-preemptive.

*2. § 3 does not indirectly relate to facilities in a manner that causes pre-emption.*

Despite the lack of any express reference to "facilities" in section 3, KeySpan might contend that the "terms and conditions" clause (the "conditioning clause") of section 3(a), 15 U.S.C. § 717b(a), gives FERC a pre-emptive authority over facilities that the express text of the statute does not. That clause provides, "The Commission may by its order grant such application, in whole or in part, with such modification and upon such terms and conditions as the Commission may find necessary or appropriate," and KeySpan might argue that this clause gives FERC pre-emptive jurisdiction over not just gas imports and exports but, also, over gas facilities.

But KeySpan's possible pro-preemption interpretation of this clause has no merit with regard to LNG imports, in light of subsections (b) and (c) of section 3, which were added in the amendments to section 3 when Congress enacted the EPAct in 1992. *See* Energy Policy Act of 1992, Pub.L. 102-486, tit. II, § 201, 106 Stat. 2866 (codified as amended 15 U.S.C. § 717b(a)-(c)). Subsection 3(c), specifically, amended the statute by providing:

> *For purposes of subsection (a) of this section*, the importation of the natural gas referred to in subsection (b) of this section [e.g., liquefied natural gas] . . . shall be deemed to be consistent with the public interest, and applications for such importation or exportation shall be granted without modification or delay.

15 U.S.C. § 717b(c) (emphasis added). This new section thus dramatically limited whatever pre-emptive conditioning authority the FERC might have had pursuant to section 3(a). Thus, whatever pre-emptive authority over facilities that the conditioning clause of § 3 might arguably have conferred on FERC prior to EPAct, now, certainly, has been withdrawn by section 3(c). For the same reason, KeySpan's anticipated reliance on the case of Distrigas Corporation v. FPC, 495 F.2d 1057, 1064 (D.C. Cir. 1974), interpreting the old section 3, now is misplaced. Distrigas pre-dates the 1992 EPAct amendments. And, in any event, Distrigas was not a pre-emption case.

To recapitulate, any such jurisdiction over facility siting under section 3 is to be exercised concurrently with state jurisdiction.[4]

### E. While the Commission may have discretion under § 3 to require evidentiary hearings, § 7 mandates such measures.

The distinction between the two sections is crucial because, while the impressively detailed regulatory scheme set forth in the NGA for interstate facilities under section 7 may support a preemption holding, the approach of section 3 — which, at best, leaves so much to the Commission's exercise of its discretion – simply cannot do so. This is crucial because each of the pre-emption decisions cited by KeySpan explicitly rested on the ample provisions for state input and hearings found in the regulations implementing section 7, regulations that are not applicable to section 3 applications.

[4] Although the failure of Congress to reference facilities speaks eloquently to the absence of pre-emptive authority, to the extent FERC lawfully exercises § 3 scrutiny such absence in no way restricts the FERC's obligation to consider all matters bearing on the public interest in its review of § 3 applications.

## II. KEYSPAN ONLY INVOKES § 3.

Paragraph 1 of KeySpan's verified complaint demonstrates that KeySpan relies solely on Section 3 of the NGA with respect to the building of the project:

> Plaintiff submitted an application for the proposed modification, which includes replacing the existing LNG barge unloading facilities by installing a new ship berth in the Providence River and installing additional boil-off compression and condensing systems, LNG pumps, and indirect- fired LNG vaporizers (the "Project"), to the Federal Energy Regulatory Commission ("FERC") pursuant to Section 3 of the Natural Gas Act, 15 U.S.C. § 717b(a), on April 30, 2004.

KeySpan Compl. ¶ 1.

## III. KEYSPAN IS SEEKING TO AVOID THE RIGORS OF § 7.

There is no frustration of Congressional purpose in Rhode Island's assertion of jurisdiction. The exclusion of facilities from the pre-emptive effects of section 3 does not cause regulatory havoc because there is an alternative for KeySpan. Since the imported natural gas will be transported to customers in more than one state (if KeySpan were allowed to go forward), FERC has explicit authorization over the necessary facilities under section 7 of the NGA, 15 U.S.C. § 717f. In the case of Border Pipe Line Co. v. FPC, 171 F.2d 149 (D.C. Cir. 1948), the D.C. Circuit dealt with this dual jurisdiction problem. Border Pipe Line, 171 F.2d at 151, recognized that when a company engages in *both* interstate and foreign commerce, the regulatory burdens of the Natural Gas Act § 7 would apply. Therefore, section 7 can be the basis for FERC's authorization for facilities needed to transport natural gas that is in *both* foreign and interstate commerce. KeySpan could have chosen section 7, but seeks to avoid the rigorous regulation involved in qualifying as a "natural gas company" and the rigorous scrutiny of that section itself.

If KeySpan is obstructed, it has no one but itself to blame.

## CONCLUSION

The FERC is a creature of statute and only has the authority conferred upon it by Congress. *See* Cal. Independent System Operator Corp. v. FERC, 272 F.3d 395, 398 (D.C. Cir. 2004). The plain meaning of the language and the design of the Natural Gas Act, 15 U.S.C. §§ 717-717z, govern the FERC's authority. Neither the FERC nor KeySpan may assume ambiguity to improve, in their view, upon Congress' design. So. Cal. Edison v. FERC, 195 F.3d 17, 26-27 (D.C. Cir. 1999).

At issue here is KeySpan's interpretation of FERC's pre-emptive power under the NGA, 15 U.S.C. §§ 717-717z, and KeySpan's conclusion that section 3 of that NGA, 15 U.S.C. § 717b, gives FERC exclusive jurisdiction to determine the siting and operation of the LNG facility that KeySpan wants to construct. In fact, FERC's pre-emptive power over this type of facility under section 3 is non-existent.

Respectfully submitted,

THE STATE OF RHODE ISLAND

for Defendants, by their attorney,

PATRICK C. LYNCH
ATTORNEY GENERAL

Michael Rubin, (#3656)
Special Assistant Attorney General
150 South Main Street
Providence, R.I. 02903
Tel: (401) 274-4400 Ext. 2116

Paul J. Roberti, (#4447)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
Tel: (401) 274-4400 Ext. 2231

Brian A. Goldman, Esq., (# 3940)
Counsel for CRMC
681 Smith Street
Providence, RI 02908
Tel: (401) 521-4100

**CERTIFICATION**

I, the undersigned, hereby certify that a copy of the foregoing was handed to Gregory Benik, Holland & Knight, One Financial Plaza, Suite 1800, Prov., RI 02903; and mailed to: Peter D. Ruggiero, Ruggiero, Orton, & Brochu, 20 Centerville Road, Warwick, RI 02886; Christopher M. Mulhearn, Ferrucci Russo, P.C., 55 Pine Street, Suite 4, Prov., RI, 02903; Adrienne G. Southgate, Prov. City Solicitor's Office, 275 Westminster Street, Prov. RI, 02903; and Frederick M. Lowther, Esq., Dickstein, Shapiro, Morin & Oshinsky, 2101 L. Street NW, Washington, DC 20037 on this 20th day of May, 2005.

Pamela Lopes