EXHIBIT A

112 FERC ¶ 61,028
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Pat Wood, III, Chairman;
Nora Mead Brownell, Joseph T. Kelliher,
and Suedeen G. Kelly.

KeySpan LNG, L.P. — Docket Nos. CP04-223-000 and CP04-293-000

Algonquin Gas Transmission LLC — Docket No. CP04-358-000

# ORDER DENYING AUTHORIZATION UNDER SECTION 3 AND DISMISSING CERTIFICATE APPLICATION

(Issued July 5, 2005)

1. In this proceeding, KeySpan LNG, L.P. (KeySpan) requests authority under section 3 of the Natural Gas Act to site, construct, and operate a liquefied natural gas (LNG) terminal at its existing LNG storage facility in the City of Providence, Rhode Island.[1] In a related application, Algonquin Gas Transmission LLC (Algonquin) requests authority under section 7(c) of the Natural Gas Act to construct and operate 1.44 miles of 24-inch diameter pipeline in order to transport natural gas from KeySpan's proposed terminal to Algonquin's existing interstate pipeline system.[2]

---

[1] KeySpan filed its application in Docket Nos. CP04-223-000 and CP04-293-000 on April 30, 2004.

[2] Algonquin filed its application in Docket No. CP04-358-000 on June 14, 2004.

2. In essence, KeySpan is proposing to construct a new LNG import terminal. It proposes to do so by converting its existing LNG storage facility into an LNG import terminal. In making this conversion, KeySpan does not propose any modification to its existing LNG storage tank, impoundment, or facility site, none of which meet current Department of Transportation (DOT) safety standards for LNG import facilities.[3]

3. This order finds that authorization of KeySpan's LNG import terminal facilities, as proposed, would be inconsistent with the public interest. Although the proposed facilities would provide a new source of reliable LNG imports in New England, are fully subscribed and, if constructed in an appropriate manner, would not constitute a major federal action significantly affecting the quality of the human environment, we find that it is not consistent with the public interest under section 3 to authorize KeySpan to site, construct, and operate a new LNG import terminal that does not comply fully with the DOT's current safety standards. As a consequence, we will also dismiss Algonquin's application.

## I. Background

4. KeySpan, a jurisdictional natural gas company, is a limited partnership that is owned and operated by KeySpan LNG, L.P., L.L.C. and KeySpan LNG, G.P., L.L.C., which are, in turn, wholly owned subsidiaries of KeySpan Energy Development Corporation. KeySpan Energy Development Corporation is a subsidiary of KeySpan Corporation.

5. Algonquin is a jurisdictional natural gas company that owns and operates a pipeline system extending from points near Lambertville and Hanover, New Jersey through New Jersey, New York, Connecticut, Rhode Island, and Massachusetts to points near Boston.

---

[3] KeySpan contends that its existing facilities do not need to meet current safety standards because they were constructed before the current standards were promulgated.

6. In the early 1970's, Eascogas LNG, Inc., a corporation jointly owned by Algonquin and Public Service Electric and Gas Company, proposed to import LNG from Algeria and deliver it to facilities in New York and Rhode Island, where it would be stored, regasified, and sold to customers in the United States. We approved Eascogas' proposals to import and sell natural gas in *Eascogas LNG, Inc.*[4] Due to the increase in LNG prices, however, the project became uneconomic and most of the proposed facilities were never authorized or constructed.

7. Algonquin LNG, Inc. (Algonquin LNG), a wholly owned subsidiary of Algonquin, constructed an LNG storage facility that commenced service in May 1974 as part of the Eascogas project[5] on a site owned by New England Gas Company (New England Gas),[6] a local distribution company, in Providence.[7] Under an agreement, Algonquin LNG agreed to provide New England Gas 348,000 barrels of LNG storage capacity for 30 years. The LNG storage facility consisted of a 600,000 barrel above-ground storage tank as well as a barge unloading dock, an LNG truck unloading and loading station, three LNG pumps, three 33.4 Mcf per day direct fired vaporizers, control and equipment buildings, process piping, and other related facilities. Because the facility had more storage capacity than needed for the service to New England Gas, we granted Algonquin LNG authorization to provide jurisdictional LNG storage service to New England Gas and other customers in a series of limited term certificates until 1992.[8] In 1992, we issued Algonquin LNG a blanket certificate to provide firm and interruptible storage service and storage-related transportation on an open-access basis.[9]

---

[4] 50 F.P.C. 2075 (1973).

[5] The LNG storage facility in Providence was the only facility constructed as part of the Eascogas project.

[6] New England Gas was formerly known as Providence Gas Company.

[7] The Commission's authorization was not required for the construction and operation of Algonquin LNG's storage facility because the facility was used to provide intrastate service to a local distribution company.

[8] *See Algonquin LNG, Inc.*, 52 F.P.C. 731 (1974); 8 FERC ¶ 61,195 (1979), *amended*, 9 FERC ¶ 61,092 (1979), *and* 13 FERC ¶ 61,034 (1980); *Algonquin LNG, Inc.*, 19 FERC ¶ 61,265, *request for clarification denied*, 20 FERC ¶ 61,191 (1982).

[9] *Algonquin LNG, Inc.*, 60 FERC ¶ 61,127, *clarified on reh'g*, 61 FERC ¶ 61,292 (1992).

8. In 1999, we authorized Algonquin LNG to replace three existing vaporizers with three new ones that increased deliverability slightly, construct and operate a boil-off system to replace the existing boil-off system, make improvements to control and monitoring facilities, and replace cryogenic piping. We also authorized Algonquin LNG to bundle its storage and vaporization service with a displacement service provided by New England Gas.[10]

9. On December 12, 2002, KeySpan LNG, L.P., L.L.C. and KeySpan LNG, G.P., L.L.C. acquired Algonquin LNG from Duke Energy Gas Transmission Corporation and Algonquin Energy, Inc. In January 2003, Algonquin LNG changed its name to KeySpan and filed tariff sheets to reflect the name change.[11]

10. KeySpan currently provides up to 150,000 Dth per day of firm and interruptible storage services to Consolidated Edison Company of New York, Inc. (Consolidated Edison), KeySpan Energy Delivery New England (KEDNE), and New England Gas. Specifically, KeySpan provides up to 20,000 Dth per day of storage service to Consolidated Edison, up to 35,000 Dth per day of storage service to KEDNE, and up to 95,000 Dth per day to New England Gas. Currently, LNG is delivered to the storage facility by truck. KeySpan redelivers the gas to KEDNE and Consolidated Edison via a displacement agreement with New England Gas for use primarily as a winter peaking supply.

## II. KeySpan's Proposals

11. KeySpan proposes to upgrade its existing LNG storage facility by converting the facility to an LNG terminal capable of receiving LNG from ships. KeySpan executed a "term sheet" with BG LNG Services, LLC (BGLS), which is a leading marketer and importer of LNG into the United States, for the full capacity of the proposed LNG terminal.[12] Since KeySpan's existing storage facility is not connected to any interstate transmission facilities, BGLS has no direct means of transporting the natural gas made

---

[10] *Algonquin LNG, Inc.*, 87 FERC ¶ 61,296 (1999).

[11] In a February 25, 2003 letter order, we accepted the tariff sheets.

[12] KeySpan states that BGLS will be responsible for obtaining LNG, arranging for the delivery of LNG to KeySpan's terminal, and receiving authorization to import LNG from the Department of Energy. KeySpan states that BGLS has import authorization for "much of the LNG" it plans to ship to the terminal.

available by the expansion of KeySpan's facilities to the interstate pipeline grid. Thus, Algonquin has entered into an agreement to construct and operate pipeline facilities to transport gas from KeySpan's upgraded facilities to Algonquin's interstate pipeline.

12. Although KeySpan states that much of the infrastructure needed to provide LNG terminalling service to BGLS is already in place, KeySpan proposes to construct and operate the following facilities:

> a ship berth in the Providence River to the east of the existing facility;
>
> liquid unloading arms;
>
> vapor return blowers to return vapor to the ship;
>
> a vapor return line and loading arms;
>
> a boil-off gas compressor;
>
> a boil-off gas condenser;
>
> a two-stage LNG pumping system;
>
> an indirect-fired vaporizer system with a capacity of 375,000 Mcf per day;
>
> an expansion to the existing control/administration building; and
>
> a boil-off gas compressor building for the boil-off gas compressors and blowers, a heater building for the water/ethylene glycol heaters, a motor control center building for the electrical equipment, and a control room for berth operations controls during ship unloading.[13]

13. KeySpan also proposes to abandon an existing 12-inch diameter LNG barge unloading line from the Providence River bulkhead to the storage tank to provide space for the installation of a ship return line.

---

[13] The proposed project will require a non-jurisdictional sewer connection from the control building at the LNG terminal to Providence's sanitary system and a non-jurisdictional connection with Narragansett Electric's substation, transmission, and distribution facilities to meet the increased electrical load from the facility upgrades.

14. KeySpan states that the proposed LNG terminal will unload approximately 50 LNG tankers per year. KeySpan states that the LNG in the ships will be pumped into the LNG storage tanks and later pumped from the storage tanks, vaporized, compressed up to pipeline pressure, and sent out from the terminal at a rate of up to 375,000 Mcf per day into Algonquin's proposed facilities. In addition to the delivery of 375,000 Mcf per day to Algonquin, KeySpan states that the LNG facilities will continue to deliver up to 150,000 Mcf per day of vaporized LNG to New England Gas through an existing interconnect with New England Gas' distribution system and up to approximately 20,000 Mcf per day from its truck loading system.[14]

15. KeySpan states that it will not offer open-access service and that it will not maintain a tariff or rate schedule for service from the proposed LNG terminal.

16. KeySpan states that there is an increasing demand for natural gas in the United States in general and New England in particular and that LNG will be important in meeting that demand. In addition, KeySpan quotes a Commission staff study, *New England Natural Gas Infrastructure*, stating that additional infrastructure will be needed in New England by 2010 and that delay in construction, or underestimates of demand, could result in insufficient capacity to meet demand. KeySpan states that its proposals will provide a new source of reliable LNG imports in New England. In addition, KeySpan contends that because much of the infrastructure needed to provide LNG terminalling service is in place and because the site has been used for LNG storage for over 30 years, the authorizations requested herein will have few, if any, adverse impacts on the local community or environment. KeySpan asserts that it will be a new entrant in the LNG market, that it has no existing customers that will be adversely affected by the proposed terminal, and that it will bear the economic risk in constructing and operating the proposed terminal.

## III. <u>Algonquin's Proposals</u>

17. Algonquin proposes to construct and operate approximately 1.44 miles of 24-inch diameter pipeline with a maximum operating pressure of 900 psig, extending from KeySpan's terminal to a tie-in with Algonquin's existing G-12 lateral on property owned by U.S. Generating New England, Inc. (U.S. Generating) in Providence. Algonquin states that approximately 1.14 miles of pipeline, or 79 percent of the proposed line, will

---

[14] KeySpan anticipates that KEDNE and Consolidated Edison will terminate their current agreements as of the day immediately preceding the in-service date of the proposed LNG terminal and enter into agreements with BGLS for service via New England Gas' facilities.

be constructed under city streets (Allens Avenue and Henderson Street) and the remaining 0.3 mile of line will be constructed on private property owned or leased by KeySpan, New England Gas, and U.S. Generating.

18. Algonquin also proposes to construct and operate a receipt point on KeySpan's property that will include electronic gas measurement facilities, flow control equipment, and a 30-inch diameter pig launcher. In addition, Algonquin proposes to construct and operate a 24-inch diameter tap valve at the tie-in between the proposed pipeline and Algonquin's existing facilities. The tap valve will include a 30-inch diameter pig receiver. Algonquin states that the proposed pipeline will be capable of transporting up to 500,000 Mcf per day of gas for BGLS.

19. Algonquin states that the cost to construct the proposed pipeline and related facilities will be approximately $17,180,000.

20. Algonquin states that it will execute a firm transportation agreement with BGLS under Rate Schedule AFT-CL that will specify a maximum daily transportation quantity of 500,000 Mcf per day, exclusive of fuel requirements, for a primary term of 25 years.

## IV. Procedural Matters

### A. Interventions

21. Notice of KeySpan's application in Docket Nos. CP04-223-000 and CP04-293-000 was published in the *Federal Register* on May 13, 2004 (69 *Fed. Reg.* 26573). The parties listed in Appendix A filed timely, unopposed motions to intervene.[15]

22. Notice of Algonquin's application in Docket No. CP04-358-000 was published in the *Federal Register* on June 29, 2004 (69 *Fed. Reg.* 38888). The parties listed in Appendix B filed timely, unopposed motions to intervene.[16]

23. In Docket No. CP04-358-000, the KeySpan Delivery Companies, Hess LNG LLC (Hess), and the New England Local Distribution Companies filed comments to Algonquin's application. Consolidated Edison and Orange and Rockland Utilities, Inc. (Orange and Rockland) filed a joint protest to Algonquin's application. Algonquin filed an answer to the comments and to Consolidated Edison's and Orange and Rockland's protest. Hess and Shell NA LNG LLC (Shell NA) filed answers to Algonquin's answer.

---

[15] Timely, unopposed motions to intervene are granted by operation of Rule 214.

[16] *Id.*

Algonquin and the KeySpan Delivery Companies filed answers to Hess' and Shell NA's answer. Shell NA filed another answer to Algonquin's answer and BGLS filed an answer to Hess' answer.

24. Answers to protests and answers to answers are not allowed under our rules.[17] Nevertheless, we will accept the answers filed in Docket No. CP04-358-000 because they provide information that assisted us in our decision-making.

25. Calpine Corporation; the Conservation Law Foundation; Motiva Enterprises LLC; Project Technical Liaison Associates, Inc.; the Rhode Island Chapter of the Sierra Club; and Save the Bay filed untimely motions to intervene in Docket Nos. CP04-223-000 and CP04-293-000. The Conservation Law Foundation; Marathon LNG Marketing, LLC; Motiva Enterprises LLC; Shell NA; and Virginia Power Energy Marketing, Inc. filed untimely motions to intervene in Docket No. CP04-358-000. These parties have demonstrated an interest in this proceeding and have shown good cause for intervening out of time. Further, these motions will not delay, disrupt, or otherwise prejudice this proceeding. Thus, we will grant the untimely motions to intervene.

### B. March 17, 2005 Public Meeting

26. In response to requests from the Rhode Island congressional delegation and Rhode Island Attorney General Patrick Lynch, the Commission's Chairman Wood and Commissioner Kelly met with United States Senators Lincoln Chafee and Jack Reed, United States Representatives Patrick Kennedy and James Langevin, Rhode Island Governor Donald Carcieri, Lieutenant Governor Charles Fogarty, Attorney General Patrick Lynch, and Mayor David Cicilline of Providence at a meeting open to the public at the Commission's Washington, D.C. headquarters on March 17, 2005. Those attending the meeting presented their views and discussed their concerns about the LNG terminal proposal with Chairman Wood and Commissioner Kelly.[18]

---

[17] 18 C.F.R. § 385.213(a)(2) (2004).

[18] A transcript of that meeting is part of the record in this proceeding.

## V. Discussion of KeySpan's Application

### A. Public Interest

27. Since the proposed LNG terminal facilities will be used to import natural gas from a foreign country, the construction and operation of the facilities and the location of the facilities require approval by the Commission under section 3 of the Natural Gas Act.[19] Section 3 provides that the Commission "shall issue such order on application . . ." unless it finds that the proposal "will not be consistent with the public interest."

28. Clearly, natural gas is an increasingly important fuel in the mix of energy options available in the United States. The Department of Energy/Energy Information Administration's (DOE/EIA) Annual Energy Outlook 2005 Report estimated that the demand for natural gas will increase 1.5 percent a year until 2025. Similarly, the DOE/EIA estimated that new sources of natural gas and LNG are needed in New England, where the demand for gas is projected to increase at a rate of 1.6 percent a year until 2025. It appears that this growing demand for natural gas cannot be met solely by domestic or Canadian production. For this reason, the importation of LNG is an important part of this country's energy future. The National Petroleum Council's September 2003 report estimated that LNG could increase to as much as 12 percent of domestic gas supply by 2025. In a similar vein, the DOE/EIA estimated that LNG could account for 21 percent of total natural gas supply by 2025. Thus, the construction and operation of additional facilities to import LNG is vitally important to help meet energy demands.

29. Here, the record shows that KeySpan's proposals would provide a new source of reliable LNG imports in New England, where gas is critically needed. In addition, KeySpan's project would be in close proximity to Algonquin's existing interstate pipeline facilities, as well as numerous local distribution companies and electric generation facilities, which would make the LNG imports readily available to New England markets.

---

[19] The regulatory functions of section 3 of the Natural Gas Act were transferred to the Secretary of Energy in 1977 pursuant to section 301(b) of the Department of Energy Organization Act (Pub. L. No. 95-91, 42 U.S.C. § 7101 *et seq.*). In reference to regulating the imports or exports of natural gas, the Secretary subsequently delegated to the Commission the authority to approve or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports. DOE Delegation Order No. 00-004.00, 67 *Fed. Reg.* 8,946 (2002).

KeySpan would bear the economic risk in constructing and operating the proposed terminal. Finally, the capacity of the proposed terminal is fully subscribed. However, we find that these considerations are outweighed by the fact that KeySpan's proposal for a new LNG import terminal does not meet current federal safety standards.

### B. Environmental Impact Statement

#### 1. General

30. On May 20, 2005, our staff issued a final Environmental Impact Statement (EIS) for the KeySpan project.[20] We mailed approximately 950 copies of the final EIS to agencies, groups, and individuals on the mailing list.

31. The final EIS analyzed KeySpan's proposal to convert its existing LNG facility to a marine import facility and Algonquin's proposed pipeline. The final EIS addressed the project's purpose and need; alternatives; geology; soils and sediments; water resources; wetlands and vegetation; wildlife and aquatic resources; federally listed species; land use, recreation, and visual resources; socioeconomics; cultural resources; air quality and noise; reliability and safety; and cumulative impacts. The United States Army Corps of Engineers was a cooperating agency in the preparation of the final EIS. The United States Coast Guard and the DOT participated in the preparation of the final EIS under the terms of an interagency agreement between these agencies and the Commission.

32. The final EIS addressed comments from individuals, organizations, and elected officials, who attended public meetings in Providence and Middletown, Rhode Island on January 11 and 12, 2005, respectively. A total of 38 people provided comments at these two meetings. In addition, the final EIS addressed 91 comment letters submitted in response to the draft EIS (28 of these were copies of the same form letter). The commenters' primary concerns focused on the safety of operating an LNG import facility in a populated urban setting, alternatives to the project, potential impacts to recreational and commercial use of the navigation channel, the financial demand of the project on local services, and the project's compatibility with existing land uses and future development plans. The final EIS addressed these concerns.

---

[20] On May 27, 2005, the United States Environmental Protection Agency published a Notice of Availability of the final EIS in the *Federal Register*.

### 2. Environment

33. The final EIS determined that the potential for geologic hazards or other natural events to significantly affect the project was low. KeySpan's facilities would be designed to address predicted ground shaking associated with a seismic event and Algonquin's pipeline would be constructed of modern steel that is capable of remaining elastic during the level of shaking that could occur in the project area. However, a detailed evaluation by a seismic consultant would be required to determine if the existing tank would comply with the 2001 edition of the National Fire Protection Association (NFPA) 59A, which increased the stringency and complexity of the seismic requirements.

34. The final EIS determined that the project would have minimal impacts on soils because construction of the land-based LNG facilities would be within the existing KeySpan facility site and the pipeline facilities would be within city streets and disturbed industrial land. Due to the history of the KeySpan site as a manufactured gas plant, contaminated soils may be encountered during construction of the proposed LNG facility upgrade. KeySpan's and Algonquin's soil erosion control plan would prevent or minimize impacts associated with stormwater runoff. The Spill Prevention, Control, and Countermeasure Plan and Remedial Action Work Plan would minimize impacts from spills and would specify methods for handling, storing, and disposing of contaminated soils as well as measures to minimize worker exposure to contaminated areas.

35. Aquatic sediments in the vicinity of the KeySpan facility are considered contaminated. No dredging would be required for the in-water facilities. Thus, the final EIS found that impacts from the resuspension of potentially contaminated sediments are expected to be minor, especially in comparison to impacts associated with the periodic dredging of the Providence River because only a small area would be affected.

36. KeySpan would construct the LNG facility upgrade without excavation into the surficial aquifer. This would avoid contact with contaminated groundwater. KeySpan would take precautions to protect and preserve existing monitoring or recovery wells at the LNG facility.

37. Construction of the proposed marine-based facilities could temporarily affect surface water quality in the Providence River as a result of increased turbidity. The final EIS concluded, however, that these impacts would be localized, temporary, and short term, and would not affect water quality beyond the duration of construction.

38. The Providence River and Narragansett Bay have been designated as Essential Fish Habitat (EFH) for 16 federally managed fish species. The final EIS included an EFH Assessment as necessary for compliance with the Magnuson-Stevens Fishery Conservation and Management Act. Staff determined that the proposed project could

affect water column, benthic habitat, and man-made structure EFH, as well anadromous fish and shellfish, but that none of these effects would be noticeable or significant due to the small area that would be affected by the project and the relatively short duration of construction.

39. The final EIS found that no forest land or wetlands would be affected. Vegetation within the areas that would be affected by the project is limited to isolated areas of sparse vegetation within the existing LNG facility. Due to the lack of significant vegetation in the area of impact, the proposed project would not adversely affect vegetation. Wildlife expected to be found in the project area reflects the urban nature of the area and includes species that have adapted to an urban setting. The final EIS concluded that construction and operation of the project would not likely result in adverse impacts on wildlife species.

40. The United States Fish and Wildlife Service indicated that the project is unlikely to adversely affect federally listed species, proposed species, or designated critical habitat under its jurisdiction because none are known to occur in the project area. The final EIS concurred with this finding. We received a determination from the National Marine Fisheries Service (NOAA Fisheries) that no federally listed endangered or threatened species under its jurisdiction are known to occur in the Providence River at the proposed LNG terminal site, but that an increase in vessel traffic in Narragansett Bay could potentially affect federally listed marine mammals or sea turtles as a result of vessel strikes. The North Atlantic right whale is of particular concern. NOAA Fisheries developed a "*Strategy to Reduce Ship Strikes of Right Whales*," which is not yet finalized, that would establish speed restrictions within 20 to 30 miles of the approaches in specific areas. In addition, the Coast Guard is coordinating with NOAA Fisheries on various measures to reduce vessel strikes on right whales. KeySpan committed to complying with applicable speed restrictions for LNG ships if implemented by NOAA Fisheries. The final EIS recommended that KeySpan coordinate with NOAA Fisheries to determine appropriate speed and seasonal restrictions, or other applicable measures, to avoid or minimize impacts on right whales and to file the results of that coordination with the Commission.

41. KeySpan's proposals would be consistent with current land uses (e.g., the Rhode Island Statewide Planning Program's Rhode Island State Guide Plan and Providence 2000: The Comprehensive Plan). The final EIS also evaluated the consistency of the project with the plans for the potential future implementation of The Narragansett Landing Plan (a long-term plan that the City of Providence anticipates will be implemented over the next 20 to 25 years). This plan involves the acquisition of existing properties, relocation of existing land users, remediation of contaminated sites, and development of various mixed uses. If the Narragansett Landing development plan is realized, the proposed KeySpan project would not be consistent with the plan's ultimate

objectives, which include removal of the existing KeySpan facility from its current site. However, the existing facility would have to be acquired and removed regardless of whether the proposed upgrade is constructed.

42. KeySpan and Algonquin would be required to document that their respective projects are in compliance with the Rhode Island Coastal Resource Management Program and the Coastal Zone Management Act.

43. The final EIS found that construction of the proposed facilities would not significantly affect commercial or recreational use of the Providence River. Operation of the upgraded facility as an LNG import terminal would not affect commercial shipping or recreational boating during periods between LNG deliveries. However, commercial and recreational ships and boats, fishermen, and others engaged in marine-based activities could be affected by the safety and security zones that would be imposed by the Coast Guard during periods when an LNG ship is in transit to, or berthed at, the LNG terminal. Ships and boats along the shipping channel might experience temporary delays as LNG ships transit the channel and fishermen would be required to avoid or vacate the areas encompassed by the moving security zone.

44. The final EIS concluded that the proposed upgrade would not have significant socioeconomic impacts and would be unlikely to impact property values in the surrounding area. The potential impacts of the project would not have a disproportionately high or adverse effect on environmental justice areas near the terminal site and along the federal navigation channel.

45. The Rhode Island Historic Preservation and Heritage Commission found that the project would not affect historic resources. The final EIS concurred with this finding.

46. The final EIS found that construction and operation of the proposed LNG facility and pipeline would result in a change in air emissions. However, the final EIS determined that the operational air emissions from the new stationary LNG equipment and from LNG ships would not cause or significantly contribute to a violation of an ambient air quality standard. In order to minimize emissions associated with the use of diesel fuels during construction, the final EIS recommended that KeySpan and Algonquin provide a feasibility assessment determining if the controls used by the Connecticut Department of Transportation in the Interstate 95 New Haven Harbor Crossing Corridor Improvement Program could be used for the KeySpan project, and recommended that the companies use transportation grade or better diesel fuel in construction equipment used for the project. Potential noise impacts were found not to be significant.

47. The final EIS evaluated potential alternatives to the KeySpan project, including the no action or postponed action alternatives, system alternatives, alternative LNG terminal sites, marine berthing alternatives, and pipeline system and route alternatives. Staff concluded that no single alternative or combination of alternatives would be capable of meeting the project objectives with fewer construction- or operations-related environmental impacts than the current proposal.

48. The final EIS concluded that construction and operation of the KeySpan project would result in limited adverse environmental impact with the appropriate mitigation. Although many factors were considered in this determination, the principal reason is that the project would make use of an existing LNG facility within a designated port area, which would minimize environmental impacts and maintain consistency with existing land uses.

### 3. <u>Safety</u>

49. The existing KeySpan facility commenced operations in May 1974, prior to the adoption of the Federal LNG Safety Standards in 49 C.F.R. Part 193 in February 1980. During more than 30 years of operation, the facility provided winter storage services with the tank filled exclusively by LNG truck, except for a single barge cargo in July 1974. The draft EIS determined that the proposed transformation of the existing facility into a new LNG import terminal supports the need for the existing LNG storage tank and facilities to be modified as necessary to meet the current LNG safety standards. In reaching this conclusion, the draft EIS found that the existing facility did not meet the current federal safety standards in the following areas: the LNG storage tank impoundment was designed to 100 percent of the tank contents rather than 110 percent; thermal radiation and flammable vapor exclusion zones would extend offsite onto adjacent properties; and a detailed evaluation by a seismic consultant would be required to determine if the existing tank would comply with the 2001 edition of the NFPA, which increased the stringency and complexity of the seismic requirements. As a result, the draft EIS recommended that KeySpan perform an analysis of how its existing LNG storage and send out facilities would comply with the current federal safety standards.

50. In response, in a January 24, 2005 filing, KeySpan contends that in order to bring its facility into compliance with current safety standards, it would need to make the following major modifications: (1) replace anchors, possibly increase inner tank annular plate thickness and width, and replace or increase foundation for seismic requirements; (2) install in-tank pumps and eliminate bottom penetrations to reduce flammable vapor exclusion zones; (3) increase impoundment capacity; (4) add pressure and vacuum relief valves; and (5) acquire legal control of eight adjacent industrial properties for thermal exclusion zones. KeySpan asserts that the cost of these modifications would exceed $35 million and require the removal of the LNG storage facility from service for two to

three heating seasons. Based on these findings, KeySpan contends that it would not be feasible for the existing facility to meet the federal safety standards, that the net advantages of this requirement would be negligible, that it would deprive the region of a critically needed gas supply, and that this requirement would be inconsistent with the Commission's precedent on similar projects and with the grandfather provisions of 49 C.F.R. Part 193.

51. In a supplement to its comments, KeySpan contends that it could bring the facility up to current thermal exclusion zone standards by modifying or replacing the existing storage tank at a cost of $95 to $105 million, acquiring 10 acres from four landowners within the 10,000 Btu/hr-ft$^2$ thermal exclusion zone, and acquiring legal covenants or easements on 16 acres from three landowners within the 3,000 and 1,600 Btu/hr-ft$^2$ thermal exclusion zones.[21]

52. In comments to the final EIS, KeySpan and BGLS vigorously assert that the existing storage tank does not need to meet the construction standards adopted in 2001 because the storage tank is grandfathered, i.e., the standards only apply to LNG facilities constructed after March 31, 2000. They also contend that the tank will not be replaced, relocated, or significantly altered by KeySpan's proposals, which would abrogate the grandfather provision; that under the legislative history of the Natural Gas Pipeline Safety Act (NGPSA), only in exceptional cases and in consultation with the DOT can the Commission impose safety conditions exceeding DOT's standards; and that the NGPSA provides that the DOT's standards cannot be retroactively applied by the DOT or any other federal agency acting under any other statute.

53. The siting, construction, and operation of LNG facilities is governed by a comprehensive scheme of federal regulations that guarantees that the Commission and other federal agencies will work with state and local agencies, as well as the general public, to ensure that all public interest considerations are carefully studied before an LNG facility is approved. As the lead federal agency for KeySpan's project, as well as all other onshore LNG import facilities, our goal is to ensure that projects that are found to be in the public interest are constructed and operated in a safe and secure fashion. Specifically, to meet this goal, prior to the filing of an LNG-related application, our staff will meet, if asked, with the applicant to review the conceptual design of the facility and to provide guidance on resolving environmental, safety, and design issues. In the meetings, staff also provides guidance on addressing the DOT's siting requirements and

---

[21] KeySpan filed its supplement on March 24, 2005.

on complying with marine safety and security issues.[22] Later, when filing its application under section 3, the applicant must include a detailed plan showing the location of facilities; a layout of the fire protection system, the hazard detection system, the spill containment system, and the fuel gas system; specifications for the shut-off valve; engineering plans on major process components and the electric power generation system; construction drawings for the LNG tanks; piping and instrumentation diagrams; and seismic information. To fulfill its National Environmental Policy Act of 1969 requirements, our staff prepares an EIS that, among other things, examines dike and impoundment volumes, equipment spacing, design spills, exclusions zones, and hazard areas with respect to LNG spills from ships. Our staff also prepares a Cryogenic Design Review to assure that the design of the LNG facilities is safe. The Review evaluates the LNG storage tank and all major process systems; instrumentation and controls; hazard detection, alarms, and shut down systems; hazard control systems; and safety and security. Finally, after receiving authorization for its proposals, the applicant must meet specific engineering and safety conditions prior to, and during, the construction process.

54. In addition to our responsibilities, the federal standards for design and operation of an onshore LNG facility are contained in the DOT's regulations under 49 C.F.R. Part 193 - *Liquefied Natural Gas Facilities: Federal Safety Standards*. The DOT's authority extends to the siting, design, installation, construction, initial inspection, initial testing, operation, and maintenance of LNG facilities. Operation and maintenance includes fire protection and security planning. The DOT inspects and enforces compliance with these regulations through a broad range of administrative and judicial actions.

55. The safety record of the LNG industry is excellent. With the exception of a fire in Cleveland, Ohio more than 60 years ago, there has never been an LNG safety-related incident where LNG was spilled or mishandled that resulted in adverse effects to the public or the environment in the United States. Similarly, there have been no shipping accidents resulting in adverse effects. We believe that this impressive safety record derives from the active involvement of the Coast Guard, the DOT, and the Commission in taking all reasonable steps to ensure the safety of all LNG projects.

56. Under section 3, the Commission is charged with authorizing the siting, construction, and operation of LNG import facilities. Our authority over facilities constructed and operated under section 3 includes the authority to apply terms and conditions as necessary and appropriate to ensure that the proposed construction and

---

[22] We note that KeySpan did not take advantage of the Commission's pre-filing process.

siting is in the public interest.[23] In examining LNG proposals, our most important duty is ensuring that the project that is authorized is safe and secure. We will not authorize an LNG facility if we continue to have questions about safety. Clearly, considering the industry's excellent record, the transportation of LNG by ship to import terminals and the regasification of the LNG for customers in this country is a safe process. We are convinced that this safety history is due to the array of reasonable and responsible steps, as detailed above, that this Commission takes in determining whether an LNG import terminal is in the public interest.

57. In this proceeding, for the first time, we have been presented with a proposal to construct a new LNG import facility which would incorporate an existing LNG storage facility. We do not believe that it is in the public interest to authorize the construction of such an import terminal, where the components do not meet the current federal safety standards required of all other new LNG import facilities in the United States. Our policy announced here is based on the need to maintain the impressive safety record of the LNG industry, which is due, as discussed above, to the array of safety requirements we impose in authorizing LNG facilities. Without meeting our full panoply of reasonable safety requirements, we find that KeySpan's proposals are not consistent with the public interest. Thus, we will not authorize KeySpan's proposals.

58. In reaching our decision, we are mindful that the DOT has adopted and enforces federal standards for the design and operation of onshore LNG facilities. As part of its regulatory scheme, the DOT decided that facilities constructed before March 31, 2000 were not subject to its current construction standards – a decision upon which KeySpan relies to support its position that the current safety standards do not apply to its existing storage tank. Nevertheless, under our regulatory scheme, the Commission must determine if LNG construction proposals are consistent with the public interest. As part of our determination, we must examine safety issues. We have the authority to apply terms and conditions to ensure that the proposed construction and siting is in the public interest and the discretion to, instead, deny an application where we determine that it is not in the public interest to approve it. Here, we find that approving KeySpan's proposal to construct a new LNG import facility utilizing portions of an existing LNG facility that does not meet current safety standards is not in the public interest.

---

[23] *Distrigas Corporation v. FPC*, 495 F.2d 1057, 1063-64 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 834 (1974); *Dynegy LNG Production Terminal, L.P.*, 97 FERC ¶ 61,231 (2001).

59. In its comments, KeySpan cites four cases where it alleges that we did not impose the new construction standards on existing LNG facilities – *Algonquin LNG, Inc.*,[24] *Cove Point LNG Limited Partnership*,[25] *Southern LNG, Inc.*,[26] and *Trunkline Gas Company, LLC.*[27] KeySpan states that in *Algonquin LNG*, which involved the same facilities as here, the Commission authorized Algonquin LNG, among other things, to construct and operate liquefaction and vaporization facilities at its existing LNG facilities in Providence in order to enlarge the capacity of the LNG facility and connect the facility to the interstate grid.

60. KeySpan states that the Cove Point facilities were constructed in the 1970's, but operations were suspended in 1980. In 1994, KeySpan alleges that the Commission authorized Cove Point to reactivate the existing onshore storage and process facilities and construct a liquification unit in order to provide peaking and storage services.[28] In 2001, KeySpan contends that the Commission approved the construction of an LNG storage tank, a containment system, a reduction facility, and a nitrogen separation plant, among other things, as well as the reactivation, repair, and replacement of the existing marine terminal facilities. KeySpan asserts that Cove Point planned to decommission the liquefaction facilities since it would no longer be converting gas to LNG, but LNG to gas. Thus, KeySpan contends that the Cove Point project involved the conversion of a peak shaving facility to a base load LNG import terminal.

---

[24] 79 FERC ¶ 61,139 (1997), *order on reh'g*, 83 FERC ¶ 61,133 (1998). Algonquin LNG did not accept the certificate "due to changes in market conditions."

[25] 97 FERC ¶ 61,043, *order on reh'g and clarification,* 97 FERC ¶ 61,276 (2001), *order on reh'g and clarification,* 98 FERC ¶ 61,270 (2002).

[26] 103 FERC ¶ 61,029 (2003).

[27] 108 FERC ¶ 61,251 (2004), *order amending certificate*, 110 FERC ¶ 61,131 (2005).

[28] *Cove Point LNG Limited Partnership*, 68 FERC ¶ 61,377, *reconsideration denied*, 69 FERC ¶ 61,292 (1994).

61. In *Southern*, KeySpan asserts that the Commission approved proposals to expand the storage and send-out capacity of an existing LNG terminal. The proposals included, among other things, the construction of docks, storage tanks, compressors, LNG pumps, and vaporizers. Similarly, in *Trunkline*, KeySpan points out that the Commission approved proposals to expand an LNG terminal by authorizing the construction of a dock, storage pumps, and vaporizers.

62. In each case, KeySpan asserts that the Commission did not require that the new construction standards be imposed on the existing storage tanks. Specifically, in *Algonquin LNG*, KeySpan asserts that the Commission found that the "proposed changes would not constitute a 'significant modification' to the tank" and that the current Part 193 requirements for construction did not apply. Similarly, in *Cove Point*, *Southern*, and *Trunkline*, KeySpan quotes the EAs in each proceeding, which found that since the siting requirements in Part 193 were not in effect when the original facilities were constructed, the requirements were not applicable to existing storage tanks.

63. KeySpan cites four cases where it alleges that the Commission found that it could authorize significant construction at existing LNG facilities notwithstanding the fact that certain aspects of the existing facilities did not meet the then-current safety standards. These cases, however, are not relevant to the unique facts of this case.

64. In *Cove Point*, *Southern*, and *Trunkline*, the existing facilities had already been authorized by the Commission to operate as LNG import facilities. Specifically, the Cove Point facility operated as an LNG import terminal, unloading 90 ocean-going LNG vessels between 1978 and 1980, until major changes in the natural gas market led to the suspension of LNG imports. In 1995, Cove Point recommissioned the onshore storage and process facilities and installed a liquefaction facility for LNG peaking and storage services. In 2003, Cove Point recommissioned the offshore facilities and resumed the importation of LNG. Similarly, Southern operated as an LNG import terminal from 1978 to 1980, unloading 55 ocean-going LNG vessels until market changes led to the suspension of LNG imports. Southern recommissioned its import terminal and commenced unloading LNG vessels in 2001. Trunkline unloaded 47 LNG vessels between 1982 and 1984 when imports were suspended. We authorized Trunkline to resume LNG imports in 1989. In *Algonquin LNG,* we authorized the construction of a liquefaction plant, but there was no proposal to commence operating an LNG import terminal.

65. The facts presented in the four cases cited by KeySpan are not present here. KeySpan was initially reviewed and authorized to operate as an LNG storage facility. It is now proposing to construct facilities and operate as an LNG import terminal. Under our policy announced here, we will not authorize a new LNG import terminal that does not meet current federal safety standards because of our belief that new import terminals should meet the full array of safety requirements.

66. Notwithstanding the fact that KeySpan is currently operating a seasonal peak-shaving facility at the site, we view KeySpan's proposal in this proceeding as a request to construct and operate instead, for the first time, a new LNG import facility. As such, we find that the entire facility should meet current federal safety standards.

**4. Security**

67. In addition to the analysis of the on-shore facilities related to the import proposal, the final EIS, in conjunction with the Coast Guard, Marine Safety Office and Providence, also addresses issues related to the safety and security of LNG vessel transit through Narragansett Bay, as well as cargo unloading operations. To help gauge local concern with the safety and security of LNG shipments to Rhode Island, the Coast Guard Captain of the Port initiated a series of security workshops beginning in November 2004 with federal, state, and local law enforcement agencies and port stakeholders. The workshops developed a "*Vessel Transit Security Plan*" to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities to implement prevention and mitigation strategies necessary for LNG operations. The Coast Guard also identified the additional resources, both public and/or private, needed to implement the security measures, which are not currently available in the Captain of the Port of Providence's area of responsibility.

68. On May 18, 2005, Attorney General Patrick Lynch of Rhode Island, filed a letter, urging that the Commission review a report prepared by Richard Clarke entitled, "*LNG Facilities in Urban Areas*" (Clarke Report).[29] The Clarke Report found that traditional risk management calculations are insufficient to deal with the security risk posed by terrorist groups because the probability of a terrorist attack cannot be effectively measured. Instead, the Clarke Report stated that security risk management methodology should examine five factors: intent, capabilities, vulnerabilities, consequences, and recovery. The Clarke Report concluded that while there is no adequate way to determine the probability of an attack on a proposed urban LNG facility and inland waterway transit, there are adequate grounds to judge that such an attack would be consistent with

[29] The Clarke Report is available at www.riag.ri.gov.

terrorists' demonstrated intent and capability. Further, the report stated that enhanced security measures would not significantly reduce the risk and concluded that there would be a high risk of catastrophic damage. Although the report focused on the KeySpan proposal, it also made a general finding that siting the LNG facility in a non-urban setting would reduce the incentive for a terrorist attack.

69. Section 1 of the Clarke Report, on background and threat analysis, reviewed a wide selection of articles published in journals, newspapers, and books to support its assumption that the intent of the terrorist network is to kill large numbers of Americans; disrupt the country's economy and infrastructure; and damage oil and gas infrastructure. The report stated that reasons for a terrorist attack on an LNG tanker or facility include the potential for high civilian casualties and substantial damage to the American economy. As LNG imports become a more important sector of the economy, the report posited that terrorist organizations will be more interested in attacking them.

70. The concerns expressed in Section 1 of the Clarke report are not unique to LNG, but could equally apply to many other liquid or gaseous fuels and chemicals. Specific evidence of LNG threats is not identified in the report. Indeed, a Department of Homeland Security document, *National Planning Scenarios*, referenced on page 26 of the Clarke Report, presents a number of high-casualty scenarios for attacks on other industry sectors. Regardless of what terrorist intent can be deduced from news articles and publications, the Coast Guard's security workshops referenced above considered a terrorist attack and devised methods to protect the LNG vessel from credible scenarios. There also is no support for the conclusion that terrorist organizations will be more interested in attacking LNG terminals as LNG imports become a more important sector of the economy. In fact, additional terminals and LNG vessels would provide redundancy in case a ship or terminal were out of service and thereby lessen the potential economic impact.

71. Section 2 of the Clarke Report examined seven attack scenarios on an LNG tanker in Narragansett Bay: aircraft, stand-off weapons, mortars, shaped charges, small boat, divers, and mines. The report identified and classified eight sectors along the 29-mile route to the KeySpan facility as medium risk, high risk, and extremely high risk and evaluated the sectors with respect to vulnerability to potential threats. The report found that an LNG carrier transiting the Narragansett Bay is susceptible to a number of potential terrorist threats, with the most probable/most effective to be a small boat attack, a medium rocket attack, and a small rocket attack. LNG cargo tank hole sizes for those identified threats have a nominally expected size of five square meters, but ranged from two to twelve square meters. The report also found that a pool fire is the most likely scenario to cause major deaths.

72. The Coast Guard's security workshops considered a similar range of credible attack scenarios, including the types of attacks in Section 2 of the Clarke Report. For each credible scenario, the Coast Guard developed procedures with port stakeholders and law enforcement officials to provide suitable afloat, underwater, landside, and aviation security or surveillance capabilities. The Coast Guard workshop led to the development of the *Vessel Transit Security Plan*. The details of this plan are classified as Security Sensitive Information, but the general measures were identified in the EIS. The finding in the Clarke Report that the likely enhanced security measures would not significantly reduce the high risk of catastrophic damage was made without the benefit of the Coast Guard workshops and the *Vessel Transit Security Plan*.

73. Section 3 of the Clarke Report, on consequence management, addressed the potential injuries, fatalities, and damage to infrastructure in sector 8 that could result from an attack scenario.[30] The Clarke Report stated that it considered the flammable vapor and thermal radiation hazards created by an intentional breach of two cargo tanks each with a five-meter diameter hole and a third tank breached by cascading damage, consistent with the vulnerabilities outlined in Section 2. However, a three tank breach, as described in the preceding sentence, is not consistent with the vulnerabilities outlined in Section 2 of the report. The credible threat scenarios identified there would likely result in a single cargo tank breach. Thus, the thermal hazard zones presented in Section 3 of the report are overstated, reflecting the consequence of the five square meter, three-tank breach from the Sandia Report.

74. We believe that many of the attack scenarios presented in Section 2 of the report would likely yield damages on the low end of the scale and even those judged most probable/most effective would have fewer consequences than projected in Section 3. In fact, the Sandia Report found that in most cases intentional breaching scenarios would not result in a hole of more than five to seven square meters, which is a more appropriate range for calculating potential hazards from spills. Nevertheless, the Clarke Report leaves the impression that any successful attack will yield a worst case consequence scenario.

75. The final EIS evaluated the 29-mile long LNG vessel route for areas of development within the transient thermal hazard area for the nominal five to seven square meter intentional breach scenarios. We believe these are more realistic than the worst case scenario examined for sector 8 in the Clarke Report. However, it must be recognized that they represent a low probability, high consequence event for a successful worst case terrorist attack.

---

[30] Sector 8 includes the proposed KeySpan terminal and the final mile of the LNG vessel transit.

76. We received comments from Kenneth Berwick, who is in favor of storing LNG in Providence, but not at above-ground sites such as the existing KeySpan facility. Rather, Mr. Berwick contends that LNG, heating oil, and gasoline could be stored within the "vast system of tunnels and storage rooms" that the Narragansett Bay Commission is currently building in the Providence area. According to Mr. Berwick, this could eliminate most, if not all, of the present above-ground storage of these materials in the Providence area, improving safety as well as freeing up land for more beneficial use.

77. Due to its cryogenic nature, LNG cannot be safely stored in this underground tunnel system. Previous attempts to store LNG underground in rock caverns have failed. The rock and earth surrounding the tunnels normally exist at temperatures that are over 300° F warmer than LNG and the thermal conduction of these temperatures would cause the LNG to vaporize rapidly. Thus, we conclude that Mr. Berwick's suggestion is not feasible.

### C. <u>Protests</u>

78. On May 28, 2004, the City of East Providence, Rhode Island filed a pleading that it styled as a complaint under Rule 206 of the regulations. In its pleading, East Providence contends that there are "certain insufficiencies" in KeySpan's application and that the application should be held in abeyance and supplemented. Specifically, East Providence asserts that KeySpan failed to describe the upgrades that KeySpan will make to the existing storage tank, that KeySpan failed to definitively state that the storage tank and dike containment system will comply with all current codes and regulations, that Algonquin failed to file an application to construct and operate facilities to connect KeySpan's terminal to Algonquin's system, and that KeySpan failed to address the land use and socioeconomic impacts of its proposals on East Providence's Waterfront Special Development District Plan.

79. Rule 206(a) provides that any person may file a complain against any other person "alleged to be in contravention or violation of any statute, rule, or order, or other law administered by the Commission, or for any other alleged wrong over which the Commission may have jurisdiction." Here, East Providence contends that KeySpan failed to include certain information in its application and Algonquin failed to file its application at the same time as KeySpan. East Providence, however, does not allege any "contravention or violation of any statute, rule, order, or other law." Thus, we believe that East Providence's concerns about KeySpan's application do not rise to the level of a complaint as contemplated by Rule 206(a). Consequently, we will address East Providence's concerns as a protest to KeySpan's application.

80. Briefly, in its May 28 pleading, East Providence asserts that KeySpan's application was insufficient because it failed to include information that East Providence deemed essential to a decision in this case. In light of our decision in this proceeding, we believe that the issues raised by East Providence are moot. Thus, we will dismiss East Providence's protest.

81. Project Technical Liaison Associates, Inc. (PTL), a technical advisor to LNG facility owners and to suppliers of LNG and natural gas derived from LNG, protested KeySpan's application. In its protest, however, PTL failed to set forth any reason for its protest. Thus, we will deny PTL's protest.

### D. Evidentiary Hearing

82. Providence, East Providence, and the State of Rhode Island request an evidentiary hearing on safety issues relating to the storage tank; techniques and effectiveness of consequence modeling; safety, security, and emergency response plans; the proposals' impact on Providence's and East Providence's community development plans and policies; safety and security costs; the impact of the Coast Guard's security zones on users of Narragansett Bay; and the indirect costs and secondary impacts on tourism. In the alternative, if the request for an evidentiary hearing is denied, Providence, East Providence, and the State of Rhode Island request that this case be remanded to the Rhode Island State Planning Program, i.e., the State Point of Contact, for an evidentiary hearing with KeySpan's participation required by order. They also request that BGLS be required to submit data so that the Commission can extend its cumulative impact analysis along the 29-mile LNG marine delivery route.

83. We have substantial discretion in deciding whether to hold a trial-type evidentiary hearing or to give interested parties an opportunity to participate through evidentiary submissions in written form. An evidentiary trial-type hearing is necessary only when there are material issues of fact in dispute that cannot be resolved on the basis of the written record.[31] Here, Providence, East Providence, and the State of Rhode Island have not raised a material issue of fact that cannot be resolved on the basis of the written record. The written evidentiary record provides a sufficient basis for resolving the issues relevant to this proceeding. We have satisfied the hearing requirement by giving interested parties an opportunity to participate through evidentiary submissions in written

---

[31] *See, e.g., Southern Union Gas Co. v. FERC*, 840 F.2d 964, 970 (D.C. Cir. 1988); *Cerro Wire & Cable Co. v. FERC*, 677 F.2d 124 (D.C. Cir. 1982); *Citizens for Allegan County v. FPC*, 414 F.2d 1125, 1128 (D.C. Cir. 1969).

form.[32] Thus, we will deny the requests for an evidentiary hearing. Moreover, because of our decision herein, we will deny the requests to refer this proceeding to the Rhode Island State Planning Program and to require BGLS to submit additional data.

## VI. Discussion of Algonquin's Application

84. Algonquin proposes to construct and operate pipeline facilities to connect KeySpan's LNG terminal to Algonquin's interstate pipeline facilities. Since we are denying KeySpan authority to site, construct, and operate an LNG terminal, we will dismiss Algonquin's proposals. Also, we will not address the comments and protests filed in response to Algonquin's application.

85. At a hearing held on June 30, 2005, the Commission on its own motion received and made a part of the record in this proceeding all evidence, including the application and exhibits thereto, submitted in support of the authorizations sought herein, and upon consideration of the record,

The Commission orders:

(A) KeySpan's request to site, construct, and operate an LNG terminal under section 3 of the Natural Gas Act is denied.

(B) Algonquin's request to construct and operate pipeline facilities to connect KeySpan's LNG terminal to Algonquin's system is dismissed.

(C) The untimely motions to intervene in Dockets Nos. CP04-223-000, CP04-293-000, and CP04-358-000 are granted.

(D) Providence's, East Providence's and the State of Rhode Island's request for an evidentiary hearing is denied.

By the Commission.

( S E A L )

Magalie R. Salas
Secretary

---

[32] *Moreau v. FERC*, 982 F.2d 556, 568 (D.C. Cir. 1993).

**Appendix A**

Motions to Intervene in Docket Nos. CP04-223-000 and CP04-293-000

Algonquin Gas Transmission Company
Attorney General of Rhode Island
BP Energy Company
BG LNG Services, LLC
Calpine Corporation
Carcieri, Donald L., Governor of Rhode Island, and the Rhode Island Department of Environmental Management (joint motion)
Cheniere LNG, Inc.
City of East Providence, Rhode Island
City of Norwich, Connecticut, Department of Public Utilities and the Town of Middleborough, Massachusetts, Municipal Gas and Electric Department (joint motion)
City of Providence, Rhode Island
Conoco Phillips Company
Conservation Law Foundation
Consolidated Edison Company of New York, Inc.
Distrigas of Massachusetts LLC
ExxonMobile Gas & Power Marketing Company, a Division of Exxon Mobile Corporation
Freeport LNG Development, L.P.
KeySpan Delivery Companies
Marathon Oil Company
Motiva Enterprises LLC
New England Gas Company
New England Local Distribution Companies
Philadelphia Gas Works
Project Technical Liaison Associate, Inc.
Rhode Island Chapter of the Sierra Club
Rhode Island Division of Public Utilities and Carriers
Save the Bay
Southern LNG Inc.
Tennessee Gas Pipeline Company
Weaver's Cove Energy, LLC

**Appendix B**

Motions to Intervene in Docket No. CP04-358-000

BG LNG Services, LLC
BP Energy Company
Calpine Corporation
City of East Providence, Rhode Island
Conservation Law Foundation
Consolidated Edison Company of New York, Inc. and Orange and Rockland Utilities, Inc. (joint motion)
Distrigas of Massachusetts LLC
Hess LNG LLC
KeySpan Delivery Companies
Marathon LNG Marketing, LLC
Motiva Enterprises LLC
New England Local Distribution Companies[33]
Northeast Energy Associates
Shell NA LNG LLC
U.S. Generating New England, Inc.
Virginia Power Energy Marketing, Inc.
Weaver's Cove Energy, LLC and Mill River Pipeline, LLC (joint motion)

---

[33] The New England Local Distribution Companies consist of Bay State Gas Company; Connecticut Natural Gas Corporation; Northern Utilities, Inc.; City of Norwich, Department of Public Utilities; NSTAR Gas Company; The Southern Connecticut Gas Company; and Yankee Gas Services Company.